# 22-1790

## United States Court of Appeals

### for the

### Second Circuit

◆◖◗◆

KATHY KINNIN,

*Plaintiff-Appellant,*

– v. –

SKIDMORE COLLEGE,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
## FOR DEFENDANT-APPELLEE
## VOLUME I OF V

BOND, SCHOENECK & KING, PLLC
*Attorneys for Defendant-Respondent*
268 Broadway, Suite 104
Saratoga Springs, NY 12866

## SUPPLEMENTAL APPENDIX TABLE OF CONTENTS

## VOLUME I of V

Table of Contents ....................................................................................... SUPA-i

Full Deposition Transcript of Kathy Kinnin,
   dated July 27, 2020 ................................................................. SUPA-0001

Full Deposition Transcript of Diane Pfadenhauer,
   dated August 12, 2020 ............................................................ SUPA-0087

Full Deposition Transcript of Beth Dupont,
   dated July 29, 2020 ................................................................. SUPA-0211

## VOLUME II of V

Excerpts of Deposition Transcript of Thomas Marcotte,
   dated July 30, 2020, pgs. 14-15, 19-20, 95-96 ......................... SUPA-0274

Excerpts of Deposition Transcript of William Duffy,
   dated July 31, 2020, pgs. 24-25, 36-37, 43-44, 54, 103 ............. SUPA-0281

Excerpts of Deposition Transcript of Gretchen Steffan,
   dated July 28, 2020, pgs. 74-75 ............................................... SUPA-0290

Excerpts of Deposition Transcript of Barbara Beck,
   dated September 21, 2020, pg. 7 ............................................... SUPA-0293

Excerpts of Deposition Transcript of Philip Glotzbach,
   dated July 31, 2020, pgs. 12 .................................................... SUPA-0295

Excerpts of Deposition Transcript of Christopher Breslin,
   dated July 29, 2020, pgs. 10-11 ............................................... SUPA-0297

Full Deposition Transcript of Amy B. Diehl, Ph.D.,
   dated January 22, 2021 ............................................................ SUPA-0300

## VOLUME III of V

Index of Audiotapes Recordings ..................................................... SUPA-0526

Full Transcript of Recording, Bb 10-7,
   Kathy Kinnin and Barbara Beck.............................................. SUPA-0575

Full Transcript of Recording, Alena 6-26-17,
   Kathy Kinnin and Alena Myers................................................ SUPA-0632

Full Transcript of Recording, Alena 7-17-17,
Kathy Kinnin and Alena Llorens-Myers ..................................................... SUPA-0710

Full Transcript of Recording, HR 9-27-17,
Kathy Kinnin, Saytra Green and Gretchen Steffan .................................... SUPA-0719

**VOLUME IV of V**

Full Transcript of Recording, Gretchen 10-27-17,
Kathy Kinnin and Gretchen Steffan ........................................................... SUPA-0781

Excerpts of Transcript of Recording, Phil 2-8-18,
Kathy Kinnin and Phil Glotzbach, pgs. 8-9, 12-14, 24 ............................... SUPA-0866

Excerpts of Transcript of Recording, Phil 4-3-18,
Kathy Kinnin and Phil Glotzbach, pgs. 2-4.................................................. SUPA-0873

Excerpts of Transcript of Recording, Barbara 4-25-18,
Kathy Kinnin and Barbara Beck, pgs. 32-33................................................ SUPA-0877

Email from Tom Marcotte to Committee Members,
PLF011-14 .................................................................................................... SUPA-0880

Emails from Kathy Kinnin to William Duffy,
PLF022-24 .................................................................................................... SUPA-0884

Emails from Kathy Kinnin to William Duffy,
PLF028-37 .................................................................................................... SUPA-0887

Emails from Kathy Kinnin to William Duffy,
PLF038-51 .................................................................................................... SUPA-0897

Emails among Kathy Kinnin, Barbara Beck and Herbert Crossman,
PLF056-63 .................................................................................................... SUPA-0911

Emails from Kathy Kinnin to William Duffy,
PLF064-65 .................................................................................................... SUPA-0919

Emails between Kathy Kinnin and Barbara Beck,
PLF067 ......................................................................................................... SUPA-0921

Email from Michael West to Kathy Kinnin,
PLF072 ......................................................................................................... SUPA-0922

Emails between Kathy Kinnin and Barbara Beck,
PLF080-82..................................................................................................... SUPA-0923

**VOLUME V of V**

Emails among Diane Pfadenhauer, Kathy Kinnin and Gretchen Steffan,
PLF167-69 ................................................................................... SUPA-0926

Emails from Kathy Kinnin, Alena Llorens-Myers, Barbara Beck, and
Saytra Green, PLF205-08 ............................................................ SUPA-0929

Emails from Kathy Kinnin, Alena Llorens-Myers, Barbara Beck, and
Saytra Green, PLF209 ................................................................. SUPA-0933

Email from Kathy Kinnin to William Duffy,
PLF210-11 ................................................................................... SUPA-0934

Emails among Kathy Kinnin, Alena Llorens-Myers, Barbara Beck, and
Saytra Green, PLF215-19 ............................................................ SUPA-0936

Email between William Duffy and Kathy Kinnin,
PLF227-31 ................................................................................... SUPA-0941

Email from Kathy Kinnin to William Duffy,
PLF242-43 ................................................................................... SUPA-0946

Document provided by Kathy Kinnin, Part 2 of Formal Harassment
Complaint, PLF551-62 ................................................................ SUPA-0948

Emails between Leon Briggs and Gretchen Steffan and Complaint,
S000321-23, S000487-92 ........................................................... SUPA-0960

Letter to Kathy Kinnin from EEOC, dated April 24, 2019,
S000345 ....................................................................................... SUPA-0969

Documents from Kathy Kinnin,
S000535-616, S03050-55 ............................................................ SUPA-0970

Emails between William Duffy and Kathy Kinnin,
S001272-73 .................................................................................. SUPA-1058

Emails between Kathy Kinnin and Barbara Beck,
S001287-89 .................................................................................. SUPA-1060

Email between Kathy Kinnin and William Duffy,
S001416-17 .................................................................................. SUPA-1063

Email between Kathy Kinnin, Tom Marcotte and William Duffy,
S001418-21 .................................................................................. SUPA-1065

**CERTIFIED COPY**

1   UNITED STATES DISTRICT COURT
2   NORTHERN DISTRICT OF NEW YORK
_____

3   KATHY KINNIN,

4                        Plaintiff,

5           v.

6
SKIDMORE COLLEGE,

7                        Defendant.

8
9   Civil Action No.  1:19-cv-629
_____

10
11
12
13   EXAMINATION BEFORE TRIAL of PLAINTIFF KATHY KINNIN
14            _____
                JULY 27, 2020
15            _____
16
17
18
19
20
21
22
23
24   Christine Greenaway, RPR, Notary Public
     465356

**BARKLEY**
*Court Reporters*
barkley.com

SINCE
1972

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco    (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez         (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills   (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn         (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris         00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

SUPA-0001

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KATHY KINNIN,

Plaintiff,

v.

SKIDMORE COLLEGE,

Defendant.

Civil Action No. 1:19-cv-629
_____


_____

JULY 27, 2020
_____


EXAMINATION BEFORE TRIAL of PLAINTIFF KATHY KINNIN,

taken pursuant to Notice of Examination at the law

offices of Bond, Schoeneck & King, PLLC, 268 Broadway,

Suite 104, Saratoga Springs, New York, beginning at

9:40 a.m., on the above date, before Christine

Greenaway, Registered Professional Reporter and Notary

Public for the State of New York.




Job No. 465356

BARKLEY
Court Reporters

```
1                    (KATHY KINNIN)

2

3     APPEARANCES:

4

5

6            COOPER ERVING & SAVAGE LLP

7            BY:  PHILLIP G. STECK, ESQ.

8                 39 North Pearl Street

9                 Albany, NY  12207-2797

10                518.449.3900

11                PSteck@coopererving.com

12

13                Counsel for Plaintiff

14

15

16           BOND SCHOENECK & KING

17           BY:  MICHAEL D. BILLOK, ESQ.

18                268 Broadway, Suite 104

19                Saratoga Springs, NY  12866-4281

20                518.533.3236

21                MBillok@bsk.com

22

23                Counsel for Defendant

24

25
```

KATHY KINNIN

1          (KATHY KINNIN)

2       S T I P U L A T I O N S

3

4     IT IS HEREBY STIPULATED AND AGREED by and between

5  the parties hereto that all rights provided by the

6  Federal Rules of Civil Procedure, including the right

7  to object to any question, except as to the form

8  thereof, are reserved; and, in addition, the failure

9  to object to any question or motion to strike

10 testimony at this examination shall not be a bar or

11 waiver to make such motion at, and is reserved for,

12 the trial of this action;

13

14     IT IS FURTHER STIPULATED AND AGREED that this

15 examination may be sworn to by the witness being

16 examined before a Notary Public other than the Notary

17 Public before whom this examination was begun;

18

19     IT IS FURTHER STIPULATED AND AGREED that the

20 filing and certification of the original of this

21 examination are waived.

22

23

24

25

KATHY KINNIN

BARKLEY
Court Reporters

1               (KATHY KINNIN)

2                  I N D E X

3
     WITNESS                              PAGE
4

5    KATHY KINNIN

6         BY:  MICHAEL D. BILLOK, ESQ.          7
                                                77
7

8    DOCUMENT PRODUCTION REQUEST

9         BY:  Phillip G. Steck, Esq.          56

10
     ERRATA SHEET                           81/82
11

12   EXHIBIT LIST                              5

13
     REPORTER'S CERTIFICATE                   79
14

15   TRANSCRIPT ORDER                          6

16
     WITNESS CERTIFICATE OF OATH              80
17

18

19

20

21

22

23

24

25

KATHY KINNIN

BARKLEY
Court Reporters

1                (KATHY KINNIN)

2            E X H I B I T S

3

   NUMBER/IDENTIFICATION                       PAGE

4

5   DEFENDANTS

6

   Exhibit 1.................................   15

7   Plaintiff Kathy Kinnin's Initial Disclosures

8

   Exhibit 2.................................   22

9   Documents labeled Plaintiff 1 to
   Plaintiff 562

10

11   Exhibit 3.................................   44
    Interrogatories

12

13   Exhibit 4.................................   47
    Complaint in Kinnin v Skidmore College

14

15   Exhibit 5.................................   58
    E-mail from Kathy Kinnin to Bill Duffy

16   on June 27, 2017

17

    Exhibit 6.................................   60

18   E-mail from Kathy Kinnin to Bill Duffy on
    July 6, 2017

19

20   Exhibit 7.................................   61
    E-mail from Bill Duffy to Kathy Kinnin

21

22

23   (Exhibits retained by Mr. Billok.)

24

25

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2               P R O C E E D I N G S
 3               (Whereupon, Madame court reporter
 4          administered the oath.)
 5               MS. KINNIN:  I do.
 6               (Whereupon, Madame court reporter
 7          confirmed usual stipulations.)
 8               MR. BILLOK:  Yes.
 9               MR. STECK:  Are we using the state
10          method or the federal method for paying
11          for the transcript?
12               (Whereupon, a discussion was held
13          off the stenographic record.)
14               MR. STECK:  We're not waiving her
15          right to review and sign the transcript,
16          nor I assume for any of your witnesses?
17               MR. BILLOK:  That is correct.
18               (Transcript order.)
19               MR. STECK:  Okay.  The other
20          question is who pays for the copy?
21               Because under state procedure if it
22          is your deposition, you pay for the
23          whole thing and you give me a copy.  But
24          under federal procedures, according to
25          federal -- I didn't know about this
```

SUPA-0007

BARKLEY
Court Reporters

```
1                    (KATHY KINNIN)

2          until several years ago.

3               MR. BILLOK:  Okay.

4               MR. STECK:  But under the federal

5          rules, you pay for your copy and I pay

6          for my copy.  And that would be true of

7          all witnesses.

8               MR. BILLOK:  I'm fine with whatever

9          you are comfortable with.  I am fine

10         with the state rules where we just pay

11         and provide you -- we will pay for your

12         copy for this.

13              MR. STECK:  All right.  Then we

14         will do it that way for all witnesses.

15         Just so we're clear.

16                    -  -  -

17   EXAMINATION BY MR. BILLOK:

18        Q.  Well, good morning.  So my name is Michael

19   Billok.  I'm an attorney representing Skidmore

20   College.

21         I probably should have covered this off the

22   record but just to let you know these two bottles are

23   hand sanitizer and I've got some tissues there if you

24   want to use a tissue to grab the bottle if you need

25   it, so you don't have to touch the bottle yourself.
```

SUPA-0008

BARKLEY
Court Reporters

```
 1                      (KATHY KINNIN)
 2           Do you understand that you've just sworn an
 3      oath to tell the truth in this proceeding?
 4           A.   I do.
 5           Q.   Okay.  And I will say that you can both nod
 6      and say yes like you just did, but a nod itself
 7      wouldn't suffice because then the --
 8           A.   Right.
 9           Q.   -- court reporter won't be able to take that
10      down.
11           Have you ever sued anyone before?
12           A.   No.
13           Q.   Have you ever been sued before?
14           A.   No.
15           Q.   Okay.  So today I will be asking you
16      questions for you to answer to the best of your
17      ability and then the question and answer will be
18      written down by the court reporter.
19           Do you understand?
20           A.   I do.
21           Q.   Okay.  When you answer, will you do your
22      best to answer loud enough so that we can hear your
23      answer?
24           A.   Absolutely.
25           Q.   Okay.  If you don't hear or understand a
```

                          (KATHY KINNIN)

 1
 2   question, especially with our wearing masks, can you
 3   ask me to repeat it?
 4        A.   Yes.
 5        Q.   Okay.  Are you currently on any drugs or
 6   medication that might interfere with your ability to
 7   answer a question?
 8        A.   No.
 9        Q.   Have you had any alcohol within the past
10   12 hours?
11        A.   No.
12        Q.   Okay.  Is there anything else that you're
13   aware of that would keep you from giving full,
14   complete and accurate answers to the questions here
15   today?
16        A.   No.
17        Q.   Can you think of any reason why your
18   testimony at trial would be different than your
19   testimony today?
20        A.   No.
21        Q.   Do you understand everything I've asked so
22   far?
23        A.   Yes.
24        Q.   If you need to take a break for any reason,
25   you may.  I just ask that you don't take a break while

KATHY KINNIN

BARKLEY
Court Reporters

```
1                    (KATHY KINNIN)
2   a question is pending.
3          Do you understand?
4      A.   Well, you've asked the question and I have
5   not answered; is that what you mean?
6      Q.   That is correct.
7      A.   Yeah, okay.  That makes sense.
8      Q.   And we'll keep an eye on the clock so we can
9   take a break sometime around 11:00 if everyone needs
10  to move their cars.  You don't, but others may.
11         Do you have any questions before we begin?
12     A.   No.
13     Q.   What, if anything, have you done to help
14  yourself remember what we're going to be testifying
15  about today -- or what you are going to be testifying
16  about today?
17     A.   Umm, I read my affidavit and, you know, I've
18  spoken to my lawyer.
19     Q.   Okay.  And anything else besides that?
20         And I don't want you to, at any time, to
21  state anything that you have told your lawyer or that
22  he has told you.
23         Do you understand?
24     A.   Uh-huh.
25     Q.   And by "uh-huh," you mean "yes"?
```

SUPA-0011

KATHY KINNIN



1                    (KATHY KINNIN)

2        A.   Yes.  Yes.  I'm sorry.

3        Q.   So besides from talking with Mr. Steck and

4    reading your affidavit, have you done anything else?

5        A.   No.

6        Q.   Have you ever been deposed before?

7        A.   No.

8        Q.   Have you ever given any testimony before in

9    any proceeding?

10       A.   No.

11       Q.   Okay.  Where do you currently live?

12       A.   Ganesvoort.

13       Q.   How long have you lived there?

14       A.   Nine years.

15       Q.   Okay.  Can you tell me your educational

16   background?

17       A.   I have a Bachelor's from the College of

18   St. Rose in communications.

19       Q.   And when did you get that degree?

20       A.   2010.

21       Q.   Okay.  And what was your first job after

22   getting that degree?

23       A.   I completed the degree while I was working

24   at Skidmore.

25       Q.   What was the job that you had before you

SUPA-0012

BARKLEY
Court Reporters

```
 1                      (KATHY KINNIN)

 2   started at Skidmore?

 3        A.   The College of St. Rose, the Mac tech,

 4   Macintosh Technician/Apple computer technician.

 5        Q.   How long were you at St. Rose?

 6        A.   Four years?

 7        Q.   Before then did you have a technology job or

 8   a different --

 9        A.   Yes.

10        Q.   -- type of job?  What was the job you had

11   before St. Rose?

12        A.   Capital Computers in Latham.  It was an

13   Apple store.

14        Q.   How long did you work at Capital Computers?

15        A.   I believe around ten years.

16        Q.   Okay.  Since leaving Skidmore, have you had

17   any employment?

18        A.   I started my own business because I could

19   not find a job.  Umm, so I've had a client.

20        Q.   Okay.  Have you had any full-time employment

21   since leaving Skidmore?

22        A.   No.

23        Q.   Have you had any part-time employment since

24   leaving Skidmore?

25        A.   Just my business.
```

KATHY KINNIN

BARKLEY
Court Reporters

1                   (KATHY KINNIN)

2      Q.   The independent business?

3      A.   Yes, the independent business.

4      Q.   Okay.  How did you come to work at Skidmore?

5      A.   A technology group meeting -- higher -- high

6 ed group meeting.  Umm, Tom Marcotte was at the

7 meeting and he said that he anticipated an opening;

8 that I appeared to know what I was doing with Apple

9 and he anticipated an opening at Skidmore, and to get

10 in touch with him and keep in touch with him.

11      Q.   Can you tell me a little bit more about this

12 technology group and who would the members be that

13 would attend meetings?

14      A.   Sure.  It was all people who were directors

15 of user services; people who maintain the computers.

16           And it was from the high ed colleges in the

17 area:  Sage, Siena, St. Rose, Skidmore obviously, and

18 SUNY.  Some of those.  Albany Law.  Some of those

19 colleges and all the people around that, umm, the

20 area.

21      Q.   How often did the group meet?

22      A.   I would say maybe quarterly.  Years ago it

23 was more frequently and they had it at different

24 colleges.  But at the end, the last few years, St. Rose

25 has hosted them all,

KATHY KINNIN

BARKLEY
Court Reporters

1                      (KATHY KINNIN)

2       Q.   And you said that Tom Marcotte let you know

3  about an opening at Skidmore that -- or can you tell

4  me more about what he told you?

5       A.   He said, 'You seem to know what you're doing

6  with Apple computers.  Umm, I have somebody who will

7  be retiring, if you're interested.'

8       Q.   Did you give your resumé to him or did you

9  apply to the college directly?

10      A.   It was about a year later that the opening

11 happened and I applied directly.

12      Q.   And do you remember who was responsible for

13 hiring you?

14      A.   Tom was on the hiring committee of about

15 eight people on the committee.  He seemed to be the

16 one directing the committee.

17      Q.   Okay.  So to your knowledge did he support

18 your hiring in that position at Skidmore?

19      A.   Yes, uh-huh.

20      Q.   What were your job duties at Skidmore?

21      A.   As a technician to fix the Apple computers;

22 umm, customer service.

23           And then after four years, Tom was promoted

24 and I applied for and was awarded the Director of User

25 Services position.  So I was in charge of the help

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                     (KATHY KINNIN)
 2    desk and the employees who maintain the Apple and PC
 3    computers.
 4         Q.   So that was in 2014 when that occurred?
 5         A.   Yes.
 6         Q.   Okay.  And when you got that promotion, to
 7    your knowledge did Tom Marcotte support your promotion
 8    to Director of User Services?
 9         A.   Yes.
10         Q.   Okay.
11              MR. BILLOK:  Mark these as Exhibit
12         A.   Actually, mark it as Exhibit 1.
13              (Defendant's Exhibit 1 marked for
14              identification.)
15    BY MR. BILLOK:
16         Q.   I've handed you what has just been marked as
17    Defendant's Exhibit 1.  The title on the page is
18    Plaintiff Kathy Kinnin's Initial Disclosures.
19         A.   Uh-huh.
20         Q.   Have you seen this document before?
21         A.   Yes.  I mean it's documents that I have
22    provided, so yes.
23         Q.   Okay.
24         A.   The document as is, this grid does not look
25    familiar to me, but...
```

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                      (KATHY KINNIN)

 2        Q.   And by "this grid," you mean the grid

 3   starting on Page 1?

 4        A.   Page 1, yeah.  But I think all of the

 5   people.  So it may have been an Excel spreadsheet.

 6   This doesn't look familiar in this printed form.

 7        Q.   On the fifth page of the documents, past

 8   what's labelled as Page 4, there's a page that says

 9   Exhibit A --

10        A.   Okay.

11        Q.   -- and following that is a chart --

12        A.   Yes.

13        Q.   -- that goes from Pages 1 through 49.

14             Do you see that?

15        A.   Yes.

16        Q.   Have you seen this chart in Exhibit A

17   before?

18        A.   It's a chart that I created.

19        Q.   Okay.  When did you create this chart?

20        A.   After I was fired.

21        Q.   So did you ever take notes or transcribe

22   some of the recordings before you were fired?

23        A.   Not from the recordings.

24        Q.   Okay.

25        A.   Some of these have notes that I took during
```

SUPA-0017

KATHY KINNIN



```
 1                    (KATHY KINNIN)
 2   the meeting, and it was recorded.
 3       Q.   Okay.  When did you start working on this
 4   chart?
 5       A.   After I met my lawyer.
 6       Q.   I guess the question is:  You said that some
 7   of the notes in this chart were notes that you took
 8   from the meetings.
 9       A.   No, I'm sorry.  Some of the meetings I have
10   notes that I took during the meetings.  They're not
11   notes on the chart.
12       Q.   Okay, I understand.  So you created this
13   chart after you met your lawyer?
14       A.   Yes.  Yes.
15       Q.   So this chart references 272 recordings
16   that you took while you worked at Skidmore; is that
17   correct?
18       A.   Yes.
19       Q.   How did you take the recordings?
20       A.   On my iPhone.
21       Q.   Okay.  When you made the recordings where
22   would your phone be?
23       A.   On the table as everyone puts their phone on
24   the table.
25       Q.   Would the phone be face up or face down?
```

SUPA-0018

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2        A.    Generally face down so that any pop ups or
 3   texts or whatever wouldn't distract whoever.
 4        Q.    To your knowledge was anyone aware that you
 5   were making recordings of your conversations with
 6   them?
 7        A.    No.
 8        Q.    Okay.  Did you inform anybody that you were
 9   recording your conversations with them?
10        A.    Nope.
11        Q.    Why not?
12        A.    No one asked and --
13              MR. STECK:  I object to the
14              question.  It calls for a legal
15              conclusion.
16              But you can answer.
17              THE WITNESS:  Okay.
18        A.    And I had a sense that something was going
19   on so to protect myself, I started recording meetings.
20   BY MR. BILLOK:
21        Q.    Outside of your employment at Skidmore,
22   do you commonly record conversations with other
23   individuals?
24        A.    No.
25        Q.    Okay.  Is the chart that's Exhibit A with
```

KATHY KINNIN

BARKLEY
Court Reporters

                    (KATHY KINNIN)

1
2  272 recordings --

3      A.  Yes.

4      Q.  -- are those all of the recordings you made

5  during your time at Skidmore --

6      A.  Yes.

7      Q.  -- or were there additional recordings?

8      A.  This is all.

9      Q.  So there were no additional recordings that

10  you made?

11      A.  Correct.

12      Q.  So the earliest recording is in October 2015;

13  correct?

14      A.  That seems like -- it seems about right.  I

15  mean without looking at every page, because these are

16  in alphabetical order, not date order -- but that

17  seems about right.

18      Q.  And I'm looking at page --

19      A.  On Page 2, October 7th, 2015.  Page 2, Line

20  Item 5.

21      Q.  And there's another on Page 4, Line Item 8,

22  from October 5th, 2015?

23      A.  On what page?

24      Q.  Page 4, Line Item -- oh, excuse me, Page 5,

25  Line Item -- I just had it and it slipped through my

KATHY KINNIN

BARKLEY
Court Reporters

1                          (KATHY KINNIN)

2      fingers.  One second.

3               Page 19, Line Item 70, from October 5th,

4      2015.

5           A.   Yes.

6           Q.   Okay.  So you say you started taking

7      recordings because you say you believe something was

8      going on.

9               What did you believe was going on?

10          A.   Well, around 2015, I had gone to Human

11     Resources.  I had gone to Tom Marcotte and Bill Duffy,

12     and then Human Resources about Chris Bailey's behavior

13     towards me.  And these are meetings regarding those

14     discussions.

15              Chris Bailey and/or Tom Marcotte were in the

16     ones you pointed out.  And the one I pointed out was

17     Barbara Beck, the Director of HR.

18          Q.   And you continued to make recordings for the

19     next several years through 2018; correct?

20          A.   Yes.

21          Q.   Okay.  Did you record every conversation you

22     had at Skidmore --

23          A.   No.

24          Q.   -- from October 2015 forward?

25          A.   No.

KATHY KINNIN

1                          (KATHY KINNIN)

2          Q.    How did you decide who to record?

3          A.    The people who were harassing me.

4          Q.    Do you believe that Leon Briggs was

5    harassing you?

6          A.    I believed that he was working with someone

7    to bully, manipulate.  And since he was good friends

8    with Tom Marcotte and Leon's mistakes were so

9    egregious, I felt I had to protect myself.

10         Q.    When you say that you felt he was "working

11   with someone" was that someone Tom Marcotte or some-

12   body else?

13         A.    Yes.  Yes.

14         Q.    So were there particular people that you

15   decided to record every conversation or were there

16   some conversations that you determined not to record?

17   For example, with Leon Briggs.

18         A.    I recorded every meeting I had with them.

19         Q.    Okay.  Do you see any issue with recording

20   hundreds of conversations with your co-workers?

21         A.    No.

22         Q.    Are you recording this deposition?

23         A.    No.

24         Q.    Are you?

25               MR. STECK:  That's a fair question.

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)

 2              THE WITNESS:  Right.  Your phone is

 3         on the table.

 4              MR. BILLOK:  My phone is on the

 5         table and I am not recording this

 6         deposition.

 7              MR. STECK:  I should have asked

 8         you before we started.

 9              MR. BILLOK:  So we'll do these

10         Defendant's Exhibit 2.

11              (Defendant's Exhibit 2 marked for

12         identification.)

13   BY MR. BILLOK:

14        Q.   So I just handed you what has been marked as

15   Defendant's Exhibit 2, which is a stack of documents

16   labeled Plaintiff 1 to Plaintiff 562.

17             Do you see that?

18        A.   Yes.

19        Q.   Have you seen these documents before?  And

20   you can take your time just to familiarize yourself

21   with the stack.

22        A.   (Pause for witness review.)  Yes.

23        Q.   Okay.  I will start at Page 1.  So at the

24   top of the stack.

25        A.   Yep.
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2      Q.   So that is an e-mail from Tom Marcotte to

3  you in 2013; correct?

4      A.   Correct.

5      Q.   Okay.  Does --

6                    MR. STECK:  Maybe we should, when

7            you're referring, to note their number

8            so we don't get them confused, rather

9            than the "top of the stack."

10                    MR. BILLOK:  Correct.  I did say

11            Page 1.  But correct, I will refer to

12            them by number.

13                    MR. STECK:  Okay, great.  Thank

14            you.

15                    MR. BILLOK:  Okay.

16                    THE WITNESS:  May I ask a question?

17            Are these the same Bates numbers?

18                    MR. STECK:  These are numbers that

19            our office, I believe --

20                    THE WITNESS:  Okay.

21                    MR. STECK:  -- put on them.

22                    MR. BILLOK:  That is correct.

23                    THE WITNESS:  Okay.  I was just

24            trying to understand the process.

25                    MR. BILLOK:  Okay.

SUPA-0024

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2   BY MR. BILLOK:
 3        Q.   So again, turning to Plaintiff 1 in
 4   Defendant's Exhibit 2, do you see that page?
 5        A.   Yes.
 6        Q.   Okay.  And does this e-mail from Tom
 7   Marcotte show or evidence discrimination against you?
 8        A.   This particular document, no.
 9             MR. STECK:  I object to the
10             question.  It calls for a legal
11             conclusion.  Move to strike.
12             But you have to answer it.
13   BY MR. BILLOK:
14        Q.   The header at the top of the document says:
15   Tuesday, May 28, 2018, at 3:26:18 p.m. eastern
16   daylight time.
17             Do you see that?
18        A.   Yes.
19        Q.   What is that header?
20        A.   I -- well -- What is the header?  It is the
21   date and time?  Is that what you mean?  I mean, why
22   would it be dated that, you mean?
23        Q.   Well, let me ask you this.  Did you print
24   out these documents?
25        A.   (No response.)
```

KATHY KINNIN

BARKLEY
Court Reporters

1              (KATHY KINNIN)

2      Q.   I will start with Page 1.  Did you print out

3  Page 1?

4      A.   I don't believe I have a printout of this

5  page.

6      Q.   Do you know how the header at the top of

7  Page 1 is created?

8      A.   Yes.

9      Q.   How is it created?

10     A.   It could be from an e-mail, forwarded e-mail.

11     Q.   Okay.  Do you recall printing out Page 1 or

12  any of the pages with similar headers in Defendant's

13  Exhibit 2?

14     A.   No.

15     Q.   If a document was printed from Skidmore,

16  would it have the header similar to the header on

17  Page 1?

18     A.   It could.

19     Q.   If a document was printed from your home

20  computer, would it have a header similar to the header

21  on Page 1?

22     A.   It could -- I mean not my computer.  I don't

23  have that set, but...

24     Q.   Do you recall printing out any documents

25  from Skidmore on your home computer?



1                    (KATHY KINNIN)

2       A.   No.

3       Q.   Do you recall printing out any e-mails from

4  Skidmore, like Page 1, on Skidmore's computers?

5       A.   No.

6       Q.   So is it your testimony that you don't know

7  how the header on Page 1 was created?

8       A.   It could be created by creating a pdf of the

9  document and not printing it.

10      Q.   Do you recall creating pdf's of e-mails?

11      A.   Yes.

12      Q.   Do you have any other explanation for the

13  header other than your creation of a pdf from the

14  e-mail?

15      A.   Somebody else could have created a pdf from

16  this.

17      Q.   Do you know of anyone else creating a pdf --

18  Let me ask you this.

19           Does the header reference the date that the

20  pdf was created?

21      A.   Yes.

22      Q.   So this pdf was created on May 29, 2018?

23      A.   Correct.

24      Q.   Again, without revealing any communications

25  between yourself and Mr. Steck, did you retain

SUPA-0027

KATHY KINNIN



1              (KATHY KINNIN)

2   Mr. Steck before or after your termination?

3        A.    After.

4        Q.    So is the most likely explanation that you

5   created a pdf of this e-mail on May 28th?

6                MR. STECK:  Objection.

7   BY MR. BILLOK:

8        Q.    Excuse me, on May 29th?

9        A.    No.

10                MR. STECK:  You can answer.

11                THE WITNESS:  I can answer, is that

12          what you said?

13                MR. STECK:  Yes.  You can always

14          answer when I object.

15        A.    It says it could have been -- Tom could have

16   created this pdf.

17   BY MR. BILLOK:

18        Q.    So in your Discovery Responses you reference

19   that you had 64,000 -- or excuse me, 46,000 e-mails

20   from Skidmore College; is that correct?

21        A.    Yes.

22        Q.    Where are these e-mails currently?

23        A.    Skidmore has a copy in Microsoft Outlook.

24        Q.    I'm referring to your copy of 46,000

25   e-mails.

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2        A.   Oh.  I have a copy on my computer.
 3        Q.   How did you come to have a copy of the
 4   e-mails on your computer?
 5        A.   I used my personal computer for work for
 6   many years and Outlook is still on my computer.
 7        Q.   So once you left Skidmore, you saved those
 8   e-mails on your computer?
 9        A.   Well, I didn't delete them.  I didn't
10   purposefully save them, but I did not delete them.
11        Q.   Okay.  Are those e-mails on any other
12   location, other than on your computer?
13             For example, the cloud or another database
14   or Yahoo or anything like that?
15        A.   Skidmore would have them.
16        Q.   Okay.  But your copy, do you have any other
17   copies other than on your personal computer?
18        A.   I have copies of the last few months in
19   Gmail.
20        Q.   How did the copies from the last few months
21   come to be on Gmail?
22        A.   I sensed that my employment was at risk so,
23   I had the e-mails forwarded to a Gmail account from a
24   date on -- I don't remember the date.
25        Q.   So every e-mail was automatically forwarded
```

SUPA-0029

KATHY KINNIN



                            (KATHY KINNIN)

1

2    to Gmail?

3         A.   Yes.

4         Q.   And that includes e-mails that you both sent

5    and received?

6         A.   Yes.

7         Q.   Okay.  You said you sensed your job was at

8    risk.  Can you tell me more about what led to that

9    sense?

10        A.   Many years of not -- not getting any

11   reaction from HR to any of my complaints, and then all

12   of a sudden -- well, through the years and peaking at

13   2017, Tom's behavior got worse towards me and Leon in

14   the spring of 2018 started acting even more strange.

15             I not only listen but I watch people, and

16   their body language and what they do and things like

17   that.  And I just observed that something was changing.

18        Q.   You said you didn't quite recall when you

19   started the forwarding of e-mails.

20             Can you provide any estimate, even a year,

21   quarter, as to when that happened?

22        A.   Spring.  Maybe spring of 2018, around the

23   time that I was told to do a formal complaint.

24        Q.   You mentioned that in 2018 Leon Briggs

25   started acting strangely.

```
 1                    (KATHY KINNIN)
 2           What do you mean by he "started acting
 3    strangely"?
 4       A.   The mistakes he was making were so egregious
 5    that it appeared that I was being set up.
 6       Q.   You think that he was making mistakes on
 7    purpose?
 8       A.   Absolutely.
 9       Q.   Why do you think he was making mistakes on
10    purpose?
11       A.   Because we would meet -- I would record it.
12    We would meet and say exactly what he needed to do,
13    and then he would do something different.
14       Q.   Okay.  And why do you think that he was
15    making mistakes on purpose?
16       A.   To make it seem like I was not managing
17    him properly.  That's the only -- I don't know why
18    somebody would do that.
19       Q.   You believe he was conspiring with somebody
20    to make mistakes on purpose?
21       A.   Yes.
22       Q.   And who do you believe he was conspiring
23    with?
24       A.   Tom Marcotte.
25       Q.   Other than your observations and discussions
```

SUPA-0031

KATHY KINNIN



```
1                      (KATHY KINNIN)
2   with Leon Briggs where you believed you told him to do
3   something and he would do the opposite, do you have
4   any other documents or observations, conversations,
5   et cetera, that would lend support to your belief
6   that Leon was purposefully sabotaging his work?
7        A.   Besides the recordings of his meetings?
8        Q.   Correct.
9        A.   No.
10       Q.   Okay.  Did you ever --
11                 MR. STECK:  Can I have a word with
12            my client?
13                 MR. BILLOK:  Sure.
14                 (Whereupon, a recess was taken.)
15  BY MR. BILLOK:
16       Q.   Is there something that you wanted to add to
17  any previous answers?
18       A.   Yes.  I do have documents through discovery
19  that show that Briggs and Marcotte were in discussion
20  about me, and in Marcotte's own e-mails to himself, he
21  talks about maybe I have a problem with men or maybe I
22  have a race issue, but there's nothing to prove it.
23       Q.   Did you ever overhear any conversation
24  between Tom Marcotte and Leon Briggs where Marcotte
25  was instructing Briggs to sabotage his work?
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)
2       A.   No.   When Leon went into Tom's office, they
3  closed the door.
4       Q.   Okay.   But you didn't overhear any such
5  conversations?
6       A.   Correct.
7       Q.   But you believe such conversations took
8  place?
9       A.   Correct.
10      Q.   Did you ever see any document, e-mail, text,
11 et cetera, where Marcotte was instructing Briggs to
12 sabotage his work?
13      A.   There's an e-mail where Marcotte is against
14 using a calendar for documenting and keeping track of
15 work, and that's what Briggs' complaint was about,
16 that I made him keep this calendar.
17           So clearly, to me, it came from Marcotte
18 because Marcotte didn't believe in keeping a calendar.
19      Q.   Okay.   Are you aware of Briggs ever stopping
20 his practice of keeping a calendar as you instructed?
21      A.   Of stopping using it?
22      Q.   Correct.
23      A.   He never started it.
24      Q.   Okay.
25      A.   I mean -- I'm sorry, he sporadically used

SUPA-0033

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2  his calendar.
 3       Q.   Okay.  And you believe that Tom was under-
 4  mining you and undermining your instruction in saying
 5  that the calendar was not necessary?
 6       A.   Absolutely, I thought that he was under-
 7  mining.
 8       Q.   You mentioned that you believe that
 9  Marcotte's behavior -- I believe your word was
10  "peaked" in 2017?
11       A.   Uh-huh.
12       Q.   What did you mean by that?
13       A.   In 2015, he fully supported Chris Bailey,
14  who had severe problems with me.  But then the
15  behavior of Tom was not bad until around the spring of
16  2017.  Maybe a little bit before that.
17       Q.   Okay.  And how did it become worse?  And by
18  "it," I mean Tom Marcotte's behavior.
19       A.   Yes.  For example, he was leading Media
20  Services and Media Services worked closely with my
21  group, User Services, and there was communication
22  issues.  And so Tom requested that any issues with
23  Media Services go through him.  And I asked the same
24  in reverse and he said, "No, we'll just let them
25  communicate how they want to communicate."
```

KATHY KINNIN

BARKLEY
Court Reporters

1    (KATHY KINNIN)

2    So that's one example.

3    Q.   Okay.  And what do you believe is incorrect

4    about Tom's decision to have Media Services requests

5    go through him as opposed through you?

6    A.   It shows that he's letting them harass me

7    and my group without any intervention.

8    Q.   And how would they be harassing your group?

9    A.   For example, Steve Dinyer, who worked in

10   Media Services, sent an e-mail specifically to my

11   group about not having a door locked that went to the

12   outside after hours.  And it was very, umm, it was --

13   the e-mail was very -- worded very strongly, curt,

14   very -- my staff took it as harassment.  And it was

15   more than my group that used that door; some other

16   directors.

17   Q.   So would Tom's request that Media Services

18   go through him prevent any such e-mails like the one

19   Steve sent to your group?

20   A.   It could have but Steve continued -- through

21   the years, Steve sent e-mails and Tom did nothing --

22   Tom or Bill did nothing to stop them.

23   Q.   Do you believe that Steve's e-mails to your

24   group were because of your gender?

25   A.   Absolutely.

KATHY KINNIN

BARKLEY
Court Reporters

1          (KATHY KINNIN)

2     Q.   And what makes you believe that?

3     A.   Because the other two groups that were down

4  there in the basement, umm, that could have had the

5  door issue were male directors.

6     Q.   Do you have any reason -- Strike that.

7          I will refer you to Page 5 from Exhibit 2,

8  Page Plaintiff 5.

9          Do you see that page?

10    A.   Yes.

11    Q.   Does this page show discrimination against

12  you?

13             MR. STECK:  Object to the form.

14             The law is not that each and every

15             single item has to show discrimination.

16             It could be a collection of events.

17             The witness is not competent to

18             testify whether a particular document

19             fits into that collection of events.

20             But anyway, you may answer the

21             question.

22    A.   This one does not, but one from one day

23  later does.

24  BY MR. BILLOK:

25    Q.   Okay.  And in this document he -- "he" being

SUPA-0036

KATHY KINNIN



```
 1                    (KATHY KINNIN)
 2   Tom Marcotte -- says "Come up and see me when you get
 3   a minute."  Smiley face, and he addresses you as
 4   Director Kinnin; correct?
 5        A.   Correct.
 6        Q.   So is it fair to say this is an e-mail that
 7   shows that he's happy about your promotion to director?
 8        A.   Yes.
 9        Q.   Okay.  And I refer you to Plaintiff 25, 26,
10   and 27, which is an e-mail chain.
11        A.   25?
12        Q.   And this is an e-mail string between you and
13   Tom Marcotte.
14             Do you see that --
15        A.   Yes.
16        Q.   -- in 2015?
17        A.   Yes, I do see that.
18        Q.   Do you contend that in this e-mail chain
19   that Tom is treating you differently or harshly
20   because of your gender?
21        A.   Yes.
22        Q.   Okay.  And what in the e-mail makes you say
23   that?
24        A.   The first line, where he says:  He must have
25   come to the realization that it was the switchers
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2   after your conversation with him covering up for Chris

3   Bailey's attitude toward me during this incident.

4       Q.   Okay.  Can you tell me more about the

5   incident?  Give context to that?

6       A.   Sure.  There was a few classrooms that the

7   video was split when it came through a projector.  One

8   of my staff members and I went up to the classrooms

9   with three different computers to test it to show that

10  the issue was not the computers.

11              And, umm, Chris Bailey had said in his

12  interviews that he knew all about these media services

13  systems.  So it came out that the issue was a reset of

14  the system.

15      Q.   So you contend during that issue that Chris

16  Bailey was not competent in his job; correct?

17      A.   Correct.

18      Q.   Okay.  How do you contend that that is

19  discrimination against you because of your gender?

20      A.   In this particular instance he was in the

21  classroom and yelling -- Chris Bailey was yelling

22  that -- and insisting that it was still the computers.

23              But I only witnessed him yelling at me and

24  not my employee who was with me.

25      Q.   Were you more senior to your co-worker at

KATHY KINNIN

BARKLEY
Court Reporters

1                              (KATHY KINNIN)

2    that time?

3         A.   Yes.   Than my employee?

4         Q.   Correct.

5         A.   Yes.

6         Q.   Going back to your conversation with -- or

7    not your conversation, the e-mail from Steve about the

8    door being left open.

9              Do you have any evidence to show that Steve

10   sent that e-mail to you because you were a woman as

11   opposed to him honestly believing that it was somebody

12   in your group that left the door open?

13        A.   By excluding the males.  I mean there would

14   be no reason to think that it was my group over one of

15   the male directors' group.

16        Q.   But do you have any evidence to show that he

17   didn't reasonably believe that it could have been your

18   group?

19             MR. STECK:  Object to the form.

20             She doesn't know what's in his mind.

21             You can answer it, if you can.

22        A.   His harassing e-mails went to me and another

23   female director throughout his time there.

24   BY MR. BILLOK:

25        Q.   So your affidavit, as you mentioned before,

SUPA-0039



1                    (KATHY KINNIN)

2   details a number of issues that you claim to have at

3   Skidmore over the years due to your gender?

4        A.    Uh-huh.

5        Q.    Can you recount for me -- and we can go one

6   at a time -- let's say the number one issue or the top

7   instance you think of that you felt was harassment or

8   discrimination against you?

9              MR. STECK:    Objection.

10             You may answer.

11       A.    The top?

12  BY MR. BILLOK:

13       Q.    Correct.  If you want to list two or three

14  or five, you can.  I'm just trying to get an idea of

15  the ones that you believe are the most egregious.

16       A.    Chris Bailey, when I went to Tom Marcotte

17  about his behavior, and Tom sided with him saying, "I

18  thought you would like him because he's a Type A

19  personality" without taking my statements seriously.

20             And then when I also reported that Chris

21  Bailey took my arm and exited me out a door, unwanted

22  touching.  You know, to get me out of a space.

23             Umm, Tom Marcotte, umm, in his office

24  pounding down his fist talking to me.  Raising his

25  voice.  Being in HR with Tom and Tom yelling at the

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2   HR person.  I'm not a yeller, so just in an already
 3   anxious situation, for someone to raise their voice
 4   is even...
 5        Q.   Going back to -- And do you have more
 6   instances or --
 7        A.   That's --
 8                 MR. STECK:  Well, there's the thing
 9             called the Complaint, there's her
10             Affidavit.  You can show her those
11             documents and ask about that.
12                 But to ask her whether she recalls
13             in a deposition all the instances that
14             evidence discrimination, I don't think
15             that's proper.
16                 MR. BILLOK:  I'm not asking for
17             all.  I'm just asking the most egregious
18             ones.
19                 MR. STECK:  They're in the
20             Complaint and the Affidavit.  That's
21             what those documents are for.
22                 MR. BILLOK:  I will ask one more
23             time because you can answer.
24   BY MR. BILLOK:
25        Q.   Are there any other egregious incidents that
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2    you recall, other than what you just talked about with

3    Chris Bailey and Tom Marcotte?

4         A.   I mean I would say the most egregious is

5    that my complaints went un -- I don't want to say

6    unheard, but un -- I never received responses back

7    from e-mails to Bill Duffy and HR many times.

8         Q.   And Chris Bailey, from the e-mails and from

9    the complaints, your issue with him, one of them was

10   the fact that he tended to yell; correct?

11        A.   In his interview, when asked how his

12   employees would view him, he said, "They would call me

13   a tyrant."  So yes, him yelling.

14        Q.   Did he yell at everybody?

15        A.   I don't believe so.

16        Q.   Did you ever see him yell at men?

17        A.   No.

18        Q.   Okay.  When did you see him yell at women?

19        A.   He yelled at me.

20        Q.   Did you ever see him yell at any other

21   women?

22        A.   Not that I recall.

23        Q.   So he yelled at you during that time of the

24   screen setup.

25             Did he yell at you at any other times?

KATHY KINNIN

**BARKLEY**
Court Reporters

1                    (KATHY KINNIN)

2        A.    Yes.   There was a time when a vendor came

3    in to show a product and his behavior was -- toward me

4    was so egregious that somebody else in the meeting,

5    Carol Snitzer (ph), mentioned it to Bill Duffy.

6        Q.    And what was Chris Bailey's behavior in that

7    meeting?

8        A.    Talking over me; kind of acting as if I

9    wasn't there; you know, talking over me and -- I can't

10   describe...

11       Q.    Okay.   And then you mentioned obviously Tom

12   Marcotte and instances of yelling and pounding his

13   fist on the table.

14             Do you recall that?

15       A.    Yes.

16       Q.    Did you ever observe Tom Marcotte yelling at

17   men?

18       A.    I -- I don't recall.

19       Q.    Okay.

20       A.    He has said when he's gotten off the phone

21   with vendors who do not do what he likes, change

22   policy or whatever, hang up the phone and he'll say

23   "Communist" and that really made me uncomfortable.

24       Q.    How often would that happen where he would

25   hang up the phone on a vendor and say Communist?

KATHY KINNIN



(KATHY KINNIN)

1

2     A.    Everytime it wasn't what he wanted.

3     Q.    Did he do that with only vendors or did he

4  do that with other conversations?  For example, with

5  Skidmore employees?

6     A.    I -- I don't believe I heard Skidmore

7  employees.

8     Q.    Okay.  How many times do you recall that he

9  yelled at you?

10    A.    I would say a handful yelling, but it's the

11  condescending speak that may not be loud.

12    Q.    What --

13    A.    Intimidating speak, body posture.  You know,

14  just the words.

15    Q.    Can you give examples of when you refer to

16  intimidating or condensating speak?

17    A.    One particular directors' meeting, I walked

18  in -- I was already in my seat, he came in and he was

19  hovering over me, and then he turned and went to his

20  chair.

21        Like just that, umm, that feeling -- I can't

22  think of the word but just kind of hovering over me

23  for no reason.  A kind of intimidating look.

24        And then during the directors' meetings,

25  other directors would report and what they were doing

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2   and he would always question my report.
 3        Q.   And this was after you became a director in
 4   2014?
 5        A.   Yes.
 6        Q.   How soon after you became a director did
 7   such instances start?  Did they start right away or
 8   after a period of time?
 9        A.   In this e-mail the very next day, he says,
10   "Sorry I was snippy."
11             So his attitude toward me changed and got
12   worse as time went on.  Umm, to me it appeared that he
13   couldn't let go of his previous position, which is
14   what I was in.  He was the director and I became the
15   director.
16                    MR. BILLOK:  Mark this as
17             Defendant's Exhibit 3.
18                    (Defendant's Exhibit 3 marked for
19             identification.)
20   BY MR. BILLOK:
21        Q.   I'm going to hand you what was just marked
22   as Defendant's Exhibit 3, and I will direct you to the
23   last page of the document.
24             Is that your signature?
25        A.   Yes, it is.
```

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2       Q.   So have you seen this document before,
 3  Defendant's Exhibit 3?
 4       A.   Yes.
 5       Q.   So in the first Interrogatory you were asked
 6  to identify times that Tom Marcotte described women as
 7  dumb or stupid.
 8            And in your response you identify conversa-
 9  tions from January 2011 and February 2012 about Kim
10  Coons and Michelle Osgood, and then state there were
11  other conversations about Beth DuPont.
12            Approximately how many other conversations
13  about Beth do you recall that Tom Marcotte had where
14  he was referring to her performance?
15                 MR. STECK:  Where he was referring
16            to her performance?
17                 MR. BILLOK:  Where he was referring
18            to her being dumb, stupid or anything
19            else that this Interrogatory refers to.
20       A.   I would say a handful but I can't give an
21  exact number.
22  BY MR. BILLOK:
23       Q.   Did you report -- Oh, good head.
24       A.   Umm, well, I'm sorry it says right here:
25  "She cannot manage Steven Dinyer.  In subsequent years
```

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                     (KATHY KINNIN)
 2  he spoke about her inability to lead her group."
 3       Q.   Did you report any of these comments that
 4  Marcotte made to anyone?
 5       A.   No.
 6       Q.   Were there any other witnesses to these
 7  conversations besides you and Tom Marcotte?
 8       A.   No.
 9       Q.   Do you have any evidence that would show
10  Marcotte had an issue with Kim Coons because of her
11  gender as opposed to her job performance?
12       A.   I don't know how you distinguish.  At the
13  time she worked in student financial aid and that's
14  when he said she was in way over her head in not
15  knowing what she was doing.
16       Q.   Is it your belief that she did know what she
17  was doing?
18       A.   From my experience with her, yes.
19       Q.   Do you have any evidence that would show
20  Marcotte had an issue with Beth DuPont because she was
21  a woman as opposed to her job performance?
22       A.   Can you repeat that?
23            MR. BILLOK:  Can you read the
24            question back?
25            (Whereupon, the question was read
```

KATHY KINNIN



```
 1                    (KATHY KINNIN)

 2            back by Madame court reporter.)

 3     A.   Just in this speak where it says that she's

 4  unable to lead her group.  He's never said that about

 5  you of the male directors.

 6  BY MR. BILLOK:

 7     Q.   Did you ever hear Marcotte complain about

 8  any male employee?

 9     A.   One of my employees, John Sanders, who I

10  inherited from him, Marcotte explained -- umm, said

11  that he was an 80 percent kind of guy; that's all you

12  would get out of him.  So that's not complaining but

13  that's giving him a pass.

14     Q.   So that's referring to the fact that John

15  would only give 80 percent effort?  Something to that

16  extent?

17     A.   His best was only 80 percent.

18            MR. BILLOK:  This is 4.

19            (Defendant's Exhibit 4 marked for

20            identification.)

21  BY MR. BILLOK:

22     Q.   I'm going to show you -- You can still keep

23  Defendant's Exhibit 3 out.  The top.

24     A.   The top, I'm sorry.

25     Q.   And I'm going to show you what has been
```

KATHY KINNIN



```
1                    (KATHY KINNIN)
2   marked Defendant's Exhibit 4.
3            Have you seen that document before?
4        A.   Yes.
5        Q.   So that is the Complaint in this matter.  So
6   I will refer you to Paragraph 44 in the Complaint, in
7   Exhibit 4.
8        A.   Okay.
9        Q.   As well as Page 6 of Exhibit 3.
10       A.   Page 6?
11       Q.   Yes.
12       A.   Okay.
13       Q.   So Interrogatory No. 6 asks you about your
14  allegation in Paragraph 44 that Briggs' complaint
15  against you was a retaliatory workplace complaint.
16           And your answer to Interrogatory 6 -- I'm
17  paraphrasing -- is basically that you felt his
18  complaint against you was because you were addressing
19  performance issues with him?
20       A.   Yes.
21       Q.   Okay.  So you feel that his complaint was
22  retaliatory because you were addressing performance
23  issues with him?
24       A.   And his discussions with Marcotte.
25       Q.   Okay.  And by "discussions with Marcotte"
```

KATHY KINNIN



```
 1                    (KATHY KINNIN)
 2   you're referring to what we talked about before, where
 3   you believe that he and Marcotte were planning some-
 4   thing to set you up; is that correct?
 5        A.   Correct.
 6        Q.   Okay.  And why do you believe that he, Leon
 7   Briggs, and Tom Marcotte were planning something to
 8   set you up?
 9             MR. STECK:  Objection; asked and
10             answered.
11             But you can answer it again.
12        A.   I have no idea why they would set me up.
13             Leon Briggs had received poor performance
14   reviews since six months while he was still in
15   probation.  And Bill Duffy said, "Let's give him more
16   time."
17             And through the years I was forced to change
18   his, umm, performance reviews.  And this appears to be
19   their only way to get rid of me.
20        Q.   So you believe that Leon Briggs, when he
21   made a complaint against you, that he was not making a
22   complaint in good faith; correct?
23        A.   Correct.
24        Q.   You're aware of the investigation that was
25   performed into Leon Briggs' complaint against you;
```

KATHY KINNIN



```
 1                    (KATHY KINNIN)
 2   correct?
 3        A.    I received a copy of the complaint after I
 4   had met with the investigator regarding my complaint.
 5        Q.    And are you aware that the investigator
 6   found that you did not discriminate against Briggs
 7   because of his race; correct?
 8        A.    Correct.
 9        Q.    And you are also aware that the investigator
10   found that while you didn't treat him differently
11   because of his race, the investigator found that you
12   did treat him and other employees harshly.
13              You're aware that the investigator found
14   those conclusions; correct?
15        A.    I'm aware that the investigator stated
16   those.
17        Q.    Okay.  You disagree with the investigator's
18   conclusions?
19        A.    I do.
20        Q.    Do you have any evidence that the investi-
21   gator fabricated that conclusion?
22        A.    I have many e-mails between myself and Leon
23   Briggs and Mark Cross about performance issues and
24   processes, and some of the investigator's report is
25   generalized and has no evidence of such.
```

SUPA-0051

KATHY KINNIN



1                        (KATHY KINNIN)

2       Q.   Do you believe the investigator, in reaching

3   that conclusion about you and Leon Briggs regarding

4   Leon Briggs' complaint, do you believe that she

5   reached that conclusion mistakenly or intentionally

6   or something else, not to box you into a choice?

7                   MR. STECK:  Objection.

8               But you can answer it.

9       A.   Intentionally.

10  BY MR. BILLOK:

11      Q.   What makes you think she intentionally came

12  to an incorrect conclusion?

13      A.   That her conclusions did not have supporting

14  documents.  It's all hearsay.

15              And that I was not given a chance to,

16  despite numerous requests, I was not given a chance

17  to respond to Briggs' complaint against me when I was

18  given the paper that said what she came to the

19  conclusion, I said, "How could she have come to this

20  conclusion since I never had a chance to respond?"

21  And Gretchen Steffen (ph) said, "She has enough

22  information to make her conclusion."

23      Q.   You mentioned earlier that you met with the

24  investigator; correct?

25      A.   Yes.

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2      Q.   Okay.  About how long was your meeting with

3  the investigator?

4      A.   I met with the investigator twice.  One was

5  the morning and the next one was the full day.

6      Q.   And you also provided a number of documents

7  to the investigator; correct?

8      A.   Correct.

9      Q.   Did the investigator ask you for particular

10 documents?

11     A.   She did.

12     Q.   Did you provide those document that she

13 asked for?

14     A.   I did.

15     Q.   Did you provide additional documents that

16 you felt were relevant to the issue?

17     A.   Absolutely.

18          In fact, I have an e-mail from somebody in

19 HR sending the documents -- well, with regard to my

20 complaint or my documents being sent -- saying, 'Here

21 we go again' or here's -- you know, 'It's neverending.'

22          I'm sorry, that's what it is, "It never ends

23 with her."

24     Q.   Do you have any evidence that the investi-

25 gator came to her conclusion about the investigation

KATHY KINNIN

BARKLEY Court Reporters

```
 1                    (KATHY KINNIN)
 2    due to the fact that you're a woman?
 3         A.   I -- I -- I don't know how to answer that
 4    question.  Can you reword it?
 5         Q.   Sure.  So you believe that the investigator
 6    knew that you didn't treat employees badly but yet
 7    intentionally concluded in the investigation that you
 8    treated your employees badly; is that correct?
 9                    MR. STECK:  Object to the form.
10    BY MR. BILLOK:
11         Q.   You can answer.
12         A.   I believe she came to that conclusion
13    because I had complained about male harassment against
14    me.
15         Q.   So earlier I asked you in terms of the
16    investigator came to the conclusions that you were not
17    subject to harassment and discrimination; that you did
18    not discriminate against Leon Briggs, but that you had
19    treated Leon Briggs and other employees harshly.
20              Do you recall her reaching those
21    conclusions?
22         A.   I recall reading the document with those
23    statements.
24         Q.   Okay.  And you believe that each of those
25    conclusions is incorrect?
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2       A.    I believe the state that I treated employees

3  is incorrect.

4       Q.    Correct.  And you believe that the

5  investigator reaching that conclusion when she did so,

6  she didn't do it mistakenly or negligently?  You

7  believe she did that intentionally?

8                    MR. STECK:  Objection.

9            Go ahead.

10      A.    I do.

11 BY MR. BILLOK:

12      Q.    Okay.  Do you know why she did that, reached

13 that --

14      A.    Intentionally would also be mistakenly.

15      Q.    Well, there is a difference.  I'm stating to

16 you, when I say "mistakenly," it's you reasonably

17 believe something, you make a complaint in good faith

18 but you happen to be wrong about it.

19      A.    I see, yes.

20      Q.    As opposed to 'I know this is the wrong

21 answer but I'm picking the wrong answer anyway.'

22      A.    Correct.  That's right --

23      Q.    So with that --

24      A.    -- the wrong answer.

25      Q.    Do you believe that she reached that

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                         (KATHY KINNIN)
 2   conclusion that you treated your employees harshly
 3   mistakenly or intentionally?
 4        A.    Intentionally.
 5        Q.    And why do you believe she reached that
 6   conclusion intentionally?
 7        A.    During my time with her as an investigator,
 8   her investigating, we were talking about Mark Cross
 9   and I was explaining how I was training him and she
10   said, "It sounds just like somebody who doesn't want
11   to do their job," and I said, "Exactly."
12             So Mark Cross gave a negative exit interview
13   because he didn't want to do his job.
14             Also, when I asked for a copy of the formal
15   complaint against me, Gretchen Steffen didn't know
16   what the policy and procedure was that I was allowed
17   that.
18             So it appeared to me that they were trying
19   to drum up anything to get rid of me.
20        Q.    You were provided a copy of the formal
21   complaint eventually; correct?
22        A.    Eventually, but no chance to respond to it.
23             I also will note that I never received a
24   negative review as a director.
25                    MR. BILLOK:  We can take a break
```

KATHY KINNIN



```
 1                    (KATHY KINNIN)
 2          now so people can move their cars.
 3               (Whereupon, a discussion was held
 4          off the stenographic record.)
 5  BY MR. BILLOK:
 6      Q.   Are you aware of any other employees who
 7  were found to have treated their employees harshly who
 8  were treated more favorably than you were?
 9      A.   Not that I know of.
10               (Whereupon, the following request
11          was made by Mr. Steck.)
12               MR. STECK:  We make a request for
13          any and all investigation reports done
14          of any other people in her position
15          based on that question.
16               It's not a question she could
17          possibly know.  So we're making a
18          request for any and all investigative
19          reports conducted of any employees who
20          were in a similar position to Kathy.
21               MR. BILLOK:  Send me an e-mail
22          or --
23               MR. STECK:  I just did it on the
24          record.  We will do it again.
25  BY MR. BILLOK:
```

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)

 2       Q.   Go back to Defendant's Exhibit 4, the

 3  Complaint, and I will refer you to Paragraph 21.

 4            So you contend that Marcotte hired Briggs

 5  because he was friends with Briggs?

 6       A.   He suggested I hire Briggs.

 7       Q.   And you believe he suggested you hire Briggs

 8  because Marcotte was friends with Briggs?

 9       A.   Absolutely.

10       Q.   And then in Paragraph 23, you contend that

11  Briggs' personnel reviews were overridden because of

12  his friendship with Marcotte?

13       A.   Yes.

14       Q.   In Paragraph 27, you make an allegation

15  about Mike Forbes not making eye contact with you

16  during a meeting.

17            Do you see that?

18       A.   Yes.

19       Q.   During that meeting were you pointing out

20  issues that you had with Forbes and his team's

21  performance?

22       A.   No.

23       Q.   Can you tell me what was being discussed at

24  that meeting on September 5, 2017?

25       A.   Classroom issues; podium classroom issues.
```

KATHY KINNIN



                        (KATHY KINNIN)
1
2       Q.   And what issues were taking place where that
3   impacted both you and Mike Forbes' teams?
4       A.   Every podium has one or two computers in it.
5   So my group is the computers and his group was the
6   projector, switcher, those sort of things.
7       Q.   Forbes was hired in June of 2017; correct?
8       A.   No, he was hired before that.
9       Q.   Okay.  When he was hired, you informed Bill
10  Duffy that you didn't agree with his hire; correct?
11      A.   As director.
12      Q.   You didn't agree that Mike Forbes should
13  become a director?
14      A.   Correct.
15      Q.   And when you did so, you contended to Bill
16  that Forbes was hired as part of a -- or promoted to
17  director as part of a push for diversity?
18      A.   I don't recall saying that.
19              MR. BILLOK:  Mark this as 5.
20              (Defendant's Exhibit 5 marked for
21              identification.)
22  BY MR. BILLOK:
23      Q.   I'm going to show you what has been marked
24  as Defendant's Exhibit 5.
25      A.   Uh-huh.

SUPA-0059

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                        (KATHY KINNIN)

 2        Q.   And have you seen this e-mail before?

 3        A.   Yes.

 4        Q.   And starting on the second half of the first

 5   page at 1121, it's an e-mail from you to Bill Duffy on

 6   June 27, 2017; correct?

 7        A.   Correct.

 8        Q.   And in the first paragraph on the fourth

 9   line, there's two sentences that start:  "It has come

10   to fruition what Mike Forbes said in that he was going

11   to be Director of Media Services because he knows

12   Joshua.  It's the push for diversity at the expense of

13   women."

14             Do you see that?

15        A.   I do see that.

16        Q.   And Michael Forbes is black; correct?

17        A.   Correct.

18        Q.   And so you're referring to him when you are

19   asking about the "push for diversity"?

20        A.   Yes.

21        Q.   Okay.  And then you also accused him of

22   printing wedding invitations at work; correct?

23        A.   Correct.

24        Q.   The next paragraph says:  "It has been

25   reported to you that Mike had theft of services in
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2   printing 500 copies of wedding material on the Media

3   Services printer."

4          So that was your complaint about Mike

5   Forbes; correct?

6       A.   Yes.

7       Q.   Okay.

8       A.   It would have been up against anybody who

9   was printing.

10              MR. BILLOK:  Mark this as 6.

11              (Defendant's Exhibit 6 marked for

12              identification.)

13  BY MR. BILLOK.

14      Q.   I'm going to show you what has just been

15  marked as Defendant's Exhibit 6.

16      A.   Uh-huh.

17      Q.   And have you seen this e-mail before?

18      A.   Yes.

19      Q.   And this e-mail being Defendant's Exhibit 6,

20  where it's an e-mail from you to Bill Duffy on July 6,

21  2017; do you see that?

22      A.   Yes.

23      Q.   And in this e-mail Bill Duffy had asked you

24  to support your claim that Forbes had printed wedding

25  materials and you provided a response to Bill Duffy;

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                      (KATHY KINNIN)

 2   correct?

 3        A.   Yes.

 4        Q.   And in providing a response to Bill Duffy

 5   you had accessed the record of what exact documents

 6   that Mike Forbes had printed; correct?

 7        A.   That anyone in Media Services had printed.

 8        Q.   That everybody in Media Services had

 9   printed; correct?

10        A.   Yes.

11        Q.   So it wasn't just a total number of

12   documents, it also listed the name of the documents

13   that had been printed; correct?

14        A.   That's the way the report comes out.

15        Q.   Okay.  And the college found that you

16   improperly accessed those records; correct?

17        A.   They did not say as such to me.

18             MR. BILLOK:  Mark this as 7.

19             (Defendant's Exhibit 7 marked for

20        identification.)

21   BY MR. BILLOK:

22        Q.   I'm going to give you what has been marked

23   as Defendant's Exhibit 7.

24             Have you seen this document before?

25        A.   Only from documents that they provided
```

SUPA-0062

KATHY KINNIN



1          (KATHY KINNIN)

2    during discovery.

3        Q.   So you don't recall receiving this document

4    in 2017?

5        A.   I never received this document.  It's not

6    that I recall it, I never received it.  You can see it

7    was not e-mailed.  It doesn't say hand-delivered.

8             I believe it's a fabrication, or it was made

9    and never delivered.

10       Q.   Was the contents in this document -- well,

11   you haven't seen this document before, so I will read

12   part of it and then ask you about it.

13            So the third paragraph states:  "As you

14   know, it is codified in both the Skidmore College

15   Information Technologies Acceptable Use of Technology

16   Policy and the Skidmore College Standards of Business

17   Conduct Policy, we do not use our elevated access as

18   members of the Information Technologies Department to

19   monitor individual's use of campus technology unless

20   we are authorized to do so by Human Resources and/or

21   Campus Safety in the course of an investigation.

22            "The report that you specify includes

23   information that was not relevant in the course of

24   business regarding the print count of the printer in

25   question.  There were reporting options that could

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)
 2  have been used which were not as invasive.  Please
 3  understand that the college and I take the unauthorized
 4  monitoring of individual's technology usage very
 5  seriously and need for you to understand that this
 6  conduct is unacceptable."
 7           Did Bill Duffy ever have a conversation with
 8  you where he relayed any of those contentions to you?
 9      A.   No.  The wording does not seem to be his
10  wording.
11      Q.   So you contend that somebody else wrote it
12  other than Bill Duffy?
13      A.   At least part of it.
14      Q.   Okay.  So going back to the meeting -- your
15  e-mail at least to Bill Duffy is July 6th, 2017;
16  correct?
17      A.   Yes.
18               MR. STECK:  With regard to?
19               MR. BILLOK:  In Defendant's
20          Exhibit 6, the e-mail with regard to
21          the printing.
22               MR. STECK:  Well, we have to -- oh,
23          one is the memo.
24               Can I have some void dire on this
25          memo, No. 7?
```

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)

 2              MR. BILLOK:  Sure.

 3              MR. STECK:  Looking at Exhibit 7

 4         for identification, how did you find out

 5         about how -- about Mr. Forbes' use of

 6         the printer?

 7              THE WITNESS:  One of my employees

 8         brought some wasted copies that they

 9         found in the recycle bin to my attention.

10              And the printer was not working

11         properly, so I believe it was Tom

12         Marcotte asked for reports on how much

13         the printer was being used and if it

14         should be replaced or repaired.

15              So those reports were asked for,

16         for usage.

17   BY MR. BILLOK:

18        Q.   So he was asking for how much a printer was

19   being used; correct?

20        A.   Correct.

21        Q.   But not necessarily who was using it to

22   print what?

23        A.   They were asking for a delineation between

24   employees and -- Media Services employees and

25   employees and students.
```

KATHY KINNIN



1                    (KATHY KINNIN)

2      Q.   But he was asking for the number of copies

3  that were being made by various departments; correct?

4      A.   When you do a report, it can either give you

5  the people or the overall count, and there's no way

6  from the overall count to tell what's students and

7  what's employees.

8      Q.   But you didn't give him the overall count

9  report, you gave him the people report?  Or did you

10  give him both?

11      A.   I gave him both.

12      Q.   At any time prior had you ever run a report

13  for what people were printing what documents?

14      A.   When you do it by people, it gives the

15  document name.

16      Q.   Right.  Had you run that report prior?

17      A.   Yes.

18      Q.   Okay.  Was that something that a supervisor

19  or somebody else asked for, or how did you come to run

20  that report in prior circumstances?

21      A.   Printing was under my purview and the print

22  cues.  And one example is there was, umm, umm,

23  somebody who was auditing classes that we saw was

24  printing 16,000 pages.  So we had somebody speak with

25  her about that and because Skidmore had unlimited

KATHY KINNIN

BARKLEY
Court Reporters

1                      (KATHY KINNIN)
2     printing, we used the numbers to see if in the long
3     run charges for printing would be for students and
4     staff or just how that would work.
5          Q.   And in Exhibit D-6, you were -- D-5 and
6     D-6 --
7                    MR. STECK:  D-5 and D --
8                    MR. BILLOK:  Defendant's 5 and
9            Defendant's 6.
10                   MR. STECK:  Oh, okay, 5 and 6.
11           Okay, got it.
12                   THE WITNESS:  I'm sorry, what
13           doc -- exhibits?
14                   MR. BILLOK:  The e-mails 5 and 6.
15                   THE WITNESS:  Okay, I got it.
16    BY MR. BILLOK:
17         Q.   In those two exhibits you're expressing to
18    Bill Duffy your belief that Mike Forbes was improperly
19    using the printer for personal services; correct?
20         A.   Correct.
21         Q.   And you contend in Paragraph 27 that a few
22    months later in a meeting he wouldn't make eye contact
23    with you during that meeting; correct?
24         A.   Correct.
25         Q.   Is it possible that Mike Forbes didn't make

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2      eye contact with you because you had accused him of

3      improperly using the printer?

4                    MR. STECK:  Possi -- I object to

5              the form.

6                    You may answer it.

7          A.    He should not have known that I objected to

8      that printing.  I went to the whistle blower hotline.

9      But I said I am going directly through you to Kyle

10     Bernard because if I call the hotline it would be a

11     waste of the college's money because people would know

12     the comment came from me because it was my department

13     that dealt with printing.

14         Q.    Do you know why Mike Forbes did not make eye

15     contact with you at that meeting?

16         A.    I believe he was -- he was definitely being

17     monitored by Tom Marcotte and Tom was believing what

18     Mike was saying, just like he did with Chris Bailey,

19     and not believing what my experience was saying about

20     classroom setup.

21     BY MR. BILLOK:

22         Q.    In the Complaint, you allege that Tom

23     Marcotte made statements that some women were too dumb

24     or too stupid.

25         A.    Yes.



```
 1                    (KATHY KINNIN)
 2       Q.   Other than that allegation in the Complaint,
 3  do you recall anybody at Skidmore making derogatory
 4  statements about women to you?
 5       A.   None that I can think of off the top of my
 6  head.
 7       Q.   Okay.
 8                 MR. BILLOK:  Take a quick
 9            five-minute break?
10                 MR. STECK:  Sure.
11                 (Whereupon, a recess was taken.)
12  BY MR. BILLOK:
13       Q.   So earlier I had asked you some questions
14  about Tom Marcotte and his behavior towards you and
15  what made you think that it was based on your gender,
16  as opposed to some other reason.
17            One example that you gave is the fact that
18  he would yell at you and you didn't witness him
19  yelling at men.
20            Do you recall that?
21       A.   Yes.
22       Q.   Okay.  What other examples can you provide
23  about Tom Marcotte treating you harshly or differently
24  because of your gender as opposed to some other
25  reason?
```

KATHY KINNIN



1          (KATHY KINNIN)

2               MR. STECK:  I object to the form.

3     A.   Because of the things that he has said about

4   other women.  We talked about Kim Coons and Beth

5   DuPont and Michelle Osgood.

6          And the fact that other male directors have

7   made mistakes and I have not seen him respond

8   negatively to them.

9   BY MR. BILLOK:

10    Q.   In those instances where other male

11  directors made mistakes, did you believe that they

12  made mistakes or did Tom believe they made mistakes?

13    A.   They themselves reported that they made

14  mistakes.

15    Q.   And they reported that to Tom?

16    A.   In director meetings, yes.

17    Q.   And what were Tom's reactions when they made

18  mistakes?

19    A.   I saw no reactions.

20    Q.   Can you tell me about the instances where

21  women reported making mistakes to Tom?

22    A.   I'm trying to think of a good example.

23          You know, when I reported mistakes made by

24  my group, I always took responsibility and he would

25  respond with things like, "Just my two cents.  Why

KATHY KINNIN

BARKLEY
Court Reporters

1               (KATHY KINNIN)

2     didn't you do it this way?"  You know, kind of the

3     grilling back.

4               Whereas, the males were just reporting the

5     mistakes and no reverse grilling.

6          Q.   What kind of mistakes would the males

7     report?

8          A.   For example, umm, ordering -- Mark Forbes

9     ordering equipment and going ahead with a project

10    without fully, umm, researching it.  The product ended

11    up being discontinued.  Umm, so they had to start over

12    or go with a partial shipment.  That sort of thing.

13         Q.   And do you have any other examples of males

14    reporting mistakes like that?

15         A.   Umm, there were reports from Kevin Crider

16    that his group, which is Enterprise Systems, having to

17    fix things that Jeff Clark, his predecessor, had done

18    and Kevin making mistakes being new, and Tom blaming

19    things on Jeff, even though the mistake was after

20    Jeff, and Kevin not being, like, reprimanded.  Still

21    blaming Jeff for things that even though Kevin...

22         Q.   Okay.  So Kevin took over for Jeff and Tom

23    would contend that it wasn't Kevin's fault because it

24    was something that Jeff had turned over?

25         A.   Right.

SUPA-0071

KATHY KINNIN

BARKLEY
Court Reporters

1                          (KATHY KINNIN)

2        Q.   Okay.  Do you have any other examples of

3   reports of mistakes that males made?

4        A.   Umm, not off the top of my head but I do

5   have recordings from directors' meetings.

6        Q.   Okay.  So in terms of Tom Marcotte treating

7   you differently because of your gender because you're

8   a woman as opposed to some other reason, you contend

9   it's because he treated your reporting of mistakes

10  differently than men and because he would yell at you

11  and not yell at men.

12            Is there anything else that supports that

13  he treated you differently because you're a woman as

14  opposed to some other reason?

15       A.   He treated other women differently because

16  they're women.

17       Q.   But I'm asking about his treatment of you,

18  generally.

19       A.   By hearing women are dumb, stupid, whatever,

20  you can't help but think that it's directed to you as

21  a woman since his comments are about other women too,

22  so...

23       Q.   And those comments about other women, you

24  recall in Defendant's Exhibit 3 and Interrogatory

25  No. 1, the comments occurred in January 2011 and some

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2    in 2012, and then at some other times that you can't

3    necessarily recall?

4         A.    Umm, well, I have here between 2012 and

5    January 2014, he spoke about Michelle Osgood.

6              And then 2012 to 2018, he talked about Beth

7    DuPont and her inability to be a director.

8         Q.    During that conversation about Beth DuPont,

9    did he refer to her as being stupid or dumb?

10        A.    I seem to recall he also used the word weak.

11        Q.    As in a weak leader?

12        A.    Yes.

13        Q.    Do you recall any other instances of

14   referring to women as dumb or stupid or in any other

15   derogatory way?

16        A.    He spoke about many people in HR changing

17   their tune everytime he needed something, and all of

18   the people in HR are women.

19        Q.    Did he talk about HR generally or did he

20   talk about women in HR?

21        A.    The people he spoke about were women.

22        Q.    Right.  Did he refer to them as women or

23   based on their gender or was he --

24        A.    No.

25        Q.    -- talking about issues that he had with HR?

SUPA-0073

KATHY KINNIN

BARKLEY
Court Reporters

```
1                      (KATHY KINNIN)
2       A.   Issues he had with HR.
3       Q.   Have you ever been convicted of a crime?
4       A.   No.
5       Q.   Okay.  Are there any answers that upon
6  reflection you would like to add to or change at this
7  time?
8       A.   No.
9       Q.   Okay.  Is there anything that you can
10 remember now that previously you couldn't specifically
11 recall?
12      A.   No.  This is why I documented everything.
13      Q.   Okay.
14           MR. BILLOK:  I have no further
15           questions.
16                      -  -  -
17 EXAMINATION BY MR. STECK:
18      Q.   Did you put the most prominent facts in your
19 Complaint and Affidavit that you believe evidenced
20 discrimination?
21      A.   Yes.
22      Q.   And there are other facts that evidenced
23 discrimination?
24      A.   Yes.
25      Q.   And those support the facts in your
```

KATHY KINNIN



1                    (KATHY KINNIN)

2  Complaint?

3        A.  Yes.

4        Q.  Okay.  Was it your understanding that

5  you had to put every single fact that evidenced

6  discrimination in either your Complaint or your

7  Affidavit?

8        A.  No.

9        Q.  All right.  Did Mr. Marcotte refer -- there

10 was a suggestion that he referred to Beth DuPont -- a

11 suggestion in language indicating she was a weak

12 leader?

13       A.  Uh-huh.

14       Q.  And did he indicate to you that he valued a

15 Type A personality?

16       A.  Yes, he did.

17       Q.  Did he indicate what other types of

18 personalities he valued?

19       A.  No.

20       Q.  Did the Type A personalities that he

21 referred to appear unduly aggressive towards women?

22       A.  Yes.

23       Q.  Did you ever make a complaint about

24 Marcotte?

25       A.  Yes.

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2       Q.   When was the first time you made a complaint

3   against Marcotte?

4       A.   2015.

5       Q.   Who did you make it to?

6       A.   I went up the proper chain with Bill Duffy

7   and then HR.

8       Q.   Okay.  And after you made that complaint,

9   did you believe that complaint came to Mr. Marcotte's

10  attention?

11      A.   Yes.

12      Q.   Do you believe that after you made that

13  complaint that Mr. Marcotte was retaliating against

14  you for that complaint?

15      A.   Yes.

16      Q.   And that he was working with Leon Briggs to

17  do that?

18      A.   Yes.

19      Q.   Do you believe that as well?

20      A.   Yes.

21      Q.   Okay.  Did you believe that one of the

22  things they did to retaliate against you was to raise

23  the specter of discrimination against African

24  Americans?

25      A.   I don't know what you mean.

KATHY KINNIN

BARKLEY
Court Reporters

1      (KATHY KINNIN)

2  Q. All right. The specter. Let's leave that

3 word out.

4    Do you believe that one of the things they

5 did to retaliate against you was to raise the concept

6 that you were discriminating against African Americans?

7  A. Yes.

8  Q. Now, the investigator's report that counsel

9 agreed to, which is not here before you, but when is

10 the first time that you saw that report?

11  A. On discovery.

12  Q. About a week ago; is that correct?

13  A. Yes.

14  Q. Okay. And upon reading that document, did

15 you think the investigator acted in an unbiased or

16 independent manner?

17  A. No.

18  Q. Were there facts in the report that you felt

19 were inaccurate?

20  A. Absolutely.

21  Q. Did you believe that she took the word of

22 management over you without investigation or support-

23 ing facts?

24  A. Yes.

25  Q. Do you believe the investigation was



BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2  commissioned by the college for the purpose of

3  supporting the termination of your employment?

4        A.    Absolutely.

5        Q.    Who else was investigated other than you?

6        A.    No one.

7        Q.    Was Leon Briggs' performance investigated

8  as far as you can tell from that report?

9        A.    No.

10                 MR. STECK:  I don't have anything

11           else.

12                          -  -  -

13  EXAMINATION CONTINUES

14  BY MR. BILLOK:

15        Q.    Just a few questions.  Again, famous last

16  words.

17             You placed your most salient facts or

18  allegations in your Complaint against Skidmore

19  College; correct?

20        A.    Correct.

21        Q.    Okay.  And you were just asked a question

22  about Type A personalities that Tom Marcotte supported

23  being unduly aggressive towards women.

24             Can you explain that answer?

25        A.    When I went to Tom Marcotte regarding Chris

SUPA-0078

KATHY KINNIN



```
 1                    (KATHY KINNIN)

 2  Bailey's behavior -- his yelling -- he, Tom Marcotte,

 3  said, "I'm surprised you don't like Chris Bailey.

 4  He's a Type A just like you."

 5              And I never yelled.  I've never -- I'm just

 6  not a yeller.  You can ask anyone who has ever worked

 7  with me.

 8              So Tom -- it appears that Tom likes a Type A

 9  who is very aggressive and who says that they're

10  aggressive.

11                    MR. BILLOK:  I have no further

12              questions.

13                        -  -  -

14              (Whereupon, the deposition was

15              concluded at approximately 11:40 a.m.)

16                        -  -  -

17

18

19

20

21

22

23

24

25
```

KATHY KINNIN

BARKLEY
Court Reporters

1              (KATHY KINNIN)

2              C E R T I F I C A T E

3

4
STATE OF NEW YORK   )
5                              ss.:
COUNTY OF SARATOGA  )
6

7

8      I, CHRISTINE GREENAWAY, a Registered Professional

9  Reporter and Notary Public for the State of New York,

10  do hereby certify that the foregoing transcript to

11  which this Certificate is annexed, is a true and

12  correct transcript of my original stenographic notes.

13

14      I further certify that I am neither an attorney

15  nor counsel for, nor related to or employed by any

16  of the parties to the action in which this deposition

17  is taken; and, furthermore, that I am not a relative

18  or employee of any attorney or counsel employed by

19  the party hereto or financially interested in the

20  action.

21

22

23

24      _____

                CHRISTINE GREENAWAY

25

KATHY KINNIN

BARKLEY
Court Reporters

```
 1                    (KATHY KINNIN)

 2                 CERTIFICATE OF OATH

 3

 4   STATE OF NEW YORK    )
                                ss.:
 5   COUNTY OF            )

 6

 7

 8          I, KATHY KINNIN, hereby certify that I have

 9   read the transcript of my testimony taken under oath;

10   that the transcript is a true and complete record of

11   what was asked, answered, and said during the

12   examination in the above matter, and that the answers

13   in this transcript, as given by me, are true and

14   correct, except for the changes and/or corrections

15   indicated on the Errata Sheet attached hereto.

16

17

18

19                          _____

20                          KATHY KINNIN

21

22   Subscribed and Sworn to
     before me this       day
23   of             ,    .

24

25         Notary Public
```

KATHY KINNIN

BARKLEY
Court Reporters

1                    (KATHY KINNIN)

2   EXAMINATION BEFORE TRIAL ERRATA SHEET
      -------------------------------------------------------

3   IN THE MATTER OF:

4             UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF NEW YORK

5   _____

6   KATHY KINNIN,

7                   Plaintiff,

8        v.

9

SKIDMORE COLLEGE,

10                  Defendant.

11

12   Civil Action No.  1:19-cv-629
   _____

13

14         DECLARATION UNDER PENALTY OF PERJURY

15

      I declare under penalty of perjury that I have
16   read the entire transcript of my deposition taken in
   the captioned matter or the same has been read to me
17   and the same is true and accurate, save and except
   for changes and/or corrections, if any, as indicated
18   by me on the Errata Sheet hereof, with the
   understanding that I offer these changes as if still
19   under oath.

20   Signed on the ___day of_____20___

21

22

23   _____

24                KATHY KINNIN

25

KATHY KINNIN

BARKLEY
Court Reporters

1                  (KATHY KINNIN)

2                  ERRATA SHEET

3       I, _____, have read
   the transcript of my testimony and would like
4  the following changes and the reason for such
   changes, for example, "to correct stenographic
5  error" or "to clarify the record" or "to
   conform with the facts."

6

7  PAGE:  LINE:  CHANGE:          REASON:

8  -----  -----  ----------------  ----------------

9  -----  -----  ----------------  ----------------

10 -----  -----  ----------------  ----------------

11 -----  -----  ----------------  ----------------

12 -----  -----  ----------------  ----------------

13 -----  -----  ----------------  ----------------

14 -----  -----  ----------------  ----------------

15 -----  -----  ----------------  ----------------

16 -----  -----  ----------------  ----------------

17 -----  -----  ----------------  ----------------

18 -----  -----  ----------------  ----------------

19 -----  -----  ----------------  ----------------

20 -----  -----  ----------------  ----------------

21 -----  -----  ----------------  ----------------

22 -----  -----  ----------------  ----------------

23 -----  -----  ----------------  ----------------

24 -----  -----  ----------------  ----------------

25 -----  -----  ----------------  ----------------

KATHY KINNIN

BARKLEY
Court Reporters

DEFENDANT'S
EXHIBIT
5
7/27/20 CA
PENGAD 800-631-6989

**Brett Last** 

| | |
|---|---|
| **From:** | Saytra Green (Human Resources) |
| **Sent:** | Friday, September 29, 2017 3:05 PM |
| **To:** | Gretchen Steffan |
| **Subject:** | FW: Director of Media Services |

**From:** Kathy Kinnin
**Sent:** Tuesday, June 27, 2017 7:54 AM
**To:** Alena Llorens-Myers <allorens@skidmore.edu>; Saytra Green (Human Resources) <sgreen3@skidmore.edu>; Nancy Bruno <nbruno@skidmore.edu>; Barbara Beck <bbeck@skidmore.edu>
**Subject:** FW: Director of Media Services

FYI this is more to go with the email from me with subject Human Resources Issue.

-----

Kathy Kinnin
Director, User Services
Skidmore College
815 N. Broadway
Saratoga Springs, NY 12866
(518) 580-5995

**From:** Kathy Kinnin <kkinnin@skidmore.edu>
**Date:** Tuesday, June 27, 2017 at 7:52 AM
**To:** William Duffy <bduffy@skidmore.edu>
**Cc:** Kathy Kinnin <kkinnin@skidmore.edu>
**Subject:** Re: Director of Media Services

Bill-

As you know, I have already told my staff to go through me with requests by Media Services since their experience in dealing with Media Services is hostility. What other ideas do you have for me to tell them now? There have been multiple reports by different people of harassment to you and HR regarding Mike Forbes (and Tom's) behavior especially toward women. It has come to fruition what Mike Forbes said in that he was going to be Director of Media Services because he knows Joshua. Is the push for diversity at the expense of women? The people who work most closely with Media Services are women.

During the interviews for the Director position, it was clear that Mike has no experience with managing, budgeting and vision. He actually said that he does the family budget and thought that was ok to say as experience. The other candidate had work experience with all of those items and has far more technical experience. It has even been reported to you that Mike had theft of services in printing 500 copies of wedding material on the media services printer. If paid, the price would have been $250. What ideas do you have for me to tell my staff that they can print whatever they want and the college will pay? Also, how do I explain to

S001121

them that hard work really does pay off when they know that when Mike interviewed for the day position he said that he should get it because he "is ready to work now" implying that he wasn't working during the night shift. He also made it no secret that he got his master degree during work hours.

What is your suggestion on how I explain to those that participated in the interview process that their opinions don't count and their time was wasted when the decision was already made. I know that the majority of people either voted no or concerns about hire for Mike. Help me understand how Mike Forbes could still be offered the position when so many women voiced concern about his hire.

I look forward to your prompt response.


Kathy


-----
Kathy Kinnin
Director, User Services
Skidmore College
815 N. Broadway
Saratoga Springs, NY 12866
(518) 580-5995


**From:** William Duffy <bduffy@skidmore.edu>
**Date:** Monday, June 26, 2017 at 11:59 AM
**To:** William Duffy <bduffy@skidmore.edu>
**Subject:** Director of Media Services

I would like to take this opportunity to let you know that I have decided to offer the position of Director of Media Services to Michael Forbes. As I work through the offer process with Human Resources it is imperative that you keep this information confidential. I will let you know when this information is no longer confidential. Thank you again for your participation in this process.

Bill

--
William J. Duffy
Chief Technology Officer
Skidmore College
815 North Broadway
Saratoga Springs, NY 12866
518.580.5913
bduffy@skidmore.edu

S001122



DEFENDANT'S
EXHIBIT
7
7/27/20 IH

| To: | Kathy Kinnin |
| --- | --- |
| From: | William J. Duffy, Chief Technology Officer |
| cc: | Human Resources |
| Date: | July 16, 2017 |
| Re: | Printing |

In your email message to me dated June 27, 2017 you stated that "It has even been reported to you that Mike had theft of services in printing 500 copies of wedding material on the media services printer. If paid, the price would have been $250."

The college has investigated this matter and will not be pursuing it further.

As you know, and is codified in both the Skidmore College Information Technologies Acceptable Use of Technology Policy and the Skidmore College Standards of Business Conduct Policy, we do not use our elevated access as members of the Information Technologies Department to monitor individuals use of campus technology unless we are authorized to do so by Human Resources and or Campus Safety in the course of an investigation. The report that you specify includes information that that was not relevant in the course of business regarding the print count of the printer in question. There were reporting options that could have been used which were not as invasive.

Please understand that the college and I take the unauthorized monitoring of individuals technology usage very seriously and need for you to understand that this conduct is unacceptable.

SUPA-0086

S000729

1

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF NEW YORK
2  ---------------------------------------------------------

3  KATHY KINNIN,

4          Plaintiff,

5  -against-              Civil Action No. 1:19-cv-00629

6  SKIDMORE COLLEGE,

7          Defendant.                    **COPY**

8  ---------------------------------------------------------

9

10

11          EXAMINATION BEFORE TRIAL of a nonparty

12  witness, DIANE PFADENHAUER, held at the Law Offices of

13  Bond, Schoeneck and King, PLLC, 268 Broadway, Suite 104,

14  Saratoga Springs, New York, on August 12, 2020, at

15  9:20 a.m.

16

17  APPEARANCES:

18      COOPER, ERVING & SAVAGE, LLP
        39 North Pearl Street
19      Albany, NY  12207
        By PHILLIP G. STECK, ESQ., of Counsel;
20          Attorneys for Plaintiff.

21      BOND, SCHOENECK & KING, PLLC
        268 Broadway, Suite 104
22      Saratoga Springs, NY  12866
        By MICHAEL BILLOK, ESQ., of Counsel;
23          Attorneys for Defendant.

(David Mayo, CM 518-495-9312)

2

1                          WITNESS

2   NAME                EXAMINATION BY        PAGES

3   DIANE PFADENHAUER    MR. STECK            4-121

4

5                    PLAINTIFF'S EXHIBITS

6   NO.  DESCRIPTION                          MARKED

7    1   Report of witness                      16

8    2   Binder of documents                    40

9    3   Typed notes by Marcotte                44

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**SUPA-0088**

3

1                          S T I P U L A T I O N S

2                          It is hereby stipulated and agreed by

3          and between the attorneys for the respective parties

4          hereto that the presence and oath of a Referee be

5          waived;

6                          that the transcript of testimony be

7          signed and the filing of the original transcript with

8          the Federal Court be waived;

9                          that the examining party will furnish

10         the examined party a copy of the transcript of testimony

11         free of charge;

12                         that all objections except as to the

13         form of the question be reserved until the time of

14         trial;

15                         that this deposition may be utilized

16         for all purposes as provided by the Federal Rules of

17         Civil Procedure;

18                         and that all rights provided to all

19         parties by the Federal Rules of Civil Procedure shall

20         not be deemed waived and the appropriate sections of the

21         Federal Rules of Civil Procedure shall be controlling

22         with respect thereto.

23

**SUPA-0089**

1   D I A N E   P F A D E N H A U E R, called herein as a

2   witness, having been duly sworn, was examined and

3   testified as follows:

4   EXAMINATION BY MR. STECK:

5        Q.   Please state your name for the record.

6        A.   Diane Pfadenhauer.

7        Q.   What's your address?

8        A.   ███████████████████████████████████████

9        Q.   What is your date of birth?

10       A.   ████████████████████

11       Q.   And what is your educational background?

12       A.   Bachelor's degree, Potsdam State.   Master's

13   degree, New York Institute of Technology.   Law degree,

14   St. John's Law School.

15       Q.   What year did you get your bachelor's?

16       A.   1985.

17       Q.   And when did you get your master's?

18       A.   1989.

19       Q.   And your JD?

20       A.   1996.

21       Q.   And between your bachelor's and the master's,

22   did you have any work experience during that time

23   period?

**SUPA-0090**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          5

1          A.   Yes.

2          Q.   What did you do?

3          A.   Human resources.

4          Q.   Where?

5          A.   Long Island.  Several different companies.

6          Q.   Why don't you tell me which ones?

7          A.   The first company was a company called Fonar.

8          Q.   Fonar?

9          A.   F-o-n-a-r.

10         Q.   Okay.  And what was your position there?

11         A.    I did general human resources, employee

12    relations, hiring, terminations, some benefits

13    administration.

14         Q.   And then after that?

15         A.   I worked for Nikon.

16         Q.   Nikon?

17         A.   Nikon.  Cameras.

18         Q.   Oh, Nikon, N-i-k-o-n.  How long were you with

19    Nikon?

20         A.   Seven years.

21         Q.   And what did you do with Nikon?

22         A.   Employee relations.  Hiring.

23         Q.   Terminations?

**SUPA-0091**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          6

1        A.   Yes.

2        Q.   Were you going to law school while you were

3    working at Nikon?

4        A.   Yes.

5        Q.   And did you work for any other companies on

6    Long Island in human resources?

7        A.   Yes.  I worked for a company called Adults and

8    Children with Learning and Developmental Disabilites,

9    ACLD for short.  It's a nonprofit human services

10   organization.  And I was the director of human resources

11   there.

12       Q.   How long were you director and during what

13   years?

14       A.   I don't recall the years.  I worked there for

15   three years.

16       Q.   Any other companies that you worked in HR

17   before you got your law degree?

18       A.   No.

19       Q.   Then you get your law degree in 1996.  Were you

20   still working at Nikon at that time?

21       A.   No.  I was working for ACLD.

22       Q.   For ACLD.  And after getting your law degree

23   what did you do?

**SUPA-0092**

(Diane Pfadenhauer)                                                    7

1      A.   I worked for a company called Queens Group,

2  which was in the printing and packaging industry.  And I

3  was their in-house labor employment counsel and head of

4  human resources.

5      Q.   What was the name of that company, Queens?

6      A.   Queens Group.

7      Q.   How long were you there?

8      A.   I was there for about two years.  Then they

9  were acquired by a division of International Paper.

10     Q.   And did you stay with International Paper?

11     A.   No.  I left there.  Spent about a year at

12 another company called Impac Group.  The industry was

13 undergoing a fair amount of consolidation.

14     Q.   What industry?

15     A.   The printing and packaging industry.

16     Q.   Okay.

17     A.   I was the vice-president of human resources

18 there.  I left there.  I went to a small company in the

19 Internet industry, a dot.com company.  I can't even

20 remember the name.

21     Q.   They come and go.  So how long were you at the

22 dot.com company?

23     A.   Six months or so.  And then I went to ASCAP.

**SUPA-0093**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                                8

1        Q.   A-S-C-A-P?

2        A.   Yes.

3        Q.   How long were you with ASCAP?

4        A.   I was there three years.

5        Q.   And what was your position?

6        A.   I was the head of human resources, the VP of

7   HR.

8        Q.   And then?

9        A.   Then I left the corporate world.  I became a

10  full-time college professor.

11       Q.   Where did you teach?

12       A.   I teach at St. Joseph's College.

13       Q.   Where is that?

14       A.   New York.

15       Q.   In the city?

16       A.   Brooklyn and Patchogue.

17       Q.   And how long have you been teaching at St.

18  Joseph's?

19       A.   Since 2000.

20       Q.   And are you still doing that?

21       A.   Yes.

22       Q.   And do you have additional employment while

23  being a professor at St. Joseph's College?

**SUPA-0094**

(Diane Pfadenhauer)                    9

1    A.   Yes.  I have my own company.

2    Q.   What is it called?

3    A.   It's called Employment Practices Advisers.

4    Q.   And what does Employment Practices Advisers do?

5    A.   Human resources consulting, employee relations,

6    handbooks, affirmative action programs, workplace

7    investigations.

8    Q.   And Northport is quite a distance from

9    St. Joseph's College in Brooklyn and Patchogue.  Do you

10   also live down in the New York metropolitan area?

11   A.   That's where I live.

12   Q.   Where is Northport, on Long Island?

13   A.   Yes.

14   Q.   I see.  Other than working with this company of

15   yours, did you have any other jobs since you became a

16   college professor?

17   A.   No.

18   Q.   What courses do you teach at the college?

19   A.   Human resources.  I teach a course in

20   compensation and benefits, I teach a course in staffing

21   and development, and I teach an employment law course.

22   Q.   Have you ever litigated an employment law case?

23   A.   No.

**SUPA-0095**

(Diane Pfadenhauer)                                    10

1     Q.   And when did you first start doing so-called

2   investigations?

3     A.   Probably 1985.

4     Q.   And who did you do those investigations for?

5     A.   Fonar.

6     Q.   What about in your capacity in your own

7   consulting firm?  When did you start doing

8   investigations as part of your consulting business?

9     A.   2004.

10    Q.   And who have you done investigations for?

11    A.   I really can't tell you.  That would be

12  probably a violation of the confidentiality agreement

13  that we have with our organizations.

14    Q.   Unfortunately, not when you're subpoenaed to

15  testify in a deposition in a federal case.  So I'm going

16  to have to ask you again, what companies have you

17  conducted investigations for?

18             I will say, however, that we can enter

19  into an agreement to keep the identity of those

20  confidential.  I don't mind doing that.  But you can't

21  say, "It's confidential.  I can't talk about it."

22             MR. BILLOK:  Well, I obviously don't

23             represent Miss Pfadenhauer.

**SUPA-0096**

(Diane Pfadenhauer)                           11

1       MR. STECK:  No, you don't.

2       THE WITNESS:  Can you keep your mask on,

3    please?  Thank you.

4       MR. BILLOK:  I don't know what the

5    substance of those agreements --

6       MR. STECK:  I'm going to be mask shamed by

7    the witness now.

8       THE WITNESS:  That's fine.

9       MR. STECK:  Go ahead.

10       MR. BILLOK:  I don't know what the

11    substance of those agreements with the other

12    companies might be.  They might require notice

13    of some type before she is required to compel

14    who those clients are.

15       MR. STECK:  We're just seeking the

16    identity of the people, not content.

17       MR. BILLOK:  I have no idea what they are,

18    but they might not be relevant.

19       THE WITNESS:  How is that relevant?

20       MR. STECK:  It's very relevant to

21    knowing -- I don't have to explain myself here.

22    It's extremely relevant to your background and

23    any biases that you bring to the table here.

**SUPA-0097**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    12

1        That's what we have to inquire about, whether

2        you like it or you don't.  I'm just looking for

3        the names of the entities, not the substance of

4        who you investigated or things of that nature.

5              MR. BILLOK:  Is it possible to ask

6        questions about the type of entity without

7        their name?

8              MR. STECK:  We could do that for now, yes.

9    Q.   What types of entities did you do work for?

10   A.   Fortune 500 companies.  Nonprofit institutions.

11   Religious institutions.  Small privately held companies.

12   Let me think.

13   Q.   Let me put it this way.  Were those all

14   management side?

15              MR. BILLOK:  Object to the form of the

16        question.  You can answer.

17   Q.   You can answer.

18   A.   No.

19   Q.   Did you ever assist a counsel for an employee

20   in any type of labor relations matter?

21   A.   Yes.

22   Q.   Who was that attorney and what was the nature

23   of the matter?

**SUPA-0098**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          13

1      A.    I don't recall the name of the attorney, but it

2  was in connection with an age discrimination case.

3      Q.    And what was your role?

4      A.    To answer questions for him about human

5  resources practices.

6      Q.    Did you give an affidavit or testify by

7  deposition in that case?

8      A.    No.

9      Q.    You just met with him and served as a resource,

10  is that what you did?

11      A.    That would be correct.

12      Q.    Did you review any documents from the case?

13      A.    No.

14      Q.    What other matters did you work with employees'

15  counsel on?

16      A.    I don't recall any others.

17      Q.    What year was that age discrimination matter

18  that you assisted that attorney?

19      A.    I don't remember.

20      Q.    Where was that attorney located?

21      A.    Colorado.

22      Q.    In Colorado.  So let me do this.  We'll leave a

23  blank space in the deposition.  You will get the

**SUPA-0099**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    14

1   deposition back for your review, the transcript, and

2   we'll leave a blank space and you can fill in the name

3   of the attorney.  Is that all right?

4        A.   Sure.

5             _____

6        Q.   How did you get connected with this attorney in

7   Colorado?

8        A.   He called me.

9        Q.   Before this matter had you ever done any work

10  for Skidmore College?

11       A.   Yes.

12       Q.   What did you do for Skidmore College?

13       A.   I did an investigation.

14       Q.   Of what?

15       A.   A faculty member who had not received tenure

16  and felt she should have.

17       Q.   What was the conclusion of that investigation?

18       A.   I don't even recall.

19       Q.   When was it?

20       A.   At least five years ago.

21       Q.   Have you ever done any work for the law firm

22  Bond, Schoeneck and King other than this particular

23  case?

**SUPA-0100**

(Diane Pfadenhauer)                                    15

1        A.   In terms of doing work, they have referred me

2   to some clients.  In some of those instances I have been

3   retained by their clients.  I don't recall if I was

4   retained by the law firm for this matter or retained by

5   the client.

6        Q.   Have you had other matters where you were

7   retained by the law firm?

8        A.   I don't recall.

9        Q.   So regarding this matter, which was an

10  investigation that you did regarding a complaint of Leon

11  Briggs and also of Kathy Kinnin, who was the first

12  person that talked to you about it?

13       A.   I don't recall.

14       Q.   How did it come about that you did this

15  investigation?

16       A.   I recall speaking to someone at Bond, Schoeneck

17  and King and someone from the institution.

18       Q.   What was the conversation with the person from

19  Bond, Schoeneck?

20       A.   I don't recall.

21       Q.   And what was the conversation with the person

22  from the institution?

23       A.   That there was a complaint of discrimination or

**SUPA-0101**

(Diane Pfadenhauer)                                        16

1   a complaint of a violation under the policy and they

2   needed an investigation.

3       Q.  So the initial contact concerned a complaint of

4   discrimination by Leon Briggs; is that correct?

5       A.  Yes.

6       Q.  Do you remember when this contact occurred?

7       A.  Sometime before the investigation started.

8               MR. STECK:  Why don't we mark this as

9           Exhibit 1?  It might provide some reference for

10          you.

11              (Plaintiff's Exhibit 1 was marked for

12          identification.)

13  BY MR. STECK:

14      Q.  In the subpoena, just curiously, were you asked

15  to bring any documents with you?

16      A.  Yes.

17      Q.  Did you bring any?

18      A.  No.

19      Q.  And why is that?

20      A.  Because I don't have them.

21      Q.  You don't have them or you don't have any?

22      A.  I don't have any.

23      Q.  What did you do with any documents that you

**SUPA-0102**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    17

1    generated in the course of this investigation?

2         A.   I gave them to Mr. Billok.

3         Q.   And when did you do that?

4         A.   I don't recall.

5         Q.   Was that after this litigation was commenced?

6         A.   I don't recall.  I don't know when the

7    litigation commenced.

8         Q.   Did he tell you that there was litigation?

9         A.   He may have.  I don't really recall.

10        Q.   In the course of this matter did you become

11   aware that Kathy Kinnin had made some complaint of

12   discrimination?

13        A.   I became aware while doing the investigation

14   for Mr. Briggs that Kathy also had some of her own

15   complaints.

16        Q.   And who told you about those complaints?

17        A.   It would have been Gretchen Steffan or the

18   woman who was the vice-president of human resources at

19   the time.  Barbara.

20        Q.   Beck?

21        A.   Okay.

22        Q.   Is it Barbara Beck?

23        A.   I believe so.

**SUPA-0103**

(Diane Pfadenhauer)                                    18

1    Q.   Let's assume it's Barbara Beck.  I don't know

2  any other Barbaras involved in HR in this matter.  And

3  what did Gretchen Steffan tell you about Kathy Kinnin's

4  complaints?

5    A.   All I know is there had been another complaint

6  and they were going to look to see if they were going to

7  use another investigator or if they were going to ask me

8  to investigate.

9    Q.   Did you have an understanding that Kathy

10  Kinnin's complaints predated or postdated Mr. Briggs'?

11    A.   At the time, no.  I had no idea.

12    Q.   Well, when you were told about Kathy Kinnin's

13  complaints did you have an understanding as to whether

14  they predated or postdated Mr. Briggs'?

15    A.   I had no understanding.

16    Q.   Did you come to an understanding as to whether

17  Kathy Kinnin's complaints predated or postdated

18  Mr. Briggs'?

19    A.   As I got into it I came to understand that

20  there had been a history of complaints.

21    Q.   Correct.  And did Mr. Briggs write his own

22  complaints for HR?

23    A.   I don't recall.

**SUPA-0104**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    19

1     Q.   You had indicated you had given your records to

2     Mr. Billok.   When did you first start having

3     interactions with Mr. Billok?   Was that during the

4     investigation?

5     A.   No.

6     Q.   When?

7     A.   I had no idea who he was.

8     Q.   Did you have any interactions with anyone from

9     Bond, Schoeneck and King during the investigation?

10    A.   No.

11    Q.   So when did you begin interacting with someone

12    from Bond, Schoeneck and King, Mr. Billok or otherwise?

13    A.   If my recollection serves me correctly, I

14    recall dropping things off, the documents, here in

15    Saratoga.   It might have been last summer.

16    Q.   Did he tell you that was in connection with a

17    filing that had been made with the Equal Employment

18    Opportunity Commission?

19    A.   I don't recall.

20         MR. STECK:   What was the first name of

21    Mr. Cross?

22         MS. KINNIN:   Mark.

23    Q.   So during the course of this investigation did

**SUPA-0105**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    20

1    you interview Kathy Kinnin?

2         A.   Yes.

3         Q.   Did you tell her that any employee who worked

4    for her, that her description of what was going on

5    "sounds like people who don't want to do their jobs"?

6              MR. BILLOK:   Object to the form of the

7              question.   You can answer.

8         A.   I'm not sure I even understand the question.

9         Q.   We can say it again.   Did you ever tell Kathy

10   Kinnin when discussing employees who worked for her as

11   director of user services "sounds like people who don't

12   want to do their jobs"?

13        A.   So you're asking me if I said those words to

14   her?

15        Q.   Yes, with respect to employees.

16        A.   With respect to her employees?

17        Q.   Yes.

18        A.   No.

19        Q.   You would never say that?

20        A.   I don't recall ever saying that.

21        Q.   Did you say that with respect to Mark Cross?

22        A.   I don't know who Mark Cross is.

23        Q.   He was an employee that you came across in your

**SUPA-0106**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                      21

1    investigation.  Didn't we give you Exhibit 1?  You can

2    feel free to refresh your recollection with respect --

3         A.   I would be happy if someone gave me a copy.

4         Q.   You don't have to get so aggressive here.

5         A.   I'm really not.

6         Q.   I think you are.  So with respect to Exhibit 1,

7    do you recognize Exhibit 1?

8         A.   Yes.

9         Q.   All right.  It says, "Prepared at the request

10   of counsel, Bond, Schoeneck and King."  You wrote that;

11   correct?

12        A.   Correct.

13        Q.   Why did you write that it was prepared at the

14   request of Bond, Schoeneck and King?

15        A.   Because it was.

16        Q.   And who is Nicholas D'Ambrosio?

17        A.   He is a partner, I believe, at Bond, Schoeneck

18   and King.

19        Q.   And is he the person who requested you to write

20   this report?

21        A.   It would appear that way, yes.

22        Q.   And what conversations did you have with

23   Mr. D'Ambrosio?

**SUPA-0107**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    22

1      A.   I don't recall specifically, but my sense would
2   have been that at the conclusion of the investigation I
3   would have advised him that I was done with the
4   investigation and he likely asked me to produce a
5   report.
6      Q.   But you don't recall any conversations with
7   him?
8      A.   I do recall speaking to him, but I don't recall
9   the details of those conversations.
10      Q.   Okay.  Is this your report, then?
11      A.   Yes.
12      Q.   So if I ask you some questions and you can't
13   recall something about the report or who you spoke to or
14   that sort of thing, you can refer to your report to
15   refresh your recollection.  Do you understand?
16      A.   I do.
17      Q.   So with respect to an individual by the name of
18   Mark Cross, did it come to your attention that he was
19   someone who left employment with Skidmore?
20      A.   He's not even on my list of people I spoke to.
21      Q.   Well, he wasn't an employee anymore.  The
22   question is:  Did Mr. Marcotte or Mr. Duffy, who you did
23   speak to, relate to you any circumstances surrounding

**SUPA-0108**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    23

1    Mark Cross?

2         A.   I don't remember.

3         Q.   If they did it would be in your report or your

4    notes; is that correct?

5         A.   Most likely, yes.

6         Q.   Which representatives from HR did you deal

7    with?  Was it just Gretchen Steffan?

8         A.   Saytra.

9         Q.   Saytra Green, as well?

10        A.   Yes.

11        Q.   Saytra Green, Gretchen Steffan.  Who is the

12   other?

13        A.   There was the VP of HR.

14        Q.   Yes, Barbara Beck.  Any others?

15        A.   I don't believe so.

16        Q.   How much were you paid for doing this report?

17        A.   I don't recall.

18        Q.   Do you charge by the hour?

19        A.   Yes.

20        Q.   What is your hourly rate?

21        A.   I actually don't recall what I charged them

22   because I tend to charge less when I'm up here.  The

23   rates tend to be higher downstate.  So I don't recall my

**SUPA-0109**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                          24

1   hourly rate.

2       Q.   Well, do you have any financial records?  This

3   only goes back to 2018.

4       A.   I would.  I would have financial records.

5       Q.   We're going to ask you to provide us with a

6   copy of your bill or bills to Skidmore.

7       A.   Okay.

8       Q.   You were served with a subpoena to testify

9   today; correct?

10      A.   Correct.

11      Q.   And are you being compensated for your time

12  here today?

13      A.   No.

14      Q.   Let's go back to the HR representatives.

15  Saytra Green.  What conversations did you have with

16  Saytra Green about Kathy Kinnin?

17      A.   I don't know.  Let me look.  The conversations

18  I had with her I believe were in connection with the

19  allegations that she might have been involved in.

20      Q.   Were these allegations that Ms. Kinnin made?

21      A.   Yes, the allegations in my report.

22      Q.   And did Ms. Green tell you that Ms. Kinnin had

23  come to her previously with some of the matters that you

**SUPA-0110**

(Diane Pfadenhauer)                                    25

1   ended up looking into in your report?

2       A.   I don't recall.  I have to look through and

3   see.

4       Q.   What kind of conversations did you have with

5   Ms. Steffan?

6       A.   She was my first point of contact.  She

7   provided some background into Mr. Briggs' initial

8   claims.

9       Q.   Did she tell you that she wrote his complaint?

10      A.   I'm not aware of that.

11      Q.   And did you discuss with her complaints that

12  Kathy Kinnin had made in the past?

13      A.   I was given all kinds of information related to

14  Ms. Kinnin's complaints.  Much of that came from

15  Ms. Kinnin herself.  Much of that came from other

16  witnesses, who described their interactions with her.

17  So the source of Ms. Kinnin's complaints and the dates

18  of those complaints, some of which may have preceded the

19  investigation, came from a multitude of sources,

20  including Ms. Kinnin herself.

21      Q.   Right.  But I'm interested in what HR told you

22  about Ms. Kinnin's complaints.  Is it fair to say that

23  Saytra Green, Gretchen Steffan, and Barbara Beck while

**SUPA-0111**

1    working at HR in Skidmore College were recipients of

2    complaints that Kathy Kinnin made?

3        A.   I'm not so sure they were recipients of actual

4    complaints, formal complaints, or if they had had

5    conversations with her.  Now, mind you, I did not spend

6    a lot of time with Barbara Beck because Barbara Beck was

7    leaving the organization.  She was retiring, apparently,

8    so I spent very little time with her.

9        Q.   You had indicated before that there were a lot

10   of complaints by Ms. Kinnin.

11       A.   Yes.

12       Q.   Did you ever make a determination that --

13       A.   There are several.

14       Q.   Okay.  You list in your report a number of

15   complaints, but do you know which of those claims had

16   previously been brought to the attention of human

17   resources?

18       A.   No, I don't.

19       Q.   Do you know if all of those complaints had

20   previously been brought to the attention of human

21   resources?

22       A.   I suspect that I likely asked Ms. Kinnin if she

23   had brought these complaints forward.  And if she had, I

**SUPA-0112**

(Diane Pfadenhauer)                                    27

1    would have noted it in the report.

2         Q.   Was it your understanding that Mr. Briggs

3    himself had written a complaint of race discrimination

4    and brought it to human resources?

5         A.   I don't recall.  I recall that there was a form

6    of sorts or -- I recall that Ms. Steffan told me that

7    she had met with Mr. Briggs and she had a process where

8    she compiled his complaint into some document or form

9    that she completed.

10        Q.   Do you know if anyone in HR ever did that with

11   Kathy Kinnin's prior complaints?

12        A.   I would have no idea.

13        Q.   All right.  Did you ever see any documentation

14   showing that HR had intended or expressed an intention

15   to open up an investigation of any complaint by Kinnin?

16        A.   I recall that there -- I don't recall

17   specifics, but I do recall that there had been some

18   conversations.  I was advised that there had been

19   conversations, investigations, looking into, whatever

20   you might want to call it, in connection with concerns

21   that Kathy Kinnin had relayed to human resources.  The

22   outcome of those, I have no idea.

23        Q.   Did either Green, Steffan or Beck tell you that

**SUPA-0113**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    28

1    they had looked into Kinnin's allegations and that they

2    thought they were unfounded?

3         A.    I'm not sure what allegations you're referring

4    to.

5         Q.    Any allegations that Ms. Kinnin made that were

6    covered in this report.

7         A.    In this report?  I don't know.

8         Q.    You had mentioned she had a history of making

9    complaints; correct?

10        A.    My understanding is that she had come to human

11   resources before and had conversations with human

12   resources before.

13        Q.    Did Ms. Steffan tell you that the college

14   really had no form for a complaint?

15        A.    I have no idea.

16        Q.    Well, did Ms. Steffan tell you that the Briggs

17   complaint, she basically designed that form?

18        A.    No, she didn't tell me that.

19        Q.    My question is:  Did Saytra Green ever tell you

20   that she had met with Kathy Kinnin concerning a

21   complaint of some kind and that the complaint was

22   unfounded?

23        A.    I don't remember.  I can look in here and I can

**SUPA-0114**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    29

1   see.

2        Q.   I'm going to ask the questions.  You're going

3   to answer.  If you don't remember, you don't remember.

4   That's the way depositions work.  Okay?

5        A.   Yes.

6        Q.   We don't assume you don't remember.  We have to

7   ask.  So did Ms. Steffan tell you that she had ever met

8   with Kathy Kinnin concerning any complaints by Kathy

9   Kinnin?

10       A.   I don't recall.

11       Q.   And did Barbara Beck tell you that she had met

12  with Kathy Kinnin concerning any complaints by Kathy

13  Kinnin?

14       A.   I recall Barbara Beck stating that she had met

15  with Kathy Kinnin in connection with some complaints,

16  concerns.

17       Q.   Did she tell you that she or HR made the

18  determination that those complaints were unfounded?

19       A.   I don't recall.

20       Q.   Did Gretchen Steffan ever tell you that with

21  respect to complaints by Kinnin or documents in support

22  of complaints that "it never ends"?

23       A.   I don't recall that.

**SUPA-0115**

(Diane Pfadenhauer)                                        30

1      Q.   Did you have any conversations with Mike West?

2      A.   Mike West?  The CFO?

3      Q.   I'm not sure of his position, to be honest.  I

4  don't believe he is CFO, but Mike could correct us on

5  that.

6      A.   I think he was the CFO.

7      Q.   My understanding is he was Barbara Beck's

8  superior.

9      A.   Okay.

10     Q.   But what his title was, I don't know.  Did you

11 ever have any conversations with Mike West?

12     A.   Yes.

13     Q.   What were those conversations?

14     A.   About the complaints.

15     Q.   Did Mr. West indicate he had any knowledge of

16 any of these complaints?

17     A.   I don't recall.

18     Q.   So you had some conversations.  Did you

19 interview Mr. West?

20     A.   Um-hmm.

21     Q.   Yes?

22     A.   Yes.

23     Q.   Why did you interview Mr. West?  What was his

**SUPA-0116**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                      31

1    involvement in either the Briggs or in the Kinnin

2    complaints?

3         A.   Because Barbara Beck had left and he was taking

4    over her role.

5         Q.   Did Mr. West indicate to you that he had any

6    personal knowledge of any of the matters contained in

7    either Briggs' or Kinnin's complaints?

8         A.   I don't recall.

9         Q.   Did anyone tell you that the college was

10   considering terminating Kathy Kinnin's employment?

11        A.   The only thing I knew in connection with any

12   issues of her employment was a concern that she had

13   inappropriately accessed computer systems in a manner

14   that should only have been approved by members of the

15   cabinet.

16        Q.   And who told you that?  Was it Barbara Beck?

17        A.   I believe it was Mike West.

18        Q.   And did Mr. West or anyone give you any

19   official policy of the college stating, in sum or

20   substance, that Ms. Kinnin should not have done that or

21   that what she did was contrary to a policy of the

22   college?  Any document.

23        A.   No.

**SUPA-0117**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          32

1    Q.   Did you --

2    A.   I was not investigating that issue.

3    Q.   Did you send a draft of your report to anyone

4    before it was issued?

5    A.   No.

6    Q.   Was anyone given the opportunity to review and

7    comment on the report?

8    A.   No.

9    Q.   Did you give copies of the Briggs complaint to

10   anyone?

11   A.   I don't believe so.

12   Q.   Did you give copies of any of the Kinnin

13   allegations to anyone?

14   A.   I haven't given copies of anything related to

15   this matter to anyone other than Mr. Billok and report

16   to the college.

17   Q.   Do you know if HR gave copies of contentions by

18   Ms. Kinnin to Mr. Marcotte?

19   A.   I would have no idea.

20   Q.   Do you know if HR gave copies of contentions by

21   Ms. Kinnin to Bill Duffy?

22   A.   I don't know.

23   Q.   So you had interviews with some of the

**SUPA-0118**

(Diane Pfadenhauer)                                      33

1   employees who worked for Kathy Kinnin; is that correct?

2        A.   Correct.

3        Q.   Did you interview an employee by the name of

4   Kathy Dorando?

5        A.   Yes.

6        Q.   Did she tell you that Mr. Briggs was constantly

7   complaining about Ms. Kinnin?

8        A.   She told me that she -- I don't recall the word

9   constantly being used in her description.

10       Q.   But you do recall her saying that Briggs was

11  complaining about Kinnin?

12       A.   Yes.

13       Q.   Did she tell you that Briggs had told her that

14  he was going to take Kinnin down?

15       A.   I don't recall that.

16       Q.   And did you have an understanding that

17  Mr. Briggs had a very strong personal friendship with

18  Mr. Marcotte?

19       A.   I understood that they had worked together at a

20  previous employer.

21       Q.   What about a personal friendship?  Not just the

22  prior work relationship, but did they have a personal

23  friendship?

**SUPA-0119**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                            34

1      A.   I believe they were friends of some sort.  I

2  don't know how close.

3      Q.   Did you try to determine that in the course of

4  your investigation?

5      A.   If I recall correctly, I discussed it with

6  Marcotte and I discussed it with Briggs.

7      Q.   And you had the impression from those

8  discussions that they were not close friends?

9      A.   No.  I had the impression that they were

10  friends because of their work relationship from a

11  previous employer.  They had known each other for many

12  years.

13      Q.   Did you have any understanding of the process

14  by which Mr. Briggs was hired?

15      A.   My recollection is that it was based upon the

16  fact that he had worked for Marcotte at a previous

17  employer.

18      Q.   When Mr. Briggs was hired did you have an

19  understanding that he originally applied for a position

20  and was not selected by the hiring committee?

21      A.   I don't recall that.

22      Q.   Do you know what position Mr. Briggs was hired

23  to fill?

**SUPA-0120**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                          35

1      A.    No.

2      Q.    Mr. Briggs worked in user services.   The

3    director of that department was Kathy Kinnin; correct?

4      A.    Um-hmm.

5      Q.    Yes?

6      A.    Yes.

7      Q.    And did you get an understanding that

8    Mr. Briggs' job was to work on Mac computers and Mac

9    operating systems?  Mac being the Apple.

10     A.    Yes.

11     Q.    Are you a Mac user?

12     A.    No.

13     Q.    Okay.  Did it come to your attention during

14   your investigation that Mr. Briggs had no prior

15   experience working on Mac computers or Apple operating

16   systems?

17     A.    I don't know.

18     Q.    Why don't you know?

19           MR. BILLOK:  Object to the form of the

20           question.  You can answer.

21     Q.    There is a difference between "I don't know"

22   and "I don't remember."

23     A.    Well, ask the question again.

**SUPA-0121**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          36

1    Q.   Okay.   Did it come to your attention during

2    your investigation that Mr. Briggs had no prior

3    experience working on Mac computers or Apple operating

4    systems?

5    A.   My understanding is that Ms. Kinnin had very

6    significant questions about his ability to work on Mac

7    systems.

8    Q.   Okay.   But did it come to your attention that

9    he actually had no prior experience working on Mac?

10   A.   No.

11   Q.   So you personally use a Windows computer; is

12   that correct?

13   A.   Yes.

14   Q.   Did you ever go through training on how to use

15   a Windows computer, or you just learned it on your own?

16   A.   I think I learned it on my own.

17   Q.   Did you ever, by the way, get an understanding

18   of approximately what percentage of the computers at

19   Skidmore were Mac and what percentage were Windows?

20   A.   I think I knew that at the time.   I don't

21   recall now.

22   Q.   Would it refresh your recollection if I told

23   you it was about 50 percent for each?

**SUPA-0122**

(Diane Pfadenhauer)                                    37

1      A.   Okay.

2      Q.   You don't have to agree with me.

3      A.   I don't agree with you.  I mean, it doesn't --

4      Q.   Then you should say it doesn't refresh your

5  memory.

6      A.   It doesn't refresh my memory.

7      Q.   Is it your understanding that Mr. Briggs was

8  the only technician in user services who worked on Mac

9  computers?

10     A.   My understanding is that Ms. Kinnin worked on

11 Mac computers, also.

12     Q.   Did Ms. Dorando work on Mac computers?

13     A.   I don't recall.

14     Q.   Do you know who the employee was who was at the

15 user services, not the director's level but at the

16 employee level at user services, who was the employee

17 that worked most closely with Mr. Briggs?

18     A.   I don't recall.

19     Q.   Did you ever know that?

20     A.   No.

21     Q.   Did it come to your attention during your

22 investigation that some Mac users asked that Mr. Briggs

23 not work on their computers?

**SUPA-0123**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                      38

1      A.    Ms. Kinnin advised me of that.

2      Q.    Did you ever speak to anyone who made such a

3  request?

4      A.    No.

5      Q.    Did you investigate to determine if what

6  Ms. Kinnin said was true?

7      A.    No.  Let me rephrase that.  I spoke to Marcotte

8  and -- who was the other guy?  Who was the person who

9  was the head of IT?  Dempsey?

10     Q.    No.  That was Duffy.

11     A.    I spoke to Marcotte and Duffy.

12     Q.    Did they tell you that what Kinnin said about

13  Mac users requesting that Briggs not work on their

14  computers was not true?

15     A.    I'm not sure I understand that.  Restate the

16  question, please.

17     Q.    Did either Marcotte or Duffy tell you that what

18  Kinnin had said, that certain persons had requested that

19  Briggs not work on their Mac computers, was not true?

20     A.    No.  I understood that they had looked into

21  those issues themselves.

22     Q.    And found that they were not true; is that

23  correct?

**SUPA-0124**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                     39

1      A.   I don't recall whether they concluded that they

2   were not true or not.

3      Q.   Now, in your report you didn't interview the

4   president of the college, did you?

5      A.   I did not.

6      Q.   And the reason for that was that you were told

7   the president was unavailable?

8      A.   Correct.

9      Q.   Did it ever come to your attention that the

10  president of the college was one of the people who

11  requested that Mr. Briggs not work on his Mac computer?

12     A.   I'm not aware of that.

13     Q.   Did it ever come to your attention that the

14  president's wife requested that Mr. Briggs not work on

15  her computer?

16     A.   I'm not aware of that.  My understanding was

17  that Ms. Kinnin had specifically directed her staff that

18  she would be the one to work with the president's office

19  directly.

20     Q.   You don't have any idea how that came about?

21  It's just something Ms. Kinnin did without a reason?

22  What was the reason for that?

23          MR. BILLOK:  Object to the form of the

**SUPA-0125**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer) 40

1    question.  You can answer.

2    A.   I have no idea.

3    Q.   Did you ever investigate to determine why

4    Ms. Kinnin had said she would work on the computers in

5    the president's office?

6    A.   No.

7    Q.   Do you know if Mr. Briggs was ever sent by

8    Ms. Kinnin to work on the Mac computers in the

9    president's office?

10   A.   I don't know.

11   Q.   So we're going to now use a binder.

12        MR. STECK:  Dave, if you could mark that

13        as Exhibit 2.  Mike, you can have one.  I know

14        that will excite you greatly.  We might as well

15        take a quick bathroom break.

16        MR. BILLOK:  Okay.  We'll take five.

17        (Plaintiff's Exhibit 2 was marked for

18        identification.)

19        (A recess was taken in the proceedings.)

20        (The proceedings were reconvened as

21        follows:)

22        MR. STECK:  Back on the record.

23   Q.   I don't know if I asked you this.  Have you

**SUPA-0126**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    41

1   ever testified at a deposition before?

2       A.   Yes.

3       Q.   How many times?

4       A.   Three or four.

5       Q.   Have you ever testified in court?

6       A.   No.

7       Q.   In a deposition when you're under oath you're

8   not supposed to discuss the substance of your testimony

9   with any of the attorneys.  Okay?  Do you understand

10  that?

11      A.   I do.

12      Q.   All right.  So you just had a meeting with

13  Mr. Billok.  What were you talking about with

14  Mr. Billok?

15      A.   He asked me if I was okay.  He asked me if I

16  was tired.  He asked me if I needed a break.

17      Q.   He's a very nice fellow, so that does not

18  surprise me, but we do have to check on that.  These are

19  Bate-stamped numbers.  Are you familiar with

20  Bate-stamped numbers?

21      A.   Yes.

22      Q.   The way this is organized is the front are

23  documents containing Bate-stamped numbers that were

**SUPA-0127**

(Diane Pfadenhauer)                                    42

1    provided to me and my client by Skidmore College.

2        A.   Okay.

3        Q.   The tabs are documents that were not provided

4    by Skidmore College but that we had in our records.

5    Okay?

6        A.   Yes.

7        Q.   So I want to direct your attention to

8    document -- I'm going to use the last digits.  2247.

9    Page 2247.

10       A.   Where might I find 2247?

11       Q.   They are all in page number order.

12            MR. STECK:  Mike, I think we need the

13            original of this thing.  She won't be able to

14            tell.

15       A.   Okay.  2247.  Got it.  I was looking for 247.

16       Q.   This document also has handwritten page numbers

17   at the bottom.

18       A.   Okay.

19       Q.   And it goes all the way to page 2269.

20       A.   Okay.

21       Q.   This is a document dated -- if you look at the

22   top, it says part 1, May 30, 2018, and part 2, June 12,

23   2018.  Do you recall if those were dates when Kathy

**SUPA-0128**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                         43

1   Kinnin submitted written complaints to the college?

2       A.   I don't recall specifically.

3       Q.   This document, the one problem with it is as

4   it's reproduced, and Mike is trying to find the

5   original, but as it's reproduced you can't really tell

6   what's the original and what the comments are.  But what

7   the document is, based on prior testimony, and counsel

8   can certainly object if I'm misstating, is a copy of

9   Kinnin's complaints with comments by Tom Marcotte.

10  Okay?

11      A.   Okay.

12      Q.   And while you were investigating this case do

13  you think it was appropriate for Mr. Marcotte to have

14  access to Ms. Kinnin's complaints so he could make

15  comments on it?

16      A.   Are you suggesting that these --

17      Q.   All the marks on there.  The original will show

18  it more clearly.  You can actually see from the original

19  where typed comments were added by Mr. Marcotte and also

20  the handwritten notes and the check marks.

21      A.   I think I remember now.

22      Q.   Was that given to you when you were

23  investigating the case?

**SUPA-0129**

(Diane Pfadenhauer)                                          44

1      A.   I think I recall Marcotte having a document

2  where he did sort of add text.  It was in a different

3  color.

4      Q.   Okay.  I think Duffy also did that; is that

5  correct?

6      A.   I don't remember.  I would have to see once we

7  start talking about Duffy.

8            MR. BILLOK:  If we can take five minutes,

9         I can make a couple color copies.

10            MR. STECK:  That's fine.  In fact, why

11         don't you make one for me, as well?

12            MR. BILLOK:  Absolutely.

13            (A recess was taken in the proceedings.)

14            (During the recess Plaintiff's Exhibit 3

15         was marked for identification.)

16            (The proceedings were reconvened as

17         follows:)

18  BY MR. STECK:

19      Q.   Do you recognize Exhibit 3?

20      A.   Yes.

21      Q.   What do you recognize it to be?

22      A.   This looks like a copy of a document that

23  Marcotte gave me.

**SUPA-0130**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                           45

1      Q.   And was that his commentary, as you understood

2  it, on allegations that Kinnin had made?

3      A.   Yes.

4      Q.   All right.  Did Ms. Kinnin ever give you any

5  commentary on Leon Briggs' complaint?

6      A.   You mean written commentary?

7      Q.   Yes.

8      A.   We discussed his complaint.  I'm not sure if

9  she had forwarded any correspondence to me or Gretchen

10 after that.

11     Q.   Did you give her a copy of the Briggs

12 complaint?

13     A.   No.

14     Q.   When you talked to Ms. Kinnin was it your

15 understanding that she had seen or not seen the Briggs

16 complaint?

17     A.   I don't recall.

18     Q.   Now, how many times did you meet with

19 Ms. Kinnin?

20     A.   I don't recall specifically.

21     Q.   Did you have more than one meeting --

22     A.   Yes.

23     Q.   Not with her.  I haven't finished the question.

**SUPA-0131**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer) 46

1     A.   Okay.

2     Q.   Sometimes did you have more than one meeting

3  with certain witnesses?

4     A.   Yes.

5     Q.   And there was an initial meeting and then a

6  followup; is that correct?

7     A.   With some of them, yes.

8     Q.   Why did you have follow-up meetings with some

9  of the witnesses?

10    A.   Because there may have been information that I

11  needed to clarify.

12    Q.   Let's look at 1150 now.  Let's hope that's the

13  right number, 1150.  1150 reflects the fact that you did

14  have follow-up meetings with several witnesses; is that

15  correct?

16    A.   Yes.

17    Q.   Did you ever have a follow-up meeting with

18  Kathy Kinnin?

19    A.   Yes.

20    Q.   And at the follow-up meeting, was it your

21  understanding that she had seen the Briggs complaint by

22  that time?

23    A.   I don't recall.

**SUPA-0132**

1    Q.   Do you know if you ever met with her after she

2    had seen the Briggs complaint?

3    A.   I don't know if she ever -- I don't have

4    knowledge as to whether she ever saw the Briggs

5    complaint.

6    Q.   Just so I get your testimony clear.  Are you

7    sure you had two meetings with Kathy Kinnin?

8    A.   Yes, I believe I did.

9    Q.   Let's look at 622.  In group 3 it indicates,

10   "Please ask them to bring laptops to possibly review

11   emails," and you have Marcotte and Duffy listed.  Did

12   you ever give direction to Kinnin that she should bring

13   her laptop with her to review emails when she met with

14   you?

15   A.   I believe she did.

16   Q.   And what did you tell the people that you

17   interviewed as to why they were being questioned?

18   A.   They had been advised by human resources that

19   there had been a complaint.

20   Q.   Complaint by whom?

21   A.   I believe they understood that there was a

22   complaint by Briggs and there was a complaint by Kinnin.

23   Q.   You didn't tell them, though?

**SUPA-0133**

(Diane Pfadenhauer)                                    48

1       A.   They knew.  When they got to me they had been

2   advised by human resources.  That was my understanding.

3       Q.   That was your understanding.  Did you have a

4   list of questions that you used for the user services

5   staff or for directors in IT?

6       A.   What I did is I went through my notes.  What I

7   did was I went through my notes from my meeting with

8   Kathy or the various emails I had received in connection

9   with her complaints that I received from human

10  resources.

11      Q.   When you say your notes, did you take notes in

12  advance of your meeting with Kinnin?

13      A.   No.  I went through -- I think there was some

14  sort of written documentation that came from human

15  resources about her concerns.  I would have used that --

16      Q.   All right.

17      A.   -- as the basis and then walked through it with

18  her in terms of what her concerns were.

19      Q.   Did Mr. West ever offer to send the president

20  written questions that he could answer?

21      A.   I don't recall.

22      Q.   Why don't we look at number 684?  That doesn't

23  look right.  So the beginning of your report says on

**SUPA-0134**

(David Mayo, CM 518-495-9312)

1    page S2596 that the president was unavailable.  Do you

2    recall whether Mr. West offered to send the president

3    written questions that he could answer even though he

4    was not available to be interviewed?

5        A.   I don't recall.

6        Q.   Before you were even asked to investigate did

7    anyone ever ask you to investigate the question whether

8    Mr. Marcotte had retaliated against Ms. Kinnin for

9    making a complaint of sex discrimination concerning

10   Mr. Marcotte?

11       A.   State that again, please.

12       Q.   Before you undertook your investigation you had

13   the knowledge that Mr. Briggs had made a complaint of

14   race discrimination; correct?

15       A.   Yes.

16       Q.   And did you have the knowledge that Ms. Kinnin

17   had made a number of complaints that she considered to

18   be complaints of sex discrimination?

19       A.   Are you asking me if I knew this before I

20   started Briggs' investigation?

21       Q.   Yes.

22       A.   No.

23       Q.   So when you started the investigation you

**SUPA-0135**

(Diane Pfadenhauer)                                           50

1    basically thought you were investigating the Briggs

2    complaint; is that correct?

3         A.   Yes.

4         Q.   And during that investigation HR brought to

5    your attention that there were complaints by Kinnin?

6         A.   Correct.

7         Q.   Was it your understanding that Kinnin believed

8    that the things that had happened to her were the

9    product of sex discrimination?

10        A.   I believe so.

11        Q.   And during the course of your investigation did

12   anyone in HR ever ask you to investigate whether Tom

13   Marcotte had retaliated against Kathy Kinnin for a prior

14   complaint of sex discrimination that she made against

15   Mr. Marcotte?

16        A.   My recollection of what happened is that I was

17   investigating the Briggs complaint and that at some

18   point during that investigation I became aware from

19   people in human resources that Ms. Kinnin had come to

20   human resources, met with Barbara Burke (sic).

21        Q.   Beck.

22        A.   Beck.  And initiated some sort of complaint,

23   her own at that time, while I was conducting the first

SUPA-0136

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          51

1     investigation.

2          Q.   Did they tell you what the nature of

3     Ms. Kinnin's complaint was?

4          A.   That it was a complaint against Mr. Marcotte in

5     connection with her gender.

6          Q.   Did there ever come to your attention any

7     information indicating that Mr. Marcotte had retaliated

8     against her for a prior complaint of gender-based

9     discrimination?

10         A.   No.

11         Q.   You had an understanding that Ms. Kinnin had

12    met with the president of the college, Mr. Glotzbach,

13    concerning her complaints of sex discrimination?

14         A.   Can you restate that?

15         Q.   Did you have an understanding that Ms. Kinnin

16    had met with the president of the college,

17    Mr. Glotzbach, concerning her complaints of

18    discrimination?

19         A.   I don't recall that.

20         Q.   We just looked at a document, the one that Mike

21    so kindly provided us in red here.  I don't remember the

22    exhibit number.  What is it?

23         A.   3.

**SUPA-0137**

(David Mayo, CM 518-495-9312)

1      Q.   Exhibit 3, yes.  Do you have an understanding

2  of how it came to be that Ms. Kinnin wrote those

3  complaints for human resources?

4      A.   You mean these?

5      Q.   The ones that she wrote, not Mr. Marcotte.  How

6  did that come about?

7      A.   I don't know.

8      Q.   Did you ever in the course of your

9  investigation ascertain that Ms. Kinnin was unhappy with

10  the reaction of HR to her prior complaints that she had

11  been making since 2015?

12      A.   I do recall a conversation with Saytra Green

13  where there had been some sort of issue that Saytra

14  believed had been resolved but that Ms. Kinnin believed

15  had not been resolved.

16      Q.   Do you remember what it was?

17      A.   I don't remember what it was.

18      Q.   All right.  Do you know who told Ms. Kinnin to

19  write a written account of her complaints?

20      A.   No, I don't.

21      Q.   Who suggested that you interview Joel Aure, the

22  Title IX officer of the college?

23      A.   It must have come up in the course of my

**SUPA-0138**

(Diane Pfadenhauer)                                      53

1   conversations with other people, or someone probably

2   mentioned to me that he had some information in

3   connection with this investigation.

4        Q.   Did he have any information in connection with

5   this matter?

6        A.   I don't remember.  I remember having a

7   conversation with him, but I don't remember the

8   particular details.

9        Q.   Who was Joyce Cosertino?

10       A.   I don't know.  I don't recall.

11       Q.   Who was Kathy Coffinger?

12       A.   Well, there was user services and there was the

13  help desk.  She worked at the help desk.

14       Q.   And Kathy's management responsibility included

15  the help desk; is that correct?

16       A.   I believe so.

17       Q.   Did you have an understanding that

18  Ms. Coffinger had any difficulties working for Kathy

19  Kinnin?

20       A.   I don't remember.

21       Q.   Kevin Crider.  Why did you interview him?

22       A.   I don't know.  Like I said, the people that I

23  interviewed came up as potential witnesses or people who

**SUPA-0139**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer) 54

1    would be believed to have additional information based

2    on the statements of the other witnesses.

3         Q.   Were these names given to you by HR?

4         A.   No.

5         Q.   These were names that you developed on your

6    own?

7         A.   Yes.  There were other names that were

8    recommended to me by Ms. Kinnin, as well.

9         Q.   Wendy Anthony.  How did you come to interview

10   her?

11        A.   I actually don't know.  I would have to look

12   and see.  I don't recall offhand.

13        Q.   In this investigation it came to your attention

14   that Ms. Kinnin had asked her employees to maintain a

15   calendar?

16        A.   Yes.

17        Q.   Did you have an understanding that Mr. Briggs

18   was the only employee who was asked to do that?

19        A.   My understanding is that there was some

20   discussion about his entries on that calendar and

21   whether they were adequate, according to Ms. Kinnin.

22        Q.   Well, was it your understanding that he was the

23   only employee that Ms. Kinnin was asking to maintain a

**SUPA-0140**

(Diane Pfadenhauer)                                    55

1    calendar of daily activities?

2         A.   I don't really recall.

3         Q.   Did you discuss with Ms. Kinnin why she asked

4    that her staff maintain that calendar?

5         A.   I believe I did.

6         Q.   And what did she say?

7         A.   My understanding is that she wanted to account

8    for their activities.

9         Q.   For what reason?

10        A.   She wanted to know what they were working on.

11        Q.   Was it so she could monitor whether tasks that

12   were assigned to her department had been completed or

13   not?

14        A.   I would suspect so.

15        Q.   Beth DuPont.  Well, let's go back one here.

16   Chris Breslin was an employee in user services?

17        A.   Yes.

18        Q.   Did you have an understanding that he worked on

19   the Windows side?

20        A.   Yes.

21        Q.   Did he have difficulties working with

22   Ms. Kinnin?

23        A.   I believe he did.

**SUPA-0141**

(Diane Pfadenhauer)                                          56

1      Q.   Did Ms. Beth DuPont, who was a director, have

2  difficulties working with Ms. Kinnin?

3      A.   Beth DuPont?

4      Q.   Yes.

5      A.   I don't remember.  I barely remember who she

6  is.

7      Q.   Was she a person that Kathy identified as a

8  female who had experienced sex discrimination in a

9  manner very similar to what she was alleging?

10     A.   I don't recall.  I know that Ms. Kinnin had

11 mentioned one or two other women, but I don't recall who

12 they were.

13     Q.   And you came to the conclusion that they did

14 not experience the same type of discrimination that

15 Ms. Kinnin had experienced -- or was alleging to have

16 experienced, I should say.  Is that true?

17     A.   Is that a question?

18     Q.   Yes.  "Is that true" makes it a question.

19     A.   I would have to look.  I don't recall.  If I

20 recall correctly --

21     Q.   Have you read the report?

22     A.   I haven't read the report since I gave it to

23 the college.

**SUPA-0142**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                          57

1     Q.   We're going to go through it in greater detail.

2     It just takes longer.  Did you have an understanding

3     that Kathy Dorando had difficulties working with

4     Ms. Kinnin?

5     A.   Who is Kathy Dorando?  Is she in user services?

6     Q.   Yes.  She is the other Mac technician in

7     addition to Mr. Briggs.

8     A.   My recollection is she was a relatively new

9     employee.  Is that correct?

10    Q.   No.  You might be referring to Kathy Coffinger.

11    Kathy Dorando had been there for awhile, I believe.

12    A.   I don't recall.

13    Q.   Mr. Bill Duffy, who was the chief technology

14    officer, did you believe that his opinions of Kathy

15    Kinnin were influenced by Tom Marcotte?

16    A.   No.

17    Q.   Steve Dinyer.  He was an employee that had been

18    employed in IT for a long time; is that correct?

19    A.   I believe so.

20    Q.   And was it your understanding that his behavior

21    was a subject of complaint by both Kinnin and DuPont?

22    A.   Yes.

23    Q.   And was it your understanding that Mr. Dinyer

**SUPA-0143**

(David Mayo, CM 518-495-9312)

1   had been counseled numerous times, both by Mr. Duffy and

2   HR, concerning his behavior?

3       A.   My understanding is that his behavior was

4   unusual, acrimonious.  It was not my understanding that

5   any of his behavior was gender based or discriminatory

6   in any manner.  And I am aware that he had been spoken

7   to by someone.

8       Q.   So is it your position that if a man is equally

9   abusive to men and women that that does not constitute

10  sex discrimination?

11              MR. BILLOK:  Object to the form of the

12              question.  You can answer.

13      A.   No.

14      Q.   Does that mean that you don't think it's sex

15  discrimination or you do think it's sex discrimination

16  if a man is equally abusive to men and women?  What is

17  your opinion?

18      A.   My opinion?

19      Q.   Yes.

20      A.   I think boorish behavior, if we can label

21  Mr. Dinyer's behavior as boorish for a moment, directed

22  towards anybody is inappropriate.

23      Q.   But even if it's directed equally to men and

**SUPA-0144**

1    women --

2         A.   Is it discriminatory conduct or is it just

3    being a jackass?

4         Q.   Are there circumstances under which boorish

5    behavior, as you referred to, even though directed

6    equally to men and to women, can constitute

7    discrimination against women?

8              MR. BILLOK:  Object to the form of the

9              question.  You can answer.

10        A.   I'll say no.

11        Q.   Have you ever encountered the standard of what

12   is offensive to the reasonable woman?

13        A.   Yes.

14        Q.   And that can be different than what is

15   offensive to a man; is that correct?

16        A.   That is correct.

17        Q.   So there was this issue about Michael Forbes

18   and his computer usage.  Do you remember that?

19        A.   Michael Forbes?

20        Q.   Printer usage.

21        A.   Printer usage, yes.

22        Q.   Mr. Forbes was an African-American gentleman

23   who later became director of media services; is that

**SUPA-0145**

1    right?

2         A.    I believe so.

3         Q.    And is it your understanding that Ms. Kinnin

4    violated college policy by running a report that showed

5    how much Mr. Forbes had used the printer?  The colored

6    printer.

7         A.    That is my understanding.

8         Q.    And who did you get that understanding from?

9         A.    I believe I answered that earlier.  It was Mike

10   West.

11        Q.    Did you ever see any documents that Mr. Forbes

12   had printed using the color printer?

13        A.    No.

14        Q.    Did you ever see any emails in which superiors

15   of Kathy Kinnin, such as Tom Marcotte or Bill Duffy,

16   requested reports concerning individuals' usage of

17   printers or computers?

18        A.    My understanding is that matter had been

19   investigated previously.

20        Q.    And you took it as given for your investigation

21   that the representation made to you by Mr. West was

22   accurate; is that correct?

23        A.    Correct.

**SUPA-0146**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                          61

1     Q.   Did it ever come to your attention that

2    employees who had made complaints about men in the

3    workplace were directed by HR to the EAP program?

4     A.   There was one particular woman who I met with

5    whose name escapes me.

6     Q.   Shelly Joyce, would it be?

7     A.   Perhaps.  Who found it insulting that the HR

8    representative with whom she spoke had suggested she go

9    to the EAP.

10    Q.   Did she get from either HR or EAP a book on how

11   to deal with narcissists in the workplace?

12    A.   I recall some discussion about somebody giving

13   somebody a book.  I don't recall the details about the

14   book.

15    Q.   In fact, your report refers to a book.  It

16   doesn't say the details.  The document will speak for

17   itself.  Did Kathy Kinnin make a complaint to you during

18   the investigation that she, too, had been sent to EAP

19   and there given a book on how to deal with narcissists?

20    A.   My understanding from Ms. Kinnin is that the HR

21   department recommended that she go to the EAP.  I don't

22   recall a discussion about a book.

23    Q.   On how to deal with narcissists?

**SUPA-0147**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer) 62

1    A.   Yes.

2    Q.   Now, what's your understanding of EAP?

3    A.   EAP provides support services for employees

4    going through issues at home, issues at work.

5    Q.   Sort of like almost social work or counseling

6    or psychological assistance; is that correct?

7    A.   Or referral services for those kinds of things.

8    Q.   In your HR experience do you think it's

9    appropriate to tell employees that they should learn how

10   to deal with narcissists in the workplace?

11   A.   I suppose in the eyes of that particular human

12   resources person, if they thought that would be helpful,

13   then it would be appropriate.

14   Q.   Would it also be helpful to try and send the

15   alleged narcissist to EAP so the alleged narcissist

16   might be able to better control their behavior?

17   A.   My sense is that the standard practice would be

18   to address the concerns of the complainant.

19   Q.   And the concerns of the complainant can on

20   occasion be dealt with by counseling or other remedial

21   measures with the person who the complainant is

22   complaining about; is that correct?

23   A.   Possibly.

**SUPA-0148**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                               63

1      Q.   Now, Michelle Osgood was an individual -- this

2   may refresh your recollection -- that Ms. Kinnin

3   complained that Osgood was promoted to assistant

4   director without a hiring process.  Is that your

5   understanding of what Ms. Kinnin's complaint was about?

6      A.   I think so.

7      Q.   And was Ms. Kinnin's concern that she wanted to

8   give her staff the opportunity to apply for the position

9   because her staff really didn't have any other

10  opportunities for promotion?

11     A.   My understanding from Ms. Kinnin on that

12  subject is that she stated she wanted an opportunity for

13  her employees to apply for that position, but she also

14  had concerns about how Michelle Osgood was hired.

15     Q.   And did Mr. Marcotte complain to Ann

16  Petruzzelli about the purchasing process and telling her

17  that he would have done it differently?

18     A.   I believe that's correct.

19     Q.   Mr. Will Sabin was someone you interviewed who

20  I believe, according to your report, supported some of

21  Mr. Briggs' allegations; is that correct?

22     A.   Yes.

23     Q.   Did Ms. Kinnin indicate to you that she ever

**SUPA-0149**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    64

1   had any difficulties working with Mr. Sabin?

2        A.   Yes.

3        Q.   And did Mr. Sabin indicate to you that he had

4   difficulties working with Kinnin?

5        A.   Yes.

6        Q.   Did those difficulties get resolved?

7        A.   According to Mr. Sabin, yes.

8        Q.   Did it ever come to your attention that Kathy

9   Kinnin had written a needs improvement evaluation of

10  Mr. Briggs?

11       A.   Yes.

12       Q.   Did it come to your attention that HR directed

13  that evaluation be changed to satisfactory?

14       A.   I recall that there was some discussion between

15  HR and senior management in the department about the

16  final score or the final rating and whether that was

17  appropriate.

18       Q.   Did Mr. Duffy tell you that HR said that we

19  can't have, in sum and substance, so many needs

20  improvement evaluations in user services and that is why

21  they said the Briggs evaluation should be changed?

22       A.   I don't recall that.

23       Q.   There was a person you interviewed by the name

**SUPA-0150**

(David Mayo, CM 518-495-9312)

1    of John Sanders.

2         A.    Okay.

3         Q.    There was some question as to his performance

4    review.  Do you remember that?

5         A.    I think so.

6         Q.    Now, he got reviewed by Ms. Kinnin; correct?

7         A.    I don't recall.

8         Q.    Did you ever review Mr. Marcotte's evaluations

9    of Mr. Sanders to compare his evaluations with any that

10   Kinnin may have done?

11        A.    His evaluations by Ms. Kinnin?

12        Q.    No.  Mr. Marcotte was the director of user

13   services before Ms. Kinnin.  Do you remember that?

14        A.    Um-hmm.

15        Q.    Yes?

16        A.    Yes.

17        Q.    So did you ever review Mr. Marcotte's

18   evaluations of John Sanders to see how they compared

19   with Ms. Kinnin's review of Mr. Sanders?

20        A.    I don't recall.

21        Q.    Did it come to your attention that Mr. Marcotte

22   had given Mr. Sanders some less than favorable

23   evaluations?

**SUPA-0151**

(Diane Pfadenhauer)                                                    66

1      A.    I recall that there were issues with his

2    performance.

3      Q.    And did HR direct Mr. Marcotte to change

4    Mr. Sanders' evaluation?

5      A.    I have no idea.

6      Q.    Had you ever heard of something called the

7    staff advisory group?

8      A.    I recall there was a group of staff members who

9    could make recommendations to HR or management on some

10   issues.

11     Q.    And the head of it was a person by the name of

12   Rebecca Shepard.  And you interviewed her; correct?

13     A.    Yes.

14     Q.    Do you recall what Ms. Shepard's relevance was

15   to either the Briggs or the Kinnin complaints?

16     A.    My recollection is that there were some issues

17   that came up in this group that were either related to

18   Ms. Kinnin's complaint or had to do with employee

19   relations.  And I understood there was some question

20   about the scope of which that group should be embarking

21   on.  In other words, should they be involved in employee

22   relations matters?  My understanding is that Mr. West

23   directed that they not be addressing employee relations

**SUPA-0152**

(Diane Pfadenhauer)                                      67

1    matters.

2        Q.   Carol Schnitzer.  Is it your understanding that

3    she had made a complaint about Chris Bailey's behavior?

4        A.   I don't recall.  It's possible.  I don't recall

5    who Chris Bailey was.

6        Q.   Chris Bailey was an employee who worked in

7    media services, I believe.  And he had come from the

8    private sector and he had a very, I think it's fair to

9    say, domineering type personality.  No recollection of

10   that?

11       A.   It sounds vaguely familiar.

12       Q.   Do you recall Schnitzer and DuPont and Kinnin

13   making complaints about Bailey's behavior?

14       A.   I recall some of that.

15       Q.   And Kinnin attributed certain behavior of men

16   to sex discrimination.  Other women didn't attribute it

17   to that.  My question is:  What is the relevance of

18   their opinions as to whether the behavior should be

19   attributed to sex discrimination or not?

20            MR. BILLOK:  Object to the form of the

21            question.  You can answer.

22       A.   Just restate the question for me, please.

23       Q.   I believe in your report from time to time you

**SUPA-0153**

(Diane Pfadenhauer)                                        68

1   say so-and-so did not ascribe that behavior to gender.

2   What is the relevance of an opinion by a person as to

3   whether the behavior should be ascribed to gender or

4   not?

5        A.   I would say that the "opinion" of the person is

6   based upon their understanding of the facts of the

7   situation.

8        Q.   So you would agree that it's the facts that are

9   determinative; isn't that correct?

10       A.   I would say I would look at that being more

11  objective.

12       Q.   Did it come to your understanding that Kathy

13  Kinnin had complained that Mr. Duffy was not addressing,

14  as her manager, was not addressing her complaints?

15       A.   My understanding is that Ms. Kinnin did express

16  those concerns.  My understanding from Mr. Duffy is that

17  he repeatedly tried to address her concerns and that she

18  was not satisfied with his attempts to resolve them for

19  her.

20       Q.   And is that because the behavior that she was

21  complaining about did not change?

22       A.   No.

23       Q.   Is it your belief that the people Ms. Kinnin

**SUPA-0154**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                        69

1    complained about as having exhibited bad behavior had

2    remediated themselves and changed their behavior?

3         A.   It was my opinion that the behavior that she

4    was complaining about was not discriminatory.

5         Q.   Okay.  And that behavior, whether it was

6    discriminatory or not, was it your understanding that

7    Mr. Duffy was successful in getting those behaviors to

8    stop?  Whether they were gender-based or not.

9         A.   What behaviors are we talking about?

10        Q.   We're talking about sort of aggressive

11   comments, disagreements, not working well together,

12   things of that nature.  Mr. Duffy thought enough of it,

13   according to you, to try and resolve those issues.  Was

14   it your understanding that Mr. Duffy was successful or

15   was not successful in resolving those issues in IT?

16              MR. BILLOK:  Object to the form of the

17              question.  You can answer.

18        A.   My opinion is that Ms. Kinnin was equally, if

19   not more, acerbic than those she complained about.

20        Q.   And this is all objective.  It's in written

21   documentation; is that right?

22        A.   Yes.

23        Q.   And that's your assessment of the written

**SUPA-0155**

(Diane Pfadenhauer)                                          70

1    documentation; correct?

2         A.   Correct.

3         Q.   And other people, the documents, it is well

4    said in law, speak for themselves; is that right?

5         A.   Um-hmm.

6         Q.   Yes?

7         A.   Yes.

8         Q.   Was one of Ms. Kinnin's criticisms of

9    Mr. Briggs that he did not deliver product to her in a

10   timely manner or at all?

11        A.   My recollection is that she believed that he

12   did not service internal customers, appropriately; that

13   he did not produce the work that she was requiring him

14   to produce and did not complete logs or status forms to

15   her satisfaction.

16        Q.   And did Ms. Kinnin have any complaints about

17   any of her other employees that were of the same kind?

18        A.   No.

19        Q.   Did it come to your attention that Mr. Briggs

20   during the workday spent an awful lot of time in

21   Mr. Marcotte's office with the door closed?

22        A.   I was told that he did that.

23        Q.   Did you discuss that with Kathy Dorando to

**SUPA-0156**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                      71

1    determine whether it was true?

2          A.   Was Kathy Dorando the new person in IT?

3          Q.   Kathy Dorando worked in Mac.  She was the other

4    Mac technician.

5          A.   But she was relatively new?

6          Q.   I don't know if she was relatively new or not.

7          A.   Just restate your question again for me,

8    please.

9          Q.   My question was whether you discussed with

10   Kathy Dorando the amount of time that Mr. Briggs spent

11   in Mr. Marcotte's office with the door closed.

12         A.   My recollection is that she did say that it was

13   her understanding that she observed Briggs spending time

14   in Marcotte's office.

15         Q.   And was that time spent in Mr. Marcotte's

16   office working on computers?

17         A.   I have no idea.

18         Q.   Did you bother to investigate what Mr. Briggs

19   was doing in Mr. Marcotte's office?

20         A.   In my conversations with Mr. Briggs he advised

21   that he was in Mr. Marcotte's office discussing his

22   concerns.

23         Q.   And so he was in Marcotte's office discussing

**SUPA-0157**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    72

1    Kinnin; is that correct?

2         A.   His concerns about how he is being treated.

3         Q.   By Kinnin; is that correct?

4         A.   I'm assuming, yes.  I wasn't there.

5         Q.   Well, you were asking these questions.  Now,

6    are you familiar with anyone who uses emails as a to-do

7    list?

8         A.   I'm not sure what you mean.

9         Q.   In other words, that you get emails -- you may

10   even do this yourself.  You get an email and when you

11   read the email and you do that task you delete it.

12        A.   Okay.

13        Q.   Yes, that happens?

14        A.   I suppose it can happen.  I don't do that.

15        Q.   Have you ever heard of people managing their

16   time that way?

17        A.   I don't recall.

18        Q.   In connection with Mr. Briggs, was that a

19   suggestion that Ms. Kinnin made to him, that in order to

20   get him to be more responsive to requests that he use

21   his email as essentially a to-do list?

22        A.   I recall that she had some concerns about how

23   he managed his inbox.

**SUPA-0158**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    73

1      Q.   Is that because the emails were not being

2   responded to and they were requests for work to be done?

3      A.   Whether they were requests for work to be done

4   or they were issues that she needed him to work on that

5   maybe were not customer related.

6      Q.   Did she have a concern they were not responded

7   to?

8      A.   I think you could draw that conclusion, because

9   she was concerned about how he managed his email was

10  different than the way she managed her email.  She felt

11  that the way he managed his email was causing him to be

12  less productive than he needed to be.

13     Q.   Did you believe he was, based on your

14  investigation, that he was less productive than he

15  needed to be?

16     A.   No.

17     Q.   And how did Mr. Briggs make up for the fact

18  that he lacked any experience working with Mac

19  computers?

20     A.   I don't know.  I think there is a question of

21  experience and there is a question of motivation and

22  diligence at work.  I think those are separate things.

23     Q.   Okay.  Did it come to your attention that

**SUPA-0159**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                    74

1    Mr. Briggs was not competent with Mac computers?

2        A.   My understanding is that Ms. Kinnin felt he was

3    not competent.

4        Q.   Did you talk to anyone else who --

5        A.   My understanding was that Mr. Marcotte believed

6    he was competent.

7        Q.   Did Mr. Marcotte tell you that Leon Briggs did

8    not have any experience with Mac computers?

9        A.   I believe we discussed it, but he also believed

10   that based on his experience with Mr. Briggs that

11   Mr. Briggs either had some experience or was a quick

12   learner.  He may have actually -- my recollection is

13   that he may have actually not been in a work environment

14   with a Mac but that he had experience personally with

15   Macs.

16       Q.   All right.  This is information coming to you

17   from Mr. Marcotte; is that correct?

18       A.   As well as from people like Will Sabin.

19       Q.   Did Will Sabin work on Macs?

20       A.   No.  He was the Windows guy.

21       Q.   Why would you believe Mr. Marcotte saying that

22   he felt Briggs would be competent with Macs over Kinnin

23   observing his daily activities and concluding he was not

**SUPA-0160**

(Diane Pfadenhauer)                                    75

1    effective with Mac?

2         A.   Because Marcotte was the head of the entire

3    department.

4         Q.   Okay.  Very good.  Because he is head of the

5    department, if he was, that would mean he would be a

6    more credible person than Ms. Kinnin?

7         A.   It's not a matter of weighing who is more

8    credible as much as it's a matter of taking all of the

9    evidence into account.

10        Q.   And you found based on the evidence that

11   Mr. Marcotte was credible in his assessment of

12   Mr. Briggs' work performance?

13        A.   Yes.

14        Q.   Did you ever see any email from Mr. Marcotte in

15   which he indicated hostility toward Kinnin?

16        A.   There was one email where I would say he was

17   rather gruff.

18        Q.   Were there others when he accused her of

19   insubordination?

20        A.   I don't recall.

21        Q.   Were there others where he said she should be

22   disciplined?

23        A.   I don't recall.

**SUPA-0161**

(David Mayo, CM 518-495-9312)

1     Q.   Was there an email that you saw where

2   Mr. Marcotte said that because Kinnin had made a

3   complaint of sex discrimination against him that he

4   needed to defend himself?

5     A.   I'm not sure if that was in an email or whether

6   he stated that.

7     Q.   Now, did Mr. Briggs deny that he had discussed

8   Kinnin with Mr. Marcotte?

9     A.   No.

10    Q.   Kevin Partlow was an employee who was fired.

11  Do you remember Mr. Partlow coming to your attention?

12    A.   The name sounds familiar, but I don't recall.

13    Q.   Do you remember why he was fired?

14    A.   No.

15    Q.   Do you remember if there were any objections to

16  his being fired?

17    A.   I don't remember.

18    Q.   I would like to direct your attention to

19  page 2587.  This is a letter regarding Kevin Partlow

20  detailing performance issues that Kathy wrote to him on

21  October 24, 2016.  Did this come to your attention

22  during your investigation?

23    A.   Yes.  I remember this now.

**SUPA-0162**

(Diane Pfadenhauer)                                        77

1     Q.   Did anyone tell you that the concerns about

2     Mr. Partlow were unjustified?

3     A.   No.  My understanding is that they were

4     justified.

5     Q.   And do you recall an issue where Mr. Briggs

6     complained of being denied password access to some

7     software?

8     A.   Yes.

9     Q.   Is it fair to say that was evidence that he

10    gave as to how he was mistreated by Kinnin?

11    A.   Yes, because I believe he had had access to

12    whatever it was before and it was taken away.

13    Q.   Did it come to your attention that the company

14    who manufactured the software changed its password

15    requirements and that Mr. Briggs' password simply no

16    longer worked?

17    A.   No.

18    Q.   Other than Mr. Briggs' complaint, was there any

19    evidence that you saw that anyone had actually changed

20    his rights to access that particular software?

21    A.   State that again, please.

22    Q.   So do you know what it means, rights to access

23    software?

**SUPA-0163**

(Diane Pfadenhauer)                78

1      A.   I do.  Just restate the question.

2      Q.   Did you have any evidence that Mr. Briggs'

3   rights to the software were ever changed?

4      A.   I was advised by -- I came to understand that

5   from various people in IT.  It could have been Marcotte

6   or Duffy or Kinnin herself.

7      Q.   So it was hearsay, basically; correct?

8      A.   It was statements by individuals in their

9   interviews.

10     Q.   But you didn't have any evidence showing that

11  his rights had been changed, any documentary evidence;

12  is that correct?

13     A.   Correct.

14     Q.   Was it your understanding that after the

15  password issue was resolved that Mr. Briggs was again

16  using software?

17     A.   I don't recall that.

18     Q.   Did Mr. Marcotte have any knowledge of Mac

19  computers?

20     A.   I don't know.

21     Q.   How about Mr. Duffy?

22     A.   I don't know.

23     Q.   Did Mr. Marcotte observe on a firsthand basis

**SUPA-0164**

(David Mayo, CM 518-495-9312)

1    Mr. Briggs' performance?

2         A.   I understood that he did.

3         Q.   That was your understanding?

4         A.   No more or no less than anybody else.

5         Q.   No more or less than Kathy Kinnin, for example?

6         A.   No.  My understanding is that he understood the

7    individuals in user services and their performance.

8         Q.   Just as well as their own managers; is that

9    correct?

10        A.   I don't know.

11        Q.   What about the people that worked on a daily

12   basis with Mr. Briggs in Mac?  Wouldn't they be better

13   able to see what he was doing rather than Mr. Marcotte?

14        A.   Quite possibly.

15        Q.   Mr. Marcotte basically sat in his office; is

16   that right?

17        A.   I don't know.

18        Q.   Did you ever find out what Mr. Marcotte's

19   duties actually were?

20        A.   I did.

21        Q.   And what were those duties?

22        A.   I don't remember.  I don't recall specifically.

23        Q.   All right.  And Mr. Duffy was the chief

**SUPA-0165**

(Diane Pfadenhauer)                                          80

1    technology officer.  Kathy Kinnin was his direct report.

2    Is that your understanding?

3         A.   My understanding is that there was some sort of

4    dual role where she did have some reporting relationship

5    to Marcotte.

6         Q.   Was it your understanding that Mr. Marcotte had

7    a supervisory role over the employees in user services?

8         A.   I understood that he had management roles over

9    some of the work that they did.  And like Kinnin, who

10   would get her performance reviews from Duffy, those

11   employees would get their performance reviews from

12   Kinnin.

13        Q.   That is correct.  So where does Marcotte fit

14   in?  What was his role in evaluating performance?

15        A.   My sense was that he was a right arm to Duffy.

16   My sense was that Duffy was somewhat more strategic and

17   Marcotte was more tactical, in terms of the day-to-day

18   operations of IT.

19        Q.   You have indicated in your prior testimony that

20   Mr. Marcotte had a lot of confidence in Mr. Briggs'

21   ability to react to the new environment working on Mac

22   even though he had no prior experience; is that correct?

23   Well, you didn't say he had no prior experience.  I have

**SUPA-0166**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    81

1    to rephrase the question.  That Mr. Marcotte had a lot

2    of confidence in Mr. Briggs' ability to service Mac

3    computers based on having worked with him in a previous

4    job; is that correct?

5         A.   No.  I think he had confidence in Briggs'

6    ability to grow and adapt and to ultimately be able to

7    successfully.

8         Q.   How long had Briggs worked there?

9         A.   I don't recall.

10        Q.   Do you have any evidence that he successfully

11   adapted to his Mac work?

12        A.   I believe there was other evidence that was

13   provided that showed that, people who expressed

14   confidence in his work.

15        Q.   Like Mr. Marcotte?

16        A.   And other end users.

17        Q.   End users.  Did you interview end users?

18        A.   I looked at documentation that was provided to

19   me.

20        Q.   Thanking him for something that he had done,

21   for example?

22        A.   Perhaps.

23        Q.   Did you look at any documentation or seek any

**SUPA-0167**

1    documentation where people said they did not want

2    Mr. Briggs working on their Mac computers?

3        A.   Ms. Kinnin provided that to me.

4        Q.   Was that invalid somehow?

5        A.   No.

6                 MR. STECK:  What time is it?

7                 MR. BILLOK:  20 after 11:00.

8                 MR. STECK:  I can take a bathroom break.

9                 THE WITNESS:  Yes, I can take a bathroom

10          break.

11               MR. STECK:  I'll go first.

12               (A recess was taken in the proceedings.)

13               (The proceedings were reconvened as

14          follows:)

15   BY MR. STECK:

16       Q.   Did Barbara Beck tell you that Kinnin had a

17   long history of filing unsubstantiated complaints?

18       A.   I don't recall that specifically.  I recall

19   being advised by someone in human resources that she had

20   a history of making accusations against others that were

21   unfounded.

22       Q.   Okay.  Did you have an understanding that when

23   asked to name people who were witnesses to such that she

**SUPA-0168**

(Diane Pfadenhauer)                                    83

1    refused?

2         A.   My understanding is that she was often

3    unwilling to provide names of witnesses.

4         Q.   And do you know if she was ever asked to

5    provide names?

6         A.   Yes.

7         Q.   And your understanding was that she was?

8         A.   Yes.

9         Q.   And did not; is that correct?

10        A.   Correct.

11        Q.   All right.  And did the college have a form for

12   making a complaint where you were required to list

13   witnesses?

14        A.   That I don't recall.

15        Q.   In any of her prior complaints -- well, we saw

16   the ones that were submitted in 2018 in the spring, but

17   in any of her prior complaints do you know if she was

18   asked to reduce them to writing?

19        A.   I don't know.

20        Q.   Do you know if HR helped her prepare a

21   complaint in writing?

22        A.   I don't know.

23        Q.   And I believe you already testified that you

**SUPA-0169**

(Diane Pfadenhauer)                                          84

1   don't remember Chris Bailey at all.  He is not a person

2   you interviewed because his employment was terminated,

3   not by Kathy Kinnin.

4       A.   And it's not this Partlow guy?

5       Q.   No.  Partlow we saw.  Bailey was a different

6   guy.  He was terminated for falsifying expense reports.

7       A.   I remember hearing the story.

8       Q.   Do you remember Beth DuPont complaining about

9   Mr. Bailey?

10      A.   Vaguely.  Who is Beth DuPont?

11      Q.   What was your understanding of the hiring

12  process for positions in IT?

13      A.   My sense is that they would go to human

14  resources and human resources would post a position.

15  They would accept applicants and they would interview

16  applicants.

17      Q.   Was there an interview committee?

18      A.   I believe there was.

19      Q.   And who had the final say as to who was hired?

20      A.   It's an interesting question.  There were a

21  number of questions about various people and their being

22  hired.  Ms. Kinnin was one.  Ms. Kinnin raised a

23  question about somebody else.  Osgood being promoted.

**SUPA-0170**

(Diane Pfadenhauer) 85

1    Like, for example, my understanding is that Marcotte

2    knew Ms. Kinnin from a previous professional association

3    and viewed her very favorably and was encouraging to

4    help bring her on board.  I recall some concerns that

5    Ms. Kinnin had in connection with hiring -- was it

6    somebody in the software programming area, perhaps?  And

7    then Osgood's promotion.

8        Q.  Was it your understanding that Tom Marcotte had

9    the final -- let's go back a little bit.  Tom Marcotte

10   was director of user services when Kathy Kinnin was

11   hired?

12       A.  Right.

13       Q.  And Kathy Kinnin worked for Tom Marcotte

14   successfully in user services while Tom Marcotte was

15   director; is that correct?

16       A.  I believe so.

17       Q.  In your report you attach some -- I believe

18   it's attached.  That's the way it was presented to us.

19   Some performance evaluations for Ms. Kinnin that were

20   never completed.  It's at the back.

21       A.  If there is a reference in my report to an

22   attachment, there were attachments.  If there is no

23   reference, there would not have been attachments.

**SUPA-0171**

(Diane Pfadenhauer)                                      86

1      Q.   I don't know.  You would have to take a look at

2    that.  There are attached to the report as it was given

3    to me two unsigned performance evaluations for

4    Ms. Kinnin.

5      A.   If there is no reference in here, I would not

6    have included them.

7      Q.   My question is:  Did you ever see an excellent

8    performance review by Bill Duffy for Kathy Kinnin after

9    she completed her first year as director of user

10   services?

11     A.   I don't recall.  Quite frankly, I don't think

12   these are my attachments.

13     Q.   All right.  Do you remember seeing any

14   completed performance reviews for Kathy Kinnin?

15     A.   I believe one of her complaints was she didn't

16   get performance reviews consistently.  My sense was that

17   Mr. Duffy did not do performance reviews consistently on

18   any of his staff.

19     Q.   Did you ask her for performance reviews as part

20   of your investigation?

21     A.   I believe I did.

22     Q.   Were they given to you?

23     A.   If they are in my pile, yes.

**SUPA-0172**

(Diane Pfadenhauer)                                          87

1      Q.   Is it fair to say --

2      A.   It's possible that Ms. Kinnin had provided them

3  to me, also.  I know there was some concern about

4  Briggs, for example, and his performance reviews.

5      Q.   Do you recall something where the college had a

6  leadership academy and Wendy Anthony attended that with

7  Mr. Marcotte?

8      A.   Yes.

9      Q.   Was Mr. Marcotte vocal in his opposition to

10  what was being taught?

11      A.   There were two things that I recall from that.

12  One was Mr. Marcotte -- I think Wendy describing him

13  being vocal about something.  And I also recall her

14  saying that despite that, he was very supportive of this

15  group and whatever they were doing and she was very

16  appreciative of some of the things he had said.

17      Q.   Did it ever come to your attention that

18  Mr. Marcotte had said the leadership academy was

19  "a waste of time"?

20      A.   I don't recall that.

21      Q.   Did it come to your attention that Mr. Marcotte

22  had said Ms. DuPont was not smart enough to run her

23  department?

**SUPA-0173**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                      88

1        A.    I don't recall that.

2        Q.    With the exception of Tom Marcotte, was it your

3    understanding that Ms. DuPont had some of the same

4    complaints that Kathy Kinnin did about how she was

5    treated?

6        A.    I remember very little about her.

7        Q.    We're going to go through a few things and see

8    if they refresh your recollection.

9        A.    That's fine.

10       Q.    Did you ever learn in the course of your

11   investigation that Beth DuPont had an employee that she

12   accused, in essence, of stalking type behavior?

13       A.    Yes.  I do remember that.

14       Q.    At one point in time did that employee rush at

15   her and she had to defend herself by putting up her

16   hands?

17       A.    Quite possibly.  I do remember something with

18   an employee.

19       Q.    Did it come to your attention that a memorandum

20   or document of some kind had been put in Beth DuPont's

21   file by HR saying that she put her hands on an employee?

22       A.    I do remember something about that.

23       Q.    And is it fair to say that Ms. DuPont had

**SUPA-0174**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    89

1    experienced great difficulties working with two men who

2    were her employees?

3        A.   I recall her having problems with this one

4    employee.

5        Q.   Not two?

6        A.   I don't recall two.

7        Q.   All right.  Do you know if she gave two

8    employees unsatisfactory or less than satisfactory

9    performance evaluations?

10       A.   I don't know.

11       Q.   Do you recall, did Ms. DuPont tell you that the

12   situation with the two employees was so bad that she, as

13   a manager, had to go to psychological counseling?

14       A.   I don't recall that.

15       Q.   Did you get the impression that Mr. Marcotte

16   never really gave up his directorship of user services

17   and wanted that department run by Kinnin exactly the way

18   he had run it?

19       A.   State that again, please.

20            MR. STECK:  Dave, do you want to read that

21            back?

22            (The reporter read back the previous

23            question.)

**SUPA-0175**

(David Mayo, CM 518-495-9312)

1      A.   No.

2      Q.   And let's go back to Ann Petruzzelli.  Did she

3  tell you that Mr. Marcotte had gotten more agitated over

4  time in dealing with the purchasing department?

5      A.   She described that they had differences of

6  opinion, that she could be equally as assertive as he

7  was.

8      Q.   Did she tell you that he definitely had a

9  negative reaction if things were not done his way?

10     A.   She told me that he was a senior-level person

11 in the organization and when he wanted things done, he

12 wanted things done.  That she would tell him, "No, it

13 has to be this way."  He might disagree, he might be

14 rather vocal, but at the end of the day they would

15 follow the rules.

16     Q.   Because it wasn't his responsibility to tell

17 purchasing how things should be done; is that correct?

18     A.   I suppose anybody could tell anybody how to do

19 things, but she wasn't going to deviate from her

20 required protocol, whether he complained or not.

21     Q.   And Joyce Cosertino had said that Mr. Marcotte

22 acted unprofessionally.  What did he do?

23     A.   I don't know.

**SUPA-0176**

(Diane Pfadenhauer)                              91

1      Q.   Was Cosertino someone whose name was given to

2  you by Kathy Kinnin?

3      A.   I don't remember.

4      Q.   I think it's Carol.  Did Carol Schnitzer

5  indicate that she had complained about how she was

6  treated by Hunt Conard, who at one time was director of

7  media services?

8      A.   I don't recall.

9      Q.   Did Ms. Kinnin complain about Hunt Conard?

10     A.   Perhaps.  I'm trying to think of who Hunt

11 Conard was.

12     Q.   He was director of media services before Mike

13 Forbes.

14     A.   I would have to refresh my memory.  I don't

15 recall right now.

16     Q.   Did you believe Mr. Marcotte had the right to

17 direct Ms. Kinnin as to how to run her department?

18     A.   I think any manager who was concerned about a

19 subordinate and how they are managing their area has a

20 right to direct them.

21     Q.   If that was truly the relationship between the

22 two; correct?

23     A.   I'm not sure what you mean by that.

**SUPA-0177**

(Diane Pfadenhauer)                    92

1    Q.  In other words, was Kathy Kinnin Mr. Marcotte's

2    report, ever?

3    A.  I think that there was a dual relationship and

4    there were issues that Marcotte oversaw that was within

5    the realm of Ms. Kinnin's responsibilities.

6    Q.  Did Mr. Marcotte have the right to evaluate

7    Ms. Kinnin's performance and prepare a performance

8    evaluation for her?

9    A.  I think it would be up to Mr. Duffy to make

10   that determination.

11   Q.  And did Mr. Duffy ever delegate to Mr. Marcotte

12   that function?

13   A.  I don't know.

14   Q.  Did he ever delegate to Mr. Marcotte the

15   function of managing Kinnin?

16   A.  I don't believe so.

17   Q.  Were you familiar with the ticketing system

18   that was used by both user and media services?

19   A.  My understanding is that there was a ticketing

20   system that Ms. Kinnin implemented for user services

21   that was not adopted by media services.

22   Q.  And the purpose of the ticketing system was so

23   she, as manager, could determine whether the work was

**SUPA-0178**

(Diane Pfadenhauer)                                                   93

1    performed; is that correct?

2         A.   To keep track of incoming requests for work.

3         Q.   And the completion of said work; correct?

4         A.   Okay.

5         Q.   Is that right?

6         A.   Yes.

7         Q.   And that's very normal.  Ticketing systems are

8    very normal; correct?

9         A.   Yes.

10        Q.   Do you recall any discussion about the

11   timekeeping system known as Kronos?

12        A.   Vaguely.

13        Q.   What do you recall?

14        A.   You have to refresh my memory.  It came up

15   somewhere in the conversation.

16        Q.   What do you recall about it?

17        A.   Not much.

18        Q.   Do you recall that the college was implementing

19   a Kronos system and it did not work in the first

20   instance with Mac?

21        A.   Yes, that was an issue.  Okay.

22        Q.   And what do you understand about that?  What

23   happened?

**SUPA-0179**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                94

1      A.   I would have to refresh my memory.  I would

2    have to look.

3      Q.   Did Ms. Kinnin eventually come to understand

4    that there was a patch that made Kronos work with Mac

5    and implement that patch?

6      A.   I don't recall that.

7      Q.   Do you recall Mr. Marcotte being upset because

8    the Kronos didn't work with Mac in the very first

9    instance?

10     A.   This is all slowly coming.  If I could refresh

11   my memory, I would be happy to explain what I know.

12     Q.   I don't know what you would refresh your memory

13   with.  That's the difficulty.

14     A.   Is it a complaint in the report?

15     Q.   I have no idea.

16          (Exhibit 1 is perused by the witness.)

17   BY MR. STECK:

18     Q.   It's not that important.  Let's pass on that.

19     A.   Okay.

20     Q.   Did you have a sense that Mr. Briggs had filed

21   his complaint of race discrimination in retaliation for

22   Ms. Kinnin's performance evaluations of him?

23          MR. BILLOK:  Object to the form of the

**SUPA-0180**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                              95

1          question.  You can answer.

2          A.   My sense is that he felt he was being

3     mistreated for a long time and that the performance

4     appraisal that he received from Ms. Kinnin was the end

5     result, where he felt he could take it no longer and

6     went to human resources.

7          Q.   Did it come to your attention that Ms. Kinnin

8     had gone to human resources and Mr. Duffy with a

9     performance improvement plan for Mr. Briggs?

10         A.   Yes.

11         Q.   And did you get the understanding that

12    Mr. Marcotte and Mr. Briggs had discussed having Briggs

13    file a complaint of race discrimination against

14    Ms. Kinnin?

15         A.   I don't recall that.

16         Q.   Did you ever review the organizational chart or

17    charts for IT?

18         A.   I reviewed the reporting relationships in my

19    interviews.

20         Q.   So you saw where Mr. Marcotte stood in the

21    organizational chart; is that correct?

22         A.   Yes.

23         Q.   One person you didn't interview, I don't

**SUPA-0181**

(David Mayo, CM 518-495-9312)

1    believe, is Herb Crossman.  Do you know who he was?

2        A.   He was in human resources.

3        Q.   Was he a diversity officer?

4        A.   My understanding is that he had the same

5    position that Saytra Green had in employee relations.

6        Q.   Do you know if Ms. Kinnin had made a report to

7    Herb Crossman?

8        A.   I'm not sure, but I know he was not employed

9    there at the time I was there.

10       Q.   So you didn't talk to him?

11       A.   Correct.  My understanding is that he was ill.

12   I don't know any details, but my understanding was he

13   was ill.

14       Q.   There was also some discussion of the

15   consolidation of user and media services and that

16   Ms. Kinnin had made this proposal and alleged that it

17   would save money.  And there seemed to be some criticism

18   on the ground that she didn't give any specifics.  Do

19   you remember that?

20       A.   My recollection was that the college was not

21   interested in consolidating media and user services.

22   And my recollection is also that Marcotte and Duffy

23   didn't believe that the research that went into the

**SUPA-0182**

(Diane Pfadenhauer)                                    97

1    proposal by Ms. Kinnin was substantial enough to justify

2    it.

3        Q.   Did you see the memorandum that Ms. Kinnin

4    wrote with that specific proposal?

5        A.   I don't recall.

6        Q.   Did you just accept what Marcotte and Duffy

7    said or did you actually look at anything to verify

8    their conclusions?

9        A.   My understanding is that the college was not at

10   all interested in consolidating those two departments

11   and, therefore, my understanding was they felt it was

12   not an issue to discuss and that her review and analysis

13   wasn't going to be something they were going to

14   consider, anyway.

15       Q.   Did Ms. Kinnin do anything other than provide

16   the memorandum to them to pursue this further or was the

17   matter simply dropped?

18       A.   I don't recall.  My sense was that --

19       Q.   Should she be subjected to criticism simply for

20   making such a proposal?

21       A.   If it is taking away from time that she might

22   be better served focusing on other things, perhaps she

23   should.  That wouldn't be my decision.

**SUPA-0183**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                99

1      Q.   Well, she could say she wasn't satisfied with

2   it, but did she say that the failure to consolidate

3   media services was some form of discrimination against

4   her?

5      A.   I'm not sure what you're asking.

6      Q.   What I'm asking is, she made a proposal.  The

7   proposal wasn't accepted.  So at that point, she might

8   have said to you that she thought it was a good

9   proposal, but the point is:  What did she do in the

10  workplace to not accept the college's decision not to

11  consolidate media services and user services?  What did

12  she do in the workplace?

13     A.   I have no idea.

14     Q.   Maybe nothing; right?

15     A.   Perhaps.

16     Q.   Okay.  So is that a problem somehow?

17     A.   She brought the issue up of consolidating user

18  services.  I'm not really sure what you're asking.

19     Q.   What I'm asking is, what was the -- okay.  She

20  brought it up, but what evidence did you find that that

21  adversely affected her ability to do her job as director

22  of user services?

23          MR. BILLOK:  Object to the form of the

**SUPA-0184**

(David Mayo, CM 518-495-9312)

1     Q.   But did you review anything to make a

2    determination as to whether she should be criticized for

3    merely making the proposal?

4     A.   My sense was that they were concerned that she

5    was interfering into issues that were not part of the

6    scope of her responsibilities.

7     Q.   Is merely making a proposal interfering?

8     A.   In their mind, yes.

9     Q.   And what evidence do you have of that?  Did

10   they counsel her for doing that?

11    A.   I don't recall.

12    Q.   You had indicated that Ms. Kinnin was never

13   satisfied with the outcome of any of her complaints.

14   What were the outcomes that she wasn't satisfied with?

15    A.   I think my understanding is that Ms. Kinnin was

16   never satisfied with the answers to various work-related

17   questions that she inquired about.  And I recall in my

18   report a list of a number of things where she, for

19   example, proposed the consolidation of two departments.

20    Q.   Let's stop right there.  What evidence do you

21   have that she wasn't satisfied with the fact they didn't

22   go forward with that?

23    A.   From her.  Her statements.

**SUPA-0185**

(Diane Pfadenhauer)                                    100

1              question.

2         A.   I don't have any sense that it did or didn't.

3         Q.   Did it?

4         A.   I have no idea.  I don't supervise her.

5         Q.   All right.  What college procedures did

6    Ms. Kinnin not accept?

7         A.   My understanding is that she would make

8    specific inquiries about certain procedures and

9    practices at the college.  She would be given specific

10   answers and feedback as to how those issues were

11   resolved.  For example, promotions and hires and hiring

12   the director of media services.  And despite being given

13   answers, she would continue to inquire and to continue

14   to argue the point that, for example, this gentleman

15   that was hired as director of media services was

16   entirely unqualified and had committed terrible things

17   at the college.  And it was like she would not let go.

18        Q.   Did Beth DuPont have the exact same complaint?

19   In fact, wasn't their complaint that the college hiring

20   procedures were not being followed?

21        A.   By whom?

22        Q.   By the college.

23        A.   Who is making the complaint that they are not

**SUPA-0186**

(David Mayo, CM 518-495-9312)

1    being followed?

2        Q.   Kathy Kinnin and Beth DuPont.  Wasn't that

3    their complaint?

4        A.   I can't even remember Beth DuPont.

5        Q.   Fascinating.  So you don't remember anything

6    about Beth DuPont.  Wasn't Kathy Kinnin's complaint that

7    the hiring procedures of the college were not being

8    followed?

9        A.   Yes.  She was also a beneficiary of that same

10   procedure.

11       Q.   No.  Did you ever see a report from Saytra

12   Green which was provided to you in the investigation

13   showing that there were, in fact, two applicants for

14   Kathy Kinnin's position?

15       A.   Okay.

16       Q.   And she was just selected in a competitive

17   process.  Did you ever see that?

18       A.   My understanding is that Marcotte, as I said

19   earlier, knew her from a prior workplace, a professional

20   association, and encouraged her to apply.

21       Q.   That was her application for being a user

22   services employee.  I'm talking about when she became

23   director of user services.  Was there an internal

**SUPA-0187**

(Diane Pfadenhauer)                                    102

1    posting and applications for the position?

2        A.   I don't recall.

3        Q.   Did you ever receive a report from Saytra Green

4    saying that there were?

5        A.   Perhaps.

6        Q.   So how is Kathy Kinnin a beneficiary of any

7    hiring processes of the college not being followed?

8        A.   In her employment when she first joined the

9    college.

10       Q.   Your understanding is there was no competitive

11   search for that position?  Is that your understanding?

12       A.   I'm not aware.

13       Q.   You don't know whether there is or isn't;

14   right?

15       A.   Yes.

16       Q.   So how can you conclude that she was a

17   beneficiary of hiring processes not being followed if

18   you don't know what the process was?  That's a fair

19   question.

20       A.   Would you like me to answer that?

21       Q.   Go right ahead.  Try.

22       A.   Mr. Marcotte, I'll say this again, said that he

23   got to know Kathy at a professional association and

**SUPA-0188**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    103

1  believed he was instrumental in her being hired at the

2  college.

3       Q.   Was that contrary to the hiring processes of

4  the college?

5       A.   It could very well have been.

6       Q.   But did you have evidence that it, in fact,

7  was?

8       A.   That's not what I was investigating.

9       Q.   But you've made the comment that she was the

10  beneficiary of the very practices that she was

11  criticizing.  And I'm trying to figure out whether you

12  had any knowledge of exactly how the procedure was when

13  Kathy Kinnin was hired.  It does seem, I think you would

14  agree, you don't have such knowledge; is that correct?

15       A.   That is correct.

16       Q.   Now, if you believe that you've been a victim

17  of discrimination, not whether you are, in fact, a

18  victim, but if you believe that you're a victim of

19  discrimination and you feel that human resources has not

20  been responsive, you can continue to go up the chain of

21  management with your complaint to see if you can get it

22  addressed differently?

23       A.   I would say that's accurate.

**SUPA-0189**

(David Mayo, CM 518-495-9312)

1       Q.   And did Kathy Kinnin do that?

2       A.   My understanding is she complained to a number

3    of different people.

4       Q.   Did she go to Mr. West?

5       A.   I think she did.

6       Q.   And did he tell her to go to the president?

7       A.   I don't recall.

8       Q.   You didn't get to meet the president, but you

9    did meet someone by the name of Joshua Woodfork, who

10   worked in the president's office?

11      A.   Yes.

12      Q.   And did Mr. Woodfork tell you that Ms. Kinnin

13   had sought guidance from the president?

14      A.   I believe he did.  I understood that she

15   complained to him, and I went to discuss it with him.

16   There was something in what he told me, and I don't

17   recall what it is right now, but there was something

18   that told me that led me to believe that she had misused

19   his trust.

20      Q.   Misused Woodfork's or the president's?

21      A.   Woodfork.

22      Q.   Did she make a complaint of discrimination to

23   Mr. Woodfork?

**SUPA-0190**

(Diane Pfadenhauer)                                      105

1      A.   I would have to look at my notes.  I would have

2  to look through here.

3      Q.   Is there anything improper about her going to

4  the president of the college to raise a complaint of

5  discrimination?

6      A.   No.

7      Q.   Do you know if anyone at the college advised

8  her that if she was unsatisfied with HR's determination

9  to file a complaint with the Equal Employment

10  Opportunity Commission?

11      A.   I don't know.

12      Q.   Did you ever ask anyone that question?

13      A.   I don't recall.

14      Q.   In your report you say that her statement that

15  some people were unqualified could be defamatory.  Do

16  you recall that?

17      A.   I recall her making rather inappropriate

18  statements about the gentleman who was head of user

19  services.  Not user services.  Media services.  She

20  accused him of theft.  She accused him of obtaining his

21  master's degree on work time.  She made very, very harsh

22  accusations against Osgood.  And I found it troubling

23  because she was not their supervisor.  She was not

**SUPA-0191**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    106

1   familiar with the work that they were responsible to do,

2   yet she openly and vehemently shared very, very, very

3   negative commentary about them.

4       Q.   Let's go back to Mr. Forbes and this whole

5   issue of him misusing equipment for personal purposes.

6   Now, you got information from HR saying that that had

7   not, in fact, happened; isn't that correct?

8       A.   And I spoke to Mr. Forbes and I spoke to

9   Ms. Kinnin.

10      Q.   Did Ms. Kinnin give you evidence that were

11  actual printouts from the printer showing that he, in

12  fact, had used it for personal purposes?

13      A.   She gave me printouts, but it didn't show what

14  was printed.  She showed some sort of report that --

15      Q.   Did she give you any of the actual documents

16  printed?

17      A.   I don't even know.  I spoke to HR.  They said

18  they had reviewed the same information.  And I spoke to

19  Forbes, and he had reviewed the same information.  There

20  were different explanations from Ms. Kinnin's assertions

21  about what the use of the printer was.

22      Q.   So after HR decided -- by the way, did

23  Ms. DuPont also have objections to the hiring of Mike

**SUPA-0192**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer) 107

1 Forbes?

2     A.   I don't recall.

3     Q.   You don't remember anything about Ms. DuPont;

4 is that correct?

5     A.   No.

6     Q.   What do you remember of Ms. DuPont?

7     A.   Not a lot.

8     Q.   Well, why don't you just tell me what, if

9 anything?  What was her position at the college?

10     A.   I can look and see.  Director of academic

11 technologies.

12     Q.   By the way, did Ms. Kinnin work with media

13 services almost on a daily basis?

14     A.   I believe so, yes.

15     Q.   And in the course of doing so was she generally

16 familiar with the work that media services did?

17     A.   Perhaps to some extent.

18     Q.   In your report you refer to Kathy Kinnin "could

19 be a person who might bring her complaints outside the

20 organization."  What were you referring to?

21     A.   I don't know.  Where did I say that?

22     Q.   Is there anything inappropriate with her

23 bringing her complaints outside the organization, such

**SUPA-0193**

(Diane Pfadenhauer)                                      108

1    as filing a complaint of discrimination with the Equal

2    Employment Opportunity Commission?

3         A.   No.

4         Q.   Outside the organization could mean filing a

5    complaint of discrimination with the EEOC; is that

6    correct?  That's outside the organization.

7         A.   That's correct.

8              MR. BILLOK:  Object to the form of the

9              question.  Obviously, she can answer.

10             MR. STECK:  That's fine.  She did answer.

11             Let me have a minute with my client.

12             (There was a discussion off the record.)

13             (A luncheon recess was taken in the

14             proceedings.)

15             (The proceedings were reconvened as

16             follows:)

17   BY MR. STECK:

18        Q.   In your investigation did you become aware of

19   employees other than Mr. Briggs meeting with

20   Mr. Marcotte?  I'm sorry.  Other employees who were

21   working in user services meeting directly with

22   Mr. Marcotte?

23        A.   I think my understanding is that Will would

**SUPA-0194**

(Diane Pfadenhauer)                                                109

1    occasionally meet with him on issues.

2        Q.  What was the purpose of those meetings between

3    Sabin and Marcotte?

4        A.  I think there was a technological -- like I

5    said, Duffy was more strategic and Marcotte was more

6    tactical.

7        Q.  What does tactical mean to you in this context?

8        A.  Hardware versus strategic direction for IT of

9    the college.

10       Q.  Who the hardware guy and who was the strategic

11   guy?

12       A.  Duffy is the strategic guy.

13       Q.  And Marcotte was the hardware guy?

14       A.  I think he was probably more hands on.  That

15   was my sense.

16       Q.  And your understanding was Sabin was meeting

17   with Mr. Marcotte --

18       A.  Not just Sabin.  My sense was he would meet

19   with various people as he saw fit.

20       Q.  Regarding technological matters?

21       A.  Yes, technology stuff or operations or whatever

22   he was in charge of.

23       Q.  Do you know if Mr. Sabin, before raising those

**SUPA-0195**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                    110

1   issues with Marcotte, had discussed them with Kinnin?

2        A.   What issues?

3        Q.   Whatever he was raising with Marcotte.

4        A.   I wasn't suggesting he was raising an issue.

5   My understanding was that Marcotte --

6        Q.   He met with him on technical matters?

7        A.   -- that Marcotte would meet with other

8   employees within the IT area on operational and

9   technical issues.

10       Q.   And why wasn't that something that should have

11  been done with the manager of their particular

12  department?

13       A.   I don't know.

14       Q.   It just happened; is that correct?

15       A.   Yes.

16       Q.   So you said in your report that Briggs and

17  Sabin related to you that Kinnin changed her mind a lot

18  of the time.  Do you recall that?

19       A.   Yes.

20       Q.   Did Dorando say that?

21       A.   Dorando was the new one?

22       Q.   You keep saying that.

23       A.   My sense was that --

**SUPA 0196**

(Diane Pfadenhauer)                                          111

1          Q.   Kathy Dorando is a very easily recognizable

2     woman.  She is kind of a petite woman with white hair

3     and she had the other Mac position.  Briggs had a Mac

4     position.

5          A.   My sense was she was new.

6          Q.   Okay.

7          A.   That's why I keep referring to her that way.

8     What's your question again?

9          Q.   My question was:  Did you ask Dorando whether

10    Kinnin changed her mind a lot?

11         A.   I suspect we discussed it.  I don't recall

12    specifically if I asked her that.

13         Q.   Do you know what she said?

14         A.   I don't recall.

15         Q.   What about Chris Breslin?

16         A.   Breslin.  He said she changes her mind a lot,

17    too.

18         Q.   About what?

19         A.   My sense was that they all had the sense that

20    she would give directions and then change the directions

21    that she was giving.

22         Q.   Did you have the sense that Breslin and Dorando

23    were in agreement with Briggs?

**SUPA-0197**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                  112

1            MR. BILLOK:  Object to the form of the

2            question.  You can answer.

3       A.   My sense was that Sabin and -- who is the guy?

4  Who is the gentleman?

5       Q.   Breslin?

6       A.   The other technical guy.  The other P.C. guy.

7       Q.   I don't know who it was.

8       A.   You just said his name.

9       Q.   I only mentioned Breslin and --

10      A.   Breslin and Sabin were coworkers; correct?

11      Q.   They were on the Windows side, yes.  Briggs

12  worked on Mac and Dorando.

13      A.   Breslin and Sabin both believed that Ms. Kinnin

14  was unduly harsh to Briggs.  And Sabin reported also

15  that he had at one point challenged Ms. Kinnin in a

16  meeting and that he was the subject of very harsh

17  treatment.  So he recounted a similarity between his

18  treatment and then her treatment of Briggs.

19      Q.   Did Mr. Marcotte ever treat anyone harshly

20  after a disagreement in a meeting?

21      A.   I think the kind of treatment that Sabin was

22  describing was continued oversight, very intrusive, for

23  a long period of time.

**SUPA-0198**

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                           113

1      Q.   Of Sabin?

2      A.   Of himself by Ms. Kinnin after he somehow had a

3   falling out with her.

4      Q.   Did Ms. Kinnin report to you that Mr. Marcotte

5   was intrusive for a long period of time in her

6   department in matters that were not his responsibility?

7      A.   She reported that he was -- yeah, she did.

8   Yes.

9      Q.   She did?

10     A.   She did, yes.

11     Q.   Did you disregard that because he was, in your

12  eyes, her superior?

13     A.   No.

14     Q.   You took it into account?

15     A.   Yes.  I never said he was her superior.

16     Q.   I would have to go back to the transcript to

17  see what you said.

18     A.   That's fine.  I'm not trying to disagree.  I

19  just want to be clear that my understanding of his role

20  was that he had a role where he was involved in various

21  parts of the IT operation without direct reports in

22  those areas.

23     Q.   Was it your understanding that Mr. Marcotte was

SUPA-0199

(David Mayo, CM 518-495-9312)

(Diane Pfadenhauer)                                                114

1    free to intervene in any IT matter that he felt that he

2    should intervene in?

3         A.   Yes.

4         Q.   Did you ever look at the files concerning

5    Mr. Partlow?

6         A.   Partlow?

7         Q.   Partlow is the one who was fired.

8         A.   I did not look at this.  I think I saw the

9    termination notice.

10        Q.   Did you look at anything else regarding

11   Partlow?

12        A.   No.

13        Q.   What about regarding Cross?  What did you look

14   at regarding Cross?

15        A.   Cross?  I don't have a recollection.

16        Q.   He resigned.

17        A.   I don't have any recollection of Cross.

18        Q.   Was there a deadline to get this report

19   completed?

20        A.   No.

21        Q.   When you referred to Ms. Kinnin as acerbic,

22   were you referring to emails that she sent?

23        A.   Yes.

**SUPA-0200**

(Diane Pfadenhauer)                                    115

1        Q.   So we had talked about Briggs and Sabin.  Was

2   it your understanding that they had discussed Kinnin

3   amongst each other?

4        A.   No, that wasn't my sense.

5        Q.   Was it your sense they were making independent

6   comments?

7        A.   Yes.  Sabin did say that his relationship with

8   Ms. Kinnin had greatly improved, and at the time of our

9   discussions he felt he had a good relationship with her.

10       Q.   Did Mr. Sabin's difficulties with Ms. Kinnin

11  occur in her first year managing user services?

12       A.   It's possible, because I don't recall

13  specifically how long she was manager of user services.

14  I'm guessing it was just a couple of years.

15            MR. STECK:  Kathy, was it three years?

16            MS. KINNIN:  Four years.

17       Q.   So was this in the beginning of her tenure at

18  user services that Mr. Sabin had his own problems that

19  he related?

20       A.   I don't know.

21       Q.   You don't remember when in time his problems

22  took place?

23       A.   Correct.

**SUPA-0201**

1    Q.   Did Mr. Sabin ever get any negative performance

2  reviews from Ms. Kinnin?

3    A.   I believe he did.

4    Q.   Did the college, to your knowledge, have a

5  performance improvement plan template of some kind or

6  form?

7    A.   I'm not sure.

8    Q.   Do you know where Kathy Kinnin got the

9  performance improvement plan outline or template that

10  she was using for Leon Briggs?

11    A.   Somehow I recall that it was similar to one she

12  used with Partlow.

13    Q.   And is there anything wrong with them being

14  similar if, in fact, a lot of the problems were the

15  same?

16    A.   No.

17    Q.   Did Mr. Briggs make a complaint or tell you

18  that he had too much work to do?

19    A.   I don't recall that.

20    Q.   Do you recall seeing an email where Ms. Kinnin

21  said that maybe Mr. Briggs is not best suited for the

22  particular position that he has now, that we should

23  consider a different position for him or even possibly a

**SUPA-0202**

(Diane Pfadenhauer)                117

1    promotion?

2         A.   I don't recall that.

3         Q.   Did you see any emails where Ms. Kinnin was

4    trying to find a way to have Mr. Briggs be successful at

5    Skidmore College?

6         A.   I think that Ms. Kinnin believed she was trying

7    to help Mr. Briggs be successful.

8         Q.   But that was through trying to educate him, in

9    her view, and the procedures that she used to try and

10   manage it; correct?

11        A.   Yes.

12        Q.   I'm talking about trying to find a position for

13   him where he might be more successful than she felt he

14   was in the Mac position that he held.  Did you see any

15   evidence of that?

16        A.   I can't be sure.

17        Q.   Assuming that Mr. Briggs lacked prior extensive

18   experience in Mac, was it unreasonable for Ms. Kinnin to

19   try and go over the details of his work on Macs with

20   him?

21        A.   No.

22             MR. STECK:  Do you have anything?

23             MS. KINNIN:  No.

**SUPA-0203**

(David Mayo, CM 518-495-9312)

1              MR. STECK:  We're not going to ask any

2         questions about the notes.  They are difficult

3         to read, but I think we will make due.

4              THE WITNESS:  Okay.

5              MR. BILLOK:  If you have no further

6         questions, I have no questions.

7              MR. STECK:  No questions.

8              (There was a discussion off the record.)

9              MR. STECK:  I have one more question.  It

10        has to do with the documents that were given to

11        you when you did this investigation.

12    Q.   When you first showed up at Skidmore College to

13   do this investigations what documents did HR give you?

14    A.   They gave me various emails that Kathy had

15   forwarded to them, had sent to them, that supported her

16   complaint.

17    Q.   And what emails did they give to you -- I'm not

18   talking about as you got into the investigation and as

19   you spoke to Kathy.  I'm talking about day one, you

20   haven't interviewed a single witness.  What documents

21   did you get from them?

22    A.   Well, I was already investigating Briggs at

23   that point.

**SUPA-0204**

(Diane Pfadenhauer)                                   119

1      Q.   What documents did they give you when you first

2   arrived on the scene, no matter who or what you were

3   investigating?  It's a better way to ask it.

4      A.   I don't recall specifically.  I would probably

5   have to look at my email stamps.

6      Q.   They forwarded stuff to you by email?

7      A.   Yes, and those were printed out and those

8   became part of the documents.

9      Q.   You don't have those anymore?

10     A.   I don't have those anymore.

11     Q.   You gave them to whom?

12     A.   (Indicating.)

13     Q.   So Mr. Billok has them.  And initially were

14  those documents that HR represented to you supported

15  Mr. Briggs' claims?

16     A.   No.

17     Q.   Were they documents relating to Mr. Briggs'

18  claims?

19     A.   Yes.

20     Q.   In the sequence of events, did you receive

21  documents from HR regarding Kinnin's complaints before

22  you met with Kinnin?

23     A.   I'm not sure.

**SUPA-0205**

(Diane Pfadenhauer)                                    120

1    Q.   Then you met with her?

2    A.   Yes.

3    Q.   And she said she was going to produce more

4    supporting documentation; is that correct?

5    A.   Correct.

6    Q.   And she did; right?

7    A.   Yes.

8    Q.   And was that forwarded to you by Gretchen

9    Steffan?

10   A.   Yes.

11   Q.   And when you first started looking into

12   Kinnin's allegations did you receive from Gretchen

13   Steffan material that Ms. Kinnin had provided to HR in

14   the past before you were called upon to do this

15   investigation?

16   A.   Say that one more time.

17            MR. STECK:  Dave.

18            (The reporter read back the previous

19            question.)

20   A.   That Kinnin had provided to HR in the past?

21   Q.   Yes, before this investigation.

22   A.   My sense was that Ms. Kinnin was forwarding

23   information that she wanted me to see that concerned all

SUPA-0206

(Diane Pfadenhauer)                    121

1    of her complaints, both before and after, and that it is

2    quite possible that some of those documents that she

3    sent to me had also been sent to human resources before

4    I met with her.

5        Q.   Okay.  But the question is:  Did HR give you

6    any materials from her prior complaints, not what

7    Ms. Kinnin gave you?

8        A.   Okay.  Let me think.  I just don't recall.

9            MR. STECK:  Anything?

10           MS. KINNIN:  No.

11           MR. BILLOK:  No questions.

12           MR. STECK:  Thank you.

13           (The examination in the above-entitled

14        matter was concluded.)

15

16

17

18

19

20

21

22

23

**SUPA-0207**

(David Mayo, CM 518-495-9312)

122

1    STATE OF                  )

2    COUNTY OF             )  ss.:

3

4

5             I have (heard) read the foregoing record

6    of my testimony taken at the time and place noted in the

7    heading thereof and do hereby acknowledge it to be a

8    true and correct transcript of the same.

9

10                   _____

11                   DIANE PFADENHAUER

12

13

14

15    Sworn to before me this

16    ____ day of _____, 2020

17

18

19    _____

20    Notary Public

21

22

23

**SUPA-0208**

(David Mayo, CM 518-495-9312)

123

<u>C E R T I F I C A T E</u>

I, David Mayo, a court reporter and notary public, do hereby certify that the foregoing is a true and accurate transcript of the proceedings reported stenographically by me in the above matter.

Dated: _8-15-20_

_David Mayo_

**SUPA-0209**

124

I,_____, have read the transcript of

my testimony and would like the following changes:

PAGE   *   LINE   *   CHANGE FROM   *   CHANGE TO

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

_____ * _____ * _____ * _____

Subscribed to and sworn to before me
this ___ day of _____ 2020


_____              _____

Notary Public                        Signature

**SUPA-0210**

1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF NEW YORK
2   ------------------------------------------------------

3   KATHY KINNIN,

4           Plaintiff,

5   -against-              Civil Action No. 1:19-cv-00629

6   SKIDMORE COLLEGE,

7           Defendant.              **ORIGINAL**

8   ------------------------------------------------------

9

10

11              EXAMINATION BEFORE TRIAL of a nonparty

12   witness, BETH DuPONT, held at the Law Offices of Bond,

13   Schoeneck and King, PLLC, 268 Broadway, Suite 104,

14   Saratoga Springs, New York, on July 29, 2020, at

15   11:30 a.m.

16

17   APPEARANCES:

18       COOPER, ERVING & SAVAGE, LLP
         39 North Pearl Street
19       Albany, NY  12207
         By PHILLIP G. STECK, ESQ., of Counsel;
20           Attorneys for Plaintiff.

21       BOND, SCHOENECK & KING, PLLC
         268 Broadway, Suite 104
22       Saratoga Springs, NY  12866
         By MICHAEL BILLOK, ESQ., of Counsel;
23           Attorneys for Defendant.

**SUPA-0211**

(David Mayo, CM 518-495-9312)

2

```
 1                S T I P U L A T I O N S

 2                    It is hereby stipulated and agreed by

 3      and between the attorneys for the respective parties

 4      hereto that the presence and oath of a Referee be

 5      waived;

 6                    that the transcript of testimony be

 7      signed and the filing of the original transcript with

 8      the Federal Court be waived;

 9                    that the examining party will furnish

10      the examined party a copy of the transcript of testimony

11      free of charge;

12                    that all objections except as to the

13      form of the question be reserved until the time of

14      trial;

15                    that this deposition may be utilized

16      for all purposes as provided by the Federal Rules of

17      Civil Procedure;

18                    and that all rights provided to all

19      parties by the Federal Rules of Civil Procedure shall

20      not be deemed waived and the appropriate sections of the

21      Federal Rules of Civil Procedure shall be controlling

22      with respect thereto.

23
```

(David Mayo, CM 518-495-9312)

1    B E T H   D u P O N T, called herein as a witness,

2    having been duly sworn, was examined and testified as

3    follows:

4    EXAMINATION BY MR. STECK:

5         Q.   Please state your name for the record.

6         A.   Beth DuPont.

7         Q.   Now, do you spell DuPont D-u with a capital P

8    or a small P?

9         A.   A capital P.

10        Q.   What is your address?

11        A.   ████████████████████████████████████████

12   ██████

13        Q.   And your date of birth?

14        A.   ████████████

15        Q.   And what is your educational background?

16        A.   I have actually two master's degrees, one in

17   instructional design and another one in early childhood

18   ed.

19        Q.   And when did you get your bachelor's degree and

20   from what institution?

21        A.   My bachelor's, I think I got that in '85, from

22   Ohio State University.

23        Q.   The Ohio State University.

SUPA-0213

1       A.   The Ohio State University, yes.  I am a

2  Buckeye, yes.

3       Q.   My father is a Hawkeye, or was.  When did you

4  get your first master's after graduating from Ohio

5  State?

6       A.   Two years after, and that was the one in early

7  childhood education.

8       Q.   Then you got a second master's.  When was that?

9       A.   That would have been -- oh, my goodness.  I

10  should have brought my resume.

11       Q.   This is background.

12       A.   I probably got that one -- actually, probably

13  received that degree in 1999.

14       Q.   So between 1987 and 1999 were you employed in

15  the field of education?

16       A.   '87 to '99?  I was trained as an art therapist,

17  so I did that for a little while.  I had moved out to

18  California and did that for a little while.

19       Q.   That seems like a good place for that.

20       A.   You would have thought at the time, but then

21  there were too many therapies going on.  Then I worked

22  at a container leasing company for three years.  Then I

23  went back to school for my master's.

**SUPA 0214**

(Beth DuPont)                                                     5

1    Q.   After you got your second master's --

2    A.   That was my first master's.

3    Q.   I was trying to cover the period -- all right.

4    Then you went back to school, got your first master's.

5    What did you do, generally speaking, in the time between

6    your first master's and your second?

7    A.   I worked at McGraw-Hill and I was a trainer,

8    technology trainer.  And then also I worked in product

9    development.  Yes, I did that.  I was there for five

10   years.  Then I moved here and worked for Elliot Masie

11   for a few months.  Then I got my job at Skidmore.

12   Q.   What year were you hired by Skidmore?

13   A.   I've been there -- this is my 21st year.  I'm

14   too nervous.

15   Q.   It's around 2000?

16   A.   It would have been around 1999.

17   Q.   So you say you're nervous.  What are you

18   nervous about?

19   A.   Because I've never experienced anything like

20   this before.  That's all.  Just a little bit.  And I

21   don't like attention.  That's probably part of it, too.

22   Q.   One of the things we need to tell you, you're

23   here to tell the truth.  That's why you're under oath.

(David Mayo, CM 518-495-9312)

1    Any retaliation against you for anything you say here in

2    this room is strictly prohibited under law.  So you

3    should be aware of that, and that generally will ease

4    some concerns that some people have.

5         A.   Okay.

6         Q.   Does your husband work at Skidmore or did he

7    work at Skidmore?

8         A.   Yes.  He is still employed at Skidmore.  He has

9    been there 22 years.  But right now he's working at RIT

10   in Rochester.

11        Q.   He is still employed by Skidmore but he's

12   located at RIT or is he doing some distance thing?

13        A.   He's located there.  He's on an 18-month leave

14   of absence.

15        Q.   What is his position at Skidmore?

16        A.   He is a full professor in psychology.

17        Q.   Are you still employed by Skidmore?

18        A.   Um-hmm.

19        Q.   Yes?

20        A.   Yes.

21        Q.   Are you making any plans not to continue your

22   employment with Skidmore?

23        A.   This is a tough time to ask.

**SUPA 0216**

(Beth DuPont)                                                    7

1      Q.   Why, because the article in the paper?

2      A.   No, no.  I've been there 21 years.  I have a

3   daughter in high school and she will be done in two

4   years.  The plan is probably to retire then and move to

5   Rochester.

6      Q.   And your husband would continue at RIT?

7      A.   Yes.  It has been a good move for him.  Then I

8   plan on going into instructional design consulting work

9   instead.

10     Q.   What positions have you held at Skidmore?

11     A.   I first began there as a help desk -- not help

12  desk.  It was desktop support, doing desktop support.

13  So I did that for probably two years.  And then some

14  restructuring happened and I was promoted to be the

15  director of the instructional technology group, which

16  hadn't existed.  So I kind of built that team up.  And

17  I've been doing that ever since.

18     Q.   So when Kathy Kinnin was not director of user

19  services but was just a user services employee, were you

20  already a director at that time?

21     A.   Yes.

22     Q.   Then Kathy became director of user services for

23  a time; is that right?

**SUPA-0217**

(David Mayo, CM 518-495-9312)

1      A.   Yes.

2      Q.   Did you have any conversations with Mr. Billok

3  prior to testifying here today?

4      A.   We had two short conversations.

5      Q.   And what was the nature of those conversations?

6           MR. BILLOK:  Objection; privilege.  She is

7           a manager at Skidmore.

8  BY MR. STECK:

9      Q.   Let's ask a few questions about that.  Did you

10 make any policy in connection with the hiring and firing

11 of Kathy Kinnin?

12     A.   No.

13     Q.   Did you have any input into the decision

14 whether to terminate Kathy Kinnin's employment?

15     A.   No.

16     Q.   Was Kathy Kinnin someone that you supervised?

17     A.   No.

18           MR. STECK:  We'll leave the question

19           aside.  If I need to take it up, we'll take it

20           up.

21           MR. BILLOK:  I think you know what the

22           answers will be.  I'm still going to assert the

23           privilege.

**SUPA-0218**

(David Mayo, CM 518-495-9312)

1          MR. STECK:  Probably.  It's interesting.

2          I would have to review the case law to see if

3          you could assert the privilege or not.  Anyway,

4          it's not terribly important.

5     Q.   Did you have a problem with an employee by the

6    name of Ben Harwood?

7     A.   Yes.  He was difficult to manage for awhile.

8     Q.   And in what ways was he difficult to manage?

9     A.   He was very insecure and did not get along with

10   his coworkers.  I had a really small team.

11    Q.   How many people were on your team?

12    A.   I have two now.  And at the time when I was

13   having some friction with Ben we had three, two men and

14   one female.  And the female had been there prior to Ben

15   coming.

16    Q.   And did you engage in things as a manager to

17   try and deal with Mr. Harwood's behavior?

18    A.   Yes.

19    Q.   What did you do?

20    A.   We had regular reviews where I would instruct

21   him on things, areas that needed improvement.  I talked

22   a lot with my manager about it and had --

23    Q.   Who was your manager?

**SUPA 0219**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                         10

1      A.   At the time it was Bill Duffy.  He was the CTO

2  then.  No.  Actually, no.  I take that back.  When I was

3  having the issues with Ben, Justin Sipher was the CTO.

4      Q.   How do you spell that last name?

5      A.   S-i-p-h-e-r.

6      Q.   So you talked to Mr. Sipher about what might be

7  done with Mr. Harwood?

8      A.   Yes.

9      Q.   You gave him performance evaluations; is that

10  correct?

11      A.   I wrote the performance evaluations, yes.

12      Q.   And on that did you indicate he needed

13  improvement in certain areas?

14      A.   Yes.

15      Q.   Did you ever give him an overall rating of

16  needs improvement?

17      A.   I don't remember.

18      Q.   Did Mr. Harwood file any complaints with human

19  resources about you because you were criticizing his

20  performance or, should I say, trying to direct him to

21  better performance?

22      A.   I don't know.

23      Q.   None have come to your attention; is that

**SUPA 0220**

(Beth DuPont)                                    11

1    correct?

2        A.   No.

3        Q.   Did he eventually leave?

4        A.   No.

5        Q.   Is he still employed at Skidmore?

6        A.   Yes.

7        Q.   And did Mr. Harwood engage in any what might be

8    described as stalking type behavior towards you?

9        A.   There was one incident that I perceived as

10   that, and I was concerned enough that I went to campus

11   safety about it.

12       Q.   Was he taking pictures of your vehicle?

13       A.   Yes.  That's what I was told.

14       Q.   Did it ever come to your attention that

15   Mr. Harwood had said that he wanted to drive you out of

16   your job?

17       A.   I don't recall that, no.

18       Q.   So you went to campus security.  Did you go to

19   HR about it?

20       A.   Numerous times, yes.

21       Q.   You reported it to HR?

22       A.   Yes.

23       Q.   Did there come a time when Mr. Harwood came at

**SUPA 0221**

(David Mayo, CM 518-495-9312)

1   you in a fairly aggressive manner and you had to put up

2   your hands in defense?

3        A.   Yes.

4        Q.   Did you tell Kathy Kinnin about these things?

5        A.   I don't recall, but I may have.

6        Q.   Did you make a complaint about Ben Harwood

7   doing that?

8        A.   I did not get the opportunity to make a

9   complaint about that because he went to HR first.

10        Q.   And did HR put a document in your file saying

11   that you put hands on an employee?

12        A.   Yes.  And they made me sign it.

13        Q.   Did you get to write a rebuttal to that?

14        A.   I don't believe so.

15        Q.   How long did it take for you as a manager to

16   get it so that Mr. Harwood -- and these are fairly

17   dramatic incidents.  Did you eventually have success in

18   being able to manage Mr. Harwood?

19        A.   Yes.

20        Q.   How long did it take you before you were able

21   to achieve that?  How much time passed from the

22   beginning of your difficulties with him until when you

23   were able to get the situation under control?

**SUPA-0222**

1       A.   I'm doing the math in my head.  I think it was

2   at least five years, maybe six.

3       Q.   And during that five-year term did you have a

4   lot of anxiety in dealing with Mr. Harwood's behavior?

5       A.   Yes.

6       Q.   Did you go to EAP for that?

7       A.   No.  I had my own personal therapist, so I did

8   not go to EAP.

9       Q.   Did anyone in HR suggest that you go to EAP?

10      A.   No.

11      Q.   Did you ever go to EAP concerning any issues at

12  all?  Any issues of any kind.

13      A.   I don't know if this counts, but I ended up in

14  collaboration with HR.  We had two of my staff go to EAP

15  because they were having trouble interacting with each

16  other.

17      Q.   Okay.  And was EAP successful in getting them

18  to interact better?

19      A.   No.

20      Q.   And what happened to those staff members?  One

21  or both of them, did they leave their employment with

22  Skidmore?

23      A.   One of them, the female one, left the college.

**SUPA 0223**

(Beth DuPont) 14

1    She was let go.  Yes.

2        Q.   There was a dispute between a male and a

3    female.  What was the nature of the dispute?

4        A.   In my perspective, it was insecurity on Ben's

5    part.

6        Q.   Ben was involved with this lady, as well?

7        A.   Those were my two employees that were having

8    the trouble.

9        Q.   So Ben Harwood was one of the employees that

10   had the trouble with the lady; is that correct?

11       A.   Yes.

12       Q.   A person other than you?

13       A.   Yes.

14       Q.   I see.  And how long was that woman -- what was

15   her name?

16       A.   Kelly Dempsey-Little.

17       Q.   How long had she been at Skidmore?  Was she

18   there before Mr. Harwood arrived?

19       A.   Yes.

20       Q.   How long had she been at Skidmore before she --

21   was she terminated from employment?

22       A.   Yes, she was.

23       Q.   And what was she terminated from employment

SUPA-0224

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                      15

1    for?

2         A.   Inaccurate expense reports.

3         Q.   Did this Ms. Dempsey -- I don't remember the

4    end of the hyphen.  We'll call her that, if you don't

5    mind.

6         A.   That's fine.

7         Q.   Interestingly, I know you looked at Mr. Billok.

8    Did you look at Mr. Billok prior to answering the

9    question when I asked whether the person was terminated?

10        A.   Yes.  I just wasn't sure if that was something

11   I was allowed to answer because, being a manager, you

12   know.

13        Q.   The rules are that if Mr. Billok wants to

14   object, he will object.  But in a deposition you still

15   have to answer the question except when it's an

16   objection based on attorney-client privilege, which we

17   had one of those before.

18        A.   Okay.

19        Q.   So if there is an objection he will do his job.

20   You don't have to --

21        A.   Okay.

22        Q.   What exactly was the behavior that Mr. Harwood

23   exhibited towards Ms. Dempsey?

**SUPA 0225**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                          16

1      A.   He was unable to collaborate on work projects,

2   where, being a small team, we needed that.  He exhibited

3   a lot of the same behavior with her that he did with me.

4   Just non-communicative.  He would get fairly easily

5   angered and turn very red in the face.  He would just be

6   very quiet and not interact with either of us.  Just

7   there was no sense of trust there.

8      Q.   You had testified that this relationship with

9   Mr. Harwood went on for quite some time before it

10  started to resolve; is that correct?

11     A.   Yes.

12     Q.   And did you go to HR seeking help in resolving

13  this problem with Mr. Harwood?

14     A.   Yes.

15     Q.   Who did you speak to at HR?

16     A.   Mainly Alena.  I'm blanking on her last name.

17     Q.   Alena is good enough.  There aren't that many

18  Alenas.  What did Alena tell you to do?

19     A.   To document everything.  And sometimes she

20  would pass it on I guess to Justin Sipher, my CTO, to

21  have conversations with Ben, because at a point I was

22  not comfortable being alone in my office with Ben.  I'm

23  going around in circles here.

**SUPA 0226**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                    17

1    Q.   No, you're not.  You're answering the question.

2    A.   Okay.  He could not mesh with the rest of the

3    team.  And I think it was his own insecurities, and

4    Kelly had very strong relationships with faculty.

5    Q.   Kelly.  Last name again?

6    A.   Dempsey.

7    Q.   Dempsey.

8    A.   Very different personality type than Ben.  Very

9    good at developing relationships with faculty.  Ben

10   being more -- you know, a little more up uptight and

11   insecure.  He was young in the job.

12   Q.   Young in the job.  How old a man was he?

13   A.   I think when I hired him he was probably in his

14   early thirties, maybe.

15   Q.   So you knew a bit about what user services did;

16   correct?

17   A.   Yes.

18   Q.   And user services' personnel interacted with

19   faculty; correct?

20   A.   Yes.

21   Q.   And your group interacted with faculty?

22   A.   Yes.

23   Q.   Was your group helping faculty with technology?

**SUPA 0227**

(Beth DuPont)                                                                18

1      A.   Yes.

2      Q.   Did faculty complain about Mr. Harwood?

3      A.   Yes.

4      Q.   What about Ms. Dempsey?

5      A.   No.

6      Q.   And you said this was a five-year period where

7  you had problems with Mr. Harwood.  Do you remember what

8  years those were?

9      A.   I would be guessing.  I mean, I started out

10 roughly '99 and I was in user services at the time.

11 That's the group that I was hired into.  So it was

12 probably maybe four years after that.

13     Q.   It happened when you were director?

14     A.   Yes.

15     Q.   So it took some time for you to go from being

16 in user services to becoming a director?

17     A.   Two years, I think.

18     Q.   Did you hire Mr. Harwood as soon as you became

19 a director or after that?

20     A.   After that.

21     Q.   How many years after you became a director did

22 you hire Mr. Harwood?

23     A.   Probably two years.

**SUPA 0228**

(David Mayo, CM 518-495-9312)

1      Q.   You said you've been at Skidmore 22 years;

2    right?

3      A.   21.

4      Q.   21.  We are now 2020.  If I do my math, which

5    I'll probably mess up because I'm under pressure, you

6    came to Skidmore around 1999; is that correct?

7      A.   Yes.

8      Q.   And you were in user services for a couple

9    years?

10     A.   Yes.

11     Q.   And so that would take us to about 2001?

12     A.   Yes.

13     Q.   You became a director sometime in 2001, maybe,

14   or 2002?

15     A.   Yes.

16     Q.   And then did you say -- I may have misspoken.

17   Correct me if I'm wrong.  Did you then hire Mr. Harwood

18   a couple years after that?

19     A.   Two to three years after that.

20     Q.   So now we're somewhere around 2004.  Then you

21   had five years of difficulty with him?

22     A.   Yes.

23     Q.   That would take us to around 2009.  Do you

**SUPA-0229**

(Beth DuPont)                                    20

1   think this had ended by 2009 or was it still continuing

2   even after 2009?

3        A.   Let's see.   It improved with Ben after Kelly --

4   well, no.   Okay.   I'm trying to think.   Probably four

5   years because Kelly left and then it took me a year to

6   fill her position.   And at the time I had three

7   employees.   One was a GIS coordinator, a male, and then

8   Ben and Kelly.   Kelly left and then I had just Ben and

9   Alex.   The two of them were a very toxic combination.

10       Q.   Ben and Alex were toxic?

11       A.   Yes.

12       Q.   How long did that continue?

13       A.   It was a pretty good three years, four years,

14   with Alex.

15       Q.   So that was another three or four years after

16   Dempsey left.   Then you had conflict between Alex and

17   Ben; is that correct?

18       A.   No.   No.

19       Q.   No?

20       A.   Alex and Ben were two peas in a pod.   They both

21   were not happy with me.   I had to give both of them some

22   pretty -- how do I put it?   Not very glowing performance

23   evaluations.

**SUPA 0230**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                          21

1    Q.   Did you put any of these employees on a

2    performance improvement plan?

3    A.   No.  I was never encouraged to do that.

4    Q.   Who told you not to?

5              MR. BILLOK:  Object to the form.

6              MR. STECK:  I'll withdraw the question.

7    Q.   When you say you weren't encouraged to do that,

8    what do you mean?

9    A.   I would meet with HR and I would pretty much

10   continually be told to just keep documenting things.

11   And I did.  I have binders full of my documentation on

12   them.  They were both very verbally -- Alex was very

13   verbally abusive.

14   Q.   Did he make a complaint to HR about you?

15   A.   I don't know.

16   Q.   When you say verbally abusive, what did he say

17   and do?

18   A.   He was very disrespectful of my leadership.  At

19   one point I think when I was giving him his performance

20   evaluation, because he wasn't doing his job, he wasn't

21   meeting the expectations, and I was getting complaints

22   from faculty --

23   Q.   Also, do you feel that he was working full-time

SUPA-0231

(Beth DuPont)                                                    22

1    at his job or he wasn't?

2        A.    No.

3        Q.    He was not working full-time at his job?

4        A.    No.

5        Q.    How would you describe the degree of work that

6    he did in terms of time?

7        A.    I would say initially when I first hired him he

8    was fabulous.  Then he went through marriage troubles

9    and it went downhill from there.  I would say by the

10   time that we let him go he was maybe working a third,

11   doing about a third of the work that he should have been

12   doing.

13       Q.    And what kind of language did he use when you

14   say he was verbally abusive?

15       A.    Things like, "How can you live with yourself?"

16   for giving him that kind of performance evaluation.

17   People who know me know I'm not a hard ass.  I'm a very

18   reasonable manager.  I think and my feelings about the

19   whole thing was that he and Ben both were going through

20   divorces at the time.  I was told by Alex, he said

21   something about, "Isn't it interesting that everyone who

22   works for you gets divorced?"  Kelly got divorced, too.

23   And I think I replied to him and said, you know, "I wish

**SUPA 0232**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                    23

1    I had that kind of power.  It's not me."

2        Q.  Other than Mr. Harwood did any employees

3    complain to HR about you?

4        A.  None that I'm aware of.

5        Q.  Ms. Dempsey, you said, had some sort of expense

6    issue.  Do you know what that was?

7        A.  In hindsight, yes.

8        Q.  What was it?

9        A.  I didn't know anything about it.  She had paid

10   for some airline tickets, got reimbursed for them, then

11   went on her work trip.  Then on her expense report she

12   claimed the airline tickets again.

13       Q.  So she had been reimbursed already, in essence?

14       A.  Yes.

15       Q.  And claimed it twice?

16       A.  Yes, which should have been something I should

17   have caught as a manager.  And I'm thankful that I

18   didn't get held accountable for that.  Because of that

19   there was a red flag.  So they went back through all of

20   her five years' worth of stuff.  Apparently, they found

21   some other similar incidents.

22       Q.  What was your title again?

23       A.  Director of academic technologies.  We changed

**SUPA 0233**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                            24

1   the name of the group.

2       Q.   And what does it do?  What type of technologies

3   are we talking about?

4       A.   Pretty much anything that faculty are using to

5   teach with, learning management systems, personal

6   response systems, using white board technologies with

7   iPads.  All these digital video editing projects with

8   students.  Just a very broad range of technologies.

9       Q.   By the way, in these difficulties that you had

10  with Alex and Ben, did you discuss these difficulties

11  with Bill Duffy?

12      A.   Yes.

13      Q.   Did Mr. Duffy give you any advice?

14      A.   I honestly feel like he tried to be supportive.

15  He went to HR for me and he would meet with Alena at HR.

16  His feedback to me after that was HR gave him a list of

17  things to do.

18      Q.   You said Alex was terminated?

19      A.   Yes.

20      Q.   How did it come about that Alex was terminated?

21      A.   It was a reduction in workforce.  I guess you

22  would call it that.  We made the decision because in his

23  role as a GIS instructional technologist --

**SUPA-0234**

(David Mayo, CM 518-495-9312)

1       Q.    What's GIS?

2       A.    Geographic Information Systems.

3       Q.    Okay.  Yes.

4       A.    He ran the lab and held workshops and things.

5  But on our side, on the finance and administration side

6  of the college that IT is on, we are not allowed to

7  teach as part of our job.  We needed somebody to teach

8  intro GIS.  Alex was given the opportunity.  We offered

9  to let him teach that intro GIS in addition to his

10  current job for extra pay but not as part of his job,

11  and he declined that offer.  He did not want to do that.

12           And at the time I gave him managerial

13  advice and told him to just really think about the

14  decision he's making down the road, because if he is not

15  going to teach GIS, we need someone to teach it.

16           So we ended up working with academic

17  affairs, the dean of faculty's office, and we decided it

18  was best to turn that position into a faculty position.

19  I gave up that instructional technology position and we

20  shifted that over to academic affairs.  As part of that,

21  Alex didn't meet those criteria so we had to let him go.

22       Q.    Did you have to work with media services from

23  time to time in your position?

**SUPA-0235**

(Beth DuPont)                                                        26

1      A.   Yes.  In fact, for maybe two years I was the

2    director of media services and academic technologies.

3    So I worked in user services probably two years.  Then I

4    had -- I'm trying to think how it went.  I believe when

5    they first moved me into management I was in charge --

6    yes, I was in charge of academic technologies, which we

7    were just starting off the ground.  I had one employee,

8    and that was Kelly.  Then I was also director of media

9    services at that time.

10     Q.   How many employees did you have as director of

11   media services?

12     A.   Five.

13     Q.   Now, who succeeded you as director of media

14   services?

15     A.   Hunt Conard.

16     Q.   Did you know someone named Mike Forbes in media

17   services?

18     A.   Yes.  That was after my time.

19     Q.   What's that?

20     A.   That was after my time in leadership with media

21   services.

22     Q.   So did he work for Hunt Conard or did he become

23   director of media services?

(David Mayo, CM 518-495-9312)

1      A.   He worked for Hunt until Hunt retired.

2      Q.   And then did he become director of media

3   services?

4      A.   Yes, he did.

5      Q.   Did you know a person by the name of Chris

6   Bailey and did he work in media services?

7      A.   Yes.

8      Q.   Did you have any difficulties with either

9   Mr. Forbes or Mr. Bailey?

10             MR. BILLOK:  Object to the form.  You can

11             answer.

12     A.   Only with Mr. Forbes.

13     Q.   Did you ever interact with Mr. Bailey at all?

14     A.   Yes.

15     Q.   Did you find him accommodating to you?

16     A.   Yes.

17     Q.   With Mr. Forbes, what happened that led you to

18   say that you had difficulties with Mr. Forbes?

19     A.   He, in my opinion, was very arrogant and was

20   not really open to suggestions from people in my area

21   who were well experienced, more experienced in things

22   than he was.  He was not collaborative.  And he for some

23   reason, when our new CTO came on board -- I have had

(Beth DuPont)                                    28

1    quite a few.

2        Q.   You mean Mr. Duffy?

3        A.   No.  Our current one, Dwane Sterling.  When he

4    came on board somehow Mike had led Dwane to believe that

5    I didn't like him, that I didn't want to work with him

6    and I didn't want to cooperate with him.  Yes.

7        Q.   When Bill Duffy was the chief technology

8    officer did you go to Mr. Duffy for advice or to discuss

9    how you might better work with Mr. Forbes?

10       A.   I don't think I was having issues with

11   Mr. Forbes at the time.

12       Q.   When you had difficulties with Mr. Forbes how

13   did they manifest themselves in your interactions with

14   him?

15       A.   I guess I would feel in directors' meetings

16   that I wasn't being heard.  And the nature of our work,

17   user services, media services and my team overlap in

18   some pretty critical areas in classroom support.  The

19   previous director of media services was very

20   collaborative.

21            So when Mr. Forbes came on board he had

22   his own agendas and he would start researching

23   technologies and things like that that generally my

**SUPA 0238**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                    29

1   group supported.  And I would find out after the fact

2   that he was looking into these things and wasn't

3   communicating.  It was just an uncomfortable feeling.

4        Q.   Did you get the sense that at the directors'

5   meetings your opinions didn't matter?

6        A.   With a couple of the directors.

7        Q.   And who were they?

8        A.   I would say Mr. Forbes and occasionally Kevin

9   Crider, who was the director of enterprise systems.

10       Q.   When Crider and Forbes were directors Tom

11   Marcotte was not a director.  That position had already

12   gone to Kathy Kinnin; is that correct?

13       A.   Tom Marcotte was a director with -- no.  I

14   think that's true.  There was a lot of change during one

15   small period of time.

16       Q.   At one point Mr. Marcotte became assistant

17   chief technology officer, but before that he had another

18   position?

19       A.   Yes.

20       Q.   But he was not a director at that time.

21            MR. STECK:  What was the name of that

22            position?

23            MS. KINNIN:  Director of strategic

**SUPA-0239**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                    30

1          planning.

2          Q.   So he was not a director, as you just

3     indicated, when Forbes and Crider were manifesting these

4     behaviors toward you; is that correct?

5          A.   That Tom was not a director during that time?

6          Q.   Yes.   He had been promoted; correct?

7          A.   (No response.)

8          Q.   This gets confusing.   Let me ask you a

9     question.   When he was the director of strategic

10    planning, did you consider that a director's position

11    equal with yourself?

12         A.   It was.

13         Q.   Okay.

14         A.   It was.

15         Q.   Then there came a time when he was promoted to

16    assistant chief technology officer; correct?

17         A.   Yes.

18         Q.   When Marcotte was in both of those positions

19    that he held did he attend the directors' meetings?

20         A.   Yes.

21         Q.   Did he run the directors' meetings?

22         A.   When the CTO was not there he would run the

23    meetings.

**SUPA-0240**

(David Mayo, CM 518-495-9312)

1    Q.   When Mr. Duffy was CTO, is it fair to say he

2    rarely attended directors' meetings?

3    A.   I wouldn't say the whole time.  I would say

4    probably the last year or two in that position.  Yes, he

5    did not as often.

6    Q.   What were the problems that you experienced

7    with Mr. Crider?

8    A.   Nothing as overt as with Mr. Forbes.  I think

9    with Mr. Crider it's more of a -- I mean, he helps me

10   out whenever I need help.  He is very responsive.  He

11   was open to communicating.  I can't put my finger on it.

12   And it could be because it was a newer relationship with

13   him.  I just --

14   Q.   You didn't feel comfortable; is that fair to

15   say?

16   A.   No.  I mean, I feel comfortable around Kevin

17   Crider, but maybe not --

18   Q.   Did you feel he treated you as an equal?

19   A.   Yes.

20   Q.   So what was it about Mr. Crider's behavior that

21   you found not entirely to your liking?

22   A.   He was not as open to other ideas and

23   experimentation.  And part of my job, a big part of my

**SUPA-0241**

(David Mayo, CM 518-495-9312)

1    job with faculty, is experimenting with things.  He was

2    very much opposed to doing anything with Open Source,

3    although it's like we don't have a lot of money for

4    other things so sometimes I need that.  Or I needed help

5    from his folks.

6         Q.   Open Source is like Linux, or something like

7    that?

8         A.   Yes.  Open Source, free software that you

9    install.  He wasn't on board with that.  I guess maybe I

10   didn't feel like my opinions were as valued.

11        Q.   You had that experience with Crider; correct?

12        A.   Um-hmm.

13        Q.   Yes?

14        A.   Yes.

15        Q.   And you've had that experience with Mr. Forbes?

16        A.   Yes.

17        Q.   Did you ever have that experience with Tom

18   Marcotte?

19        A.   No.

20        Q.   Did you observe Mr. Forbes treat Kathy Kinnin

21   the same way that he treated you?

22        A.   Yes.

23        Q.   Did you observe Chris Bailey treat Kathy Kinnin

**SUPA-0242**

(Beth DuPont)                                                      33

1    in that same sort of fashion?  Even though you didn't

2    have that experience with him, but did you observe him

3    treat Kathy Kinnin that way?

4              MR. BILLOK:  Objection to form.  You can

5         answer.

6    A.   No.

7    Q.   Did you often discuss with Kathy Kinnin some of

8    these problems involving Forbes, for example?

9    A.   I don't know if I would say often, but more

10   occasionally.  We would confide in each other.  And

11   being the only females in the department and leadership,

12   we would confide in each other.

13   Q.   What did you confide in her?

14   A.   I would say the same frustrations that I

15   mentioned about Mr. Forbes and just not being

16   collaborative and being very arrogant and not feeling

17   very well respected.  Also, I think probably more of our

18   conversations about Mike were centered more around the

19   promotion of him into that position of director of media

20   services.

21   Q.   And what conversations did you have about that

22   promotion with Kathy?

23   A.   It was my understanding that Kathy and I agreed

**SUPA-0243**

1    that there were better candidates for that position and

2    that we didn't trust the process that was going on

3    between Tom and Bill.  We didn't trust the hiring

4    process.

5        Q.   What didn't you trust about the hiring process?

6        A.   We're used to at Skidmore a certain amount of

7    transparency and open conversation about the hiring of

8    new staff.  Pretty much everyone in IT was in on the

9    interviews of the different candidates.  And it's my

10   understanding that Mike was not the most qualified

11   candidate and that many people in IT voiced that, that

12   he was not the most qualified candidate.  I mean, we had

13   worked with Mike when he worked for Hunt.  I would say I

14   didn't feel like he was ready for that step.

15            And so we talked about our frustration

16   about that process and how it turned out.  We felt like

17   the decision was kind of made before -- I felt like the

18   decision was kind of made before we even did all the

19   interviewing and all of that.

20       Q.   Based on your understanding, who was promoting

21   Mike Forbes for this position?

22       A.   Tom Marcotte.

23       Q.   He was not the chief technology officer,

**SUPA-0244**

1    though, at the time, was he?

2         A.   No.

3         Q.   Wouldn't Bill Duffy ultimately have to approve

4    that appointment?

5         A.   Yes.

6         Q.   And what was Mr. Marcotte doing to try to

7    promote Mr. Forbes?

8         A.   It was apparent that Tom had -- I don't know.

9    He seemed to have some kind of investment in making sure

10   that Mike moved forward and succeeded.

11        Q.   Was that based on things he said, his advocacy,

12   say, for Mr. Forbes?

13        A.   I recall being told at some point that we had

14   to do whatever we could to help Mike succeed in that

15   position as a director.

16        Q.   Now, when you say he was not the most

17   qualified, Mr. Forbes, why do you say that?

18        A.   He had no management experience.  And having

19   managed that group myself for awhile I knew how

20   challenging, first, the role was and the work, but the

21   personalities in that group that had been there for a

22   long time were very challenging.  I felt that the other

23   candidate that I preferred had better rapport with

**SUPA-0245**

(Beth DuPont)                                              36

1    faculty, which is very important in that position.

2        Q.   Who was the other candidate?

3        A.   Ron Taylor.

4        Q.   How many people applied for the position?

5        A.   I think it was just the two of them.

6        Q.   Did Ron Taylor work for the college?

7        A.   Yes.

8        Q.   Was the position posted internally?

9        A.   Yes.

10       Q.   Was the position posted externally?

11       A.   No, because we had two internal candidates, so

12   it didn't go externally.

13       Q.   Did you feel that there were any women in IT

14   that were qualified for that position?

15       A.   Probably qualified, but they didn't apply for

16   it.  They weren't interested in it.

17       Q.   Isn't it fair to say that if you wanted to

18   bring more women in, then you might have to have an

19   external posting; is that correct?

20            MR. BILLOK:  Objection to form.  You can

21            answer.

22       A.   I would say so, yes.

23       Q.   Mr. Taylor worked for Skidmore?

SUPA-0246

(David Mayo, CM 518-495-9312)

1        A.   Yes.

2        Q.   What was his position when he applied for this

3   job?

4        A.   He was the operations coordinator for media

5   services.

6        Q.   And what was Mr. Forbes' position within media

7   services?

8        A.   He was -- I think the title was media services

9   technician.

10       Q.   It sounds like from the titles that the

11  operations manager had at least some managerial

12  experience; is that correct?

13       A.   Yes, managing all of the students.

14       Q.   Now, you had indicated that you confided some

15  things in Kathy Kinnin.  We have talked about

16  Mr. Forbes.  Anything else that you confided in Kathy?

17       A.   As I mentioned, our frustrations about the

18  leadership in IT at the time.

19       Q.   And what were your frustrations about the

20  leadership in IT?

21       A.   That for whatever reason, I don't know if it

22  was due to health reasons or whatnot, Bill was not as

23  engaged as a CTO as he had been the first couple of

**SUPA-0247**

(Beth DuPont)                                                    38

1   years he was in that role.

2        Q.   And was Mr. Marcotte taking on more and more?

3        A.   Yes.

4        Q.   Why did you find that frustrating?

5        A.   Because I guess the management style, Tom being

6   very strongly opinionated and very rigid.

7        Q.   Did Kathy confide in you that she felt her

8   opinions were not valued by Mr. Marcotte?

9        A.   Yes.

10       Q.   Did you agree?

11       A.   I don't think I have witnessed -- well, I did,

12  in a couple of directors' meetings.  He would interact

13  with her differently than he had with me.  I think he

14  would -- I don't know if it's shut her down, but he

15  definitely did interact differently with her than he did

16  with me.

17       Q.   But you did find him opinionated and rigid, the

18  same as Kathy did; is that correct?

19       A.   Yes.  For some reason, I don't know if it's

20  because when he came back I had already been in

21  leadership and then he came on board, but he at least

22  outwardly was respectful of my opinions and I could talk

23  through things with him.

**SUPA-0248**

(Beth DuPont)                                                                 39

1      Q.   Did he talk down to Kathy in those directors'

2   meetings on the several occasions that you observed?

3      A.   I would say so, yes.

4      Q.   We were talking about you confiding in each

5   other.  What else did Kathy confide in you?

6      A.   We talked a bit about struggles she was having

7   with one of her employees in particular.

8      Q.   Was that Leon Briggs?

9      A.   Um-hmm.

10      Q.   Yes?

11      A.   Yes.  I'm sorry.  Yes.  That he was not

12   performing and pulling his weight and that she had

13   written a number of -- I don't remember if she had put

14   him on a performance plan or anything like that, but I

15   know that she had tried to get support from Tom and Bill

16   to address that situation and met a lot of friction with

17   that.

18      Q.   Did you know there was some sort of personal

19   friendship between Marcotte and Leon Briggs?

20      A.   Yes.

21      Q.   How did you know that?

22      A.   I think Tom shared that when he hired Leon.  I

23   don't exactly recall if -- I think Tom was the director

**SUPA-0249**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                      40

1   of user services when he hired Leon.  I don't think that

2   was a Kathy hiring.  That was a Tom hiring.

3        Q.  Let's assume for the moment that Kathy was the

4   director of user services when Leon was hired.  You say

5   Tom hired Leon.  Where did you get the understanding

6   that Tom hired Leon?

7        A.  I think because Tom had worked with Leon before

8   and thought he was a good worker and was very supportive

9   of hiring him.

10       Q.  Were you on the hiring committee?

11       A.  I don't recall, but I don't think so.

12       Q.  So did it come to your attention that Leon

13  Briggs was hired for a position in Mac?

14       A.  Yes.

15       Q.  Did it come to your attention that Mr. Briggs

16  had no prior experience with Mac?

17       A.  Yes.

18       Q.  How did you know that?

19       A.  I don't remember.

20       Q.  When Kathy confided in you, she confided in you

21  having trouble with Briggs, did she tell you that she

22  had gone to HR?

23       A.  Yes.

**SUPA-0250**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                41

1    Q.   Did she tell you that HR wasn't helpful?

2    A.   I don't remember.

3    Q.   Did she tell you she had gone to Mr. Duffy?

4    A.   Yes.

5    Q.   Did she tell you that Mr. Duffy wasn't helpful?

6    A.   No.

7    Q.   Did she ever tell you that based on her

8    experiences that she believed that the IT department was

9    not receptive to women in leadership positions?

10   A.   Can you say that again?

11   Q.   I'll try it another way.  Did she tell you that

12   she felt that she was being mistreated because she was a

13   woman?

14   A.   I don't believe so.

15   Q.   Did she tell you that she felt that she was

16   talked down to by Mr. Marcotte, Mr. Forbes, and

17   Mr. Bailey?

18   A.   Yes.

19   Q.   And did she tell you that she believed that a

20   man's word was always taken over a woman's at the

21   directors' meetings?

22   A.   Did she tell me that?

23   Q.   Yes, whether she told you that.

**SUPA-0251**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                          42

1        A.    I don't recall that.

2        Q.    Were you ever interviewed by Diane Pfadenhauer,

3   an investigator, in connection with Leon Briggs or Kathy

4   Kinnin?

5        A.    Yes.

6        Q.    And what issues did she focus on when she

7   interviewed you?

8        A.    That's so broad.  I don't really remember

9   specifically.

10       Q.    Did you tell her that Tom Marcotte treated

11  Kathy Kinnin differently than he treated you, as you've

12  just testified here today?

13            MR. BILLOK:  Objection to form.  You can

14            answer.

15       A.    I would say it's likely that I did.

16       Q.    Did you have any observations of how Kathy

17  Kinnin treated Leon Briggs?

18       A.    No.

19       Q.    Did you relate to the investigator the way you

20  felt treated by Mike Forbes, as you have testified here

21  today?

22       A.    I think it's highly likely.

23       Q.    Did the investigator ask you whether you felt

**SUPA-0252**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                    43

1    that at directors' meetings your opinions didn't matter

2    because you were a woman?

3          A.   No.

4          Q.   She didn't ask you that?

5          A.   Did she ask me that?  I don't remember.

6          Q.   Okay.  Did you tell her that the difficulties

7    you experienced you didn't personally believe they were

8    because you were a female?

9                MR. BILLOK:  Objection; vague.  You can

10               answer.

11         A.   I'm not sure I understand the question.

12         Q.   When you talked to the investigator did you

13   relate some of the problems that you had had working as

14   a manager in the IT department at Skidmore?

15         A.   Yes.

16         Q.   Did you tell her that notwithstanding that

17   those problems involved men you didn't feel it was

18   because you were a woman?

19         A.   Can you rephrase that?

20         Q.   Did you feel that any of the problems that you

21   experienced as a manager at Skidmore was because you

22   were female?

23         A.   Yes.

**SUPA-0253**

(David Mayo, CM 518-495-9312)

(Beth DuPont) 44

1    Q.   Did you tell that to the investigator?

2    A.   Yes.

3    Q.   What did you tell her that you experienced at

4  Skidmore that indicated that you believed those

5  difficulties were because you were a female?

6    A.   I believe I told her about the problems I had,

7  the challenges that I had, when I was directing media

8  services and one of the employees there was very

9  disrespectful, very antagonistic.

10    Q.   Who was that?

11    A.   Steve Dinyer.  And I did not feel supported by

12  my CTO at the time, Justin Sipher.  And I'm fairly

13  certain I probably told her they resolved that problem

14  by splitting academic technologies off with media

15  services and putting Hunt back in charge with that

16  group.  I had gone through the same thing with HR with

17  Steve Dinyer about document, document, document.

18         The thing that strikes me most at the time

19  was that Alena would always tell me, "Oh, that's just

20  Steve."  It was a very difficult time for me.

21    Q.   For you, dealing with Mr. Dinyer?

22    A.   Yes.

23    Q.   And did Kathy Kinnin talk to you about any

**SUPA-0254**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                        45

1    problems that she had had with Steve Dinyer?

2        A.   I can't remember.

3        Q.   Now we're going to take a look at some

4    documents here.  You will see in our binder there is a

5    tab that says "DuPont."

6                MR. STECK:  I'm going to take a quick

7                bathroom break.  I'll be right back.

8                (A recess was taken in the proceedings.)

9                (The proceedings were reconvened as

10               follows:)

11   BY MR. STECK:

12       Q.   Let's start at the beginning.  These don't have

13   Bates stamped numbers, so we're going to have to

14   identify them.  They are in the binder.  Let's start

15   with a series of emails.  The first one in our binder is

16   dated April 19, 2018.  Would you take a few minutes and

17   look those over?  You have the reading glasses on now.

18       A.   Yes.

19       Q.   I need mine.  I think they would be a lot

20   better than the trifocals because of the mask.

21       A.   Is it under my tab?

22       Q.   Under your tab.  There is a series of emails

23   there.  First of all, do you recognize this email

**SUPA-0255**

(Beth DuPont)                                                    46

1    exchange?

2         A.   Yes.

3         Q.   And what was the subject matter, generally, of

4    this email exchange?

5         A.   I'm going to have to look at it.

6         Q.   That's what I thought.  It will take a little

7    time.  Okay.

8              (The documents are perused by the

9              witness.)

10        A.   Okay.  I remember this now.

11        Q.   How would you describe this email exchange?

12   What was it about?

13        A.   Well, it was about relocating one classroom

14   that had specific technologies in it that faculty were

15   using and moving it into a different location.  I did

16   the research with the faculty on what they needed in

17   that space, and they still wanted to use some kind of a

18   white board --

19        Q.   Who is "they"?

20        A.   Faculty.

21        Q.   Yes.

22        A.   Smart type technology in there.  They were used

23   to that and they wanted to continue using that.  Then

**SUPA-0256**

(Beth DuPont)                                                    47

1   there was pushback from Mike.

2        Q.   Mike Forbes?

3        A.   Mike Forbes, about the equipment.  And it was

4   his opinion we should move away from smart boards,

5   although it was my understanding, and it still is, that

6   our education studies department still uses smart board

7   technology because that's what they're teaching students

8   to go out and use in the classroom.

9        Q.   And they are also familiar with it?

10       A.   Um-hmm.

11       Q.   Yes?

12       A.   Yes.

13       Q.   And it would cost money to replace it; correct?

14       A.   Yes, it would cost money to replace it.  Yes.

15       Q.   And you had been, in fact, working with smart

16   board technology for a very long time; is that correct?

17       A.   Yes.

18       Q.   Were you the most knowledgeable person in IT

19   about smart board technology?

20       A.   No.  I would say Kelly was a little more

21   practiced in it.

22       Q.   But she was in your department?

23       A.   Yes.

**SUPA-0257**

(Beth DuPont) 48

1    Q.  Working underneath you; correct?

2    A.  Yes.

3    Q.  Did Mr. Marcotte inject himself into this

4    conversation?

5    A.  Yes.

6    Q.  This was an issue really between your

7    department and Mr. Forbes.  How did Mr. Marcotte come to

8    be in this conversation?

9    A.  I can only interpret that Mike copied Tom in.

10   Q.  Did he copy him in as a bcc?

11   A.  No.  No.  By saying copied him in, I think that

12   Mike, after the exchange, where I suggested that --

13   well, his plan was to recycle it because it was dated.

14   I had suggested that I could see if the education

15   studies department had a space for it because they could

16   still use it even though it was old.

17   Q.  Smart boards?

18   A.  Yes.

19   Q.  Okay.

20   A.  And then it appears to me that on the 19th,

21   that 11:59 message that Mike sent, either he bcc'd Tom

22   in it or he forwarded him the exchange and that's how

23   Tom jumped into the conversation.

**SUPA 0258**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                49

1      Q.   What was Marcotte's experience with smart

2   boards, to your knowledge?

3      A.   He had no experience with smart boards.

4      Q.   Was he basically taking Mr. Forbes' word for

5   it?

6            MR. BILLOK:   Objection to form.   You can

7            answer.

8      Q.   Do you understand the question?

9      A.   I -- (pause).

10     Q.   Let me rephrase it.   Did you understand

11  Mr. Marcotte to be taking Mr. Forbes' word over your

12  word or opinion as to what the correct approach was?

13     A.   Yes.

14     Q.   Now let's go on to the next one.   Why don't you

15  take a look?   This is an email that begins "Beth DuPont.

16  Subject:   Re stuff.   December 1, 2017.   To Kathy

17  Kinnin."

18     A.   Which date?

19     Q.   At the top, December 1, 2017.   Why don't you

20  take a look at this?

21            (The documents are perused by the

22            witness.)

23     Q.   It's only one page.   Maybe I'm mistaken.   The

**SUPA-0259**

(Beth DuPont)                                                    50

1    other ones are very faint.

2         A.   I'm just reading through what I sent Bill and

3    Tom.

4         Q.   Okay.  I'm sorry.

5              (The witness continues to peruse the

6              documents.)

7         A.   Okay.

8         Q.   Is this an email exchange in which you related

9    to Mr. Marcotte an issue you were having with Mike

10   Forbes?

11        A.   Yes.

12        Q.   And Marcotte replied that -- let's put it this

13   way.  Did Marcotte defend Forbes' position?

14        A.   Yes.

15        Q.   Did you feel that Mr. Forbes was interfering

16   with your job duties?

17        A.   Yes.

18        Q.   Did you tell Mr. Marcotte that?

19        A.   Yes.

20        Q.   And what was his position, if any, on your

21   concern?

22        A.   He just bounced it back to me to talk to Mike.

23        Q.   Why did you feel that Mr. Forbes was

**SUPA-0260**

(David Mayo, CM 518-495-9312)

1   interfering with your areas of responsibility?

2       A.   Because my group had been working with user

3   services on implementing technologies for projecting

4   mobile devices and we were using the Apple TV.  Mike was

5   adamant that he did not agree with the Apple TV approach

6   because it was a consumer product.  So Mike was looking

7   at all these other options that were, I felt, overkill

8   to solve the problem.

9       Q.   What does an Apple TV cost?

10      A.   $99.

11      Q.   I noted on here that you had emailed Kathy at

12  her personal email, ME.com, which I believe that was a

13  personal email; correct, not a Skidmore email; is that

14  right?

15      A.   Yes.

16      Q.   Why did you email her at her personal email?

17      A.   This was right after Mike got hired.  I didn't

18  trust the decision that was made or the process that was

19  gone through.  It was more out of a lack of trust and

20  feeling like this should be a conversation to have

21  outside of Skidmore email with Kathy.

22      Q.   It's an example of confiding in each other;

23  correct?

**SUPA-0261**

(Beth DuPont)                                              52

1      A.   Yes.

2      Q.   Let's go on to the next series.  The subject is

3  "re areas of intersection with media services," dated

4  November 21, 2017.  The first email on the top of the

5  page is from you to Kathy.  I'll let you review the

6  emails after I ask the question.  We'll do it a little

7  differently.

8           Is this another example of you voicing

9  your current concern that Mr. Forbes was doing things

10  that was within the purview of your department?

11      A.   I'll have to look.

12      Q.   Take a look.  And if you need the question read

13  back, Dave can do that.

14      A.   All right.

15           (The documents are perused by the

16           witness.)

17      A.   Okay.

18           MR. STECK:  Can you read the question

19           back, Dave?

20           (The reporter read back the previous

21           question.)

22      A.   Yes.

23      Q.   And during this time was Mr. Marcotte mentoring

1    Mr. Forbes?

2        A.   Yes.

3        Q.   Now, let's look at the next one.  This is a

4    one-pager.  Do you recognize this email?  This is an

5    email, "media services candidate interviews," Monday,

6    October 16, 2017, from Beth DuPont to Kathy Kinnin?

7        A.   Yes.

8        Q.   You testified previously about your concerns

9    concerning the interview process regarding director of

10   media services; correct?

11       A.   Yes.

12       Q.   And in this email you are expressing that

13   concern; is that correct?

14       A.   Yes.

15       Q.   And what was HR's role in the hiring process

16   for media services director?

17       A.   I don't know.

18       Q.   Did it seem to you that they weren't involved?

19       A.   I don't know.  The process just -- (pause).

20       Q.   Happened?

21       A.   Yeah.

22       Q.   So the process just happened; correct?

23       A.   Yes.

SUPA-0263

(Beth DuPont)                                          54

1       Q.   Did you have any communications with HR about

2   the process?

3       A.   I don't remember.

4       Q.   And let's look at the last one.  It's only two

5   pages.  This is a subject "for your eyes only," Friday,

6   September 22, 2017, from Beth DuPont to Kathy Kinnin,

7   telling Kathy what you had forwarded to Bill Duffy.  Why

8   don't you take a minute and read what it was that you

9   had said to Bill Duffy?

10                  (The documents are perused by the

11                  witness.)

12      A.   Okay.

13      Q.   Who was Randy?

14      A.   Randy was kind of an administrative assistant

15  for technical services at the time, although when he was

16  let go I think he had been moved to doing some card

17  access stuff.

18      Q.   What's card access?

19      A.   Card swipe blocks on campus.

20      Q.   You say that there is low morale.  Where was

21  there low morale?

22      A.   In my department, because a lot of people were

23  questioning -- you know, all of a sudden Randy is gone.

**SUPA 0264**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                          55

1    I think it was kind of riding that wave of when we had

2    some problems in enterprise with someone there who had

3    been embezzling.

4        Q.   Who was that?  Someone in enterprise was

5    embezzling, you said?

6        A.   Yes.

7        Q.   It wasn't the director?

8        A.   No, but then the director got let go because he

9    wasn't keeping an eye on it.

10       Q.   What was his name?

11       A.   Cliff Williams.  Jeff Clark.

12       Q.   Was the embezzler?

13       A.   Cliff Williams was the one that was.

14       Q.   The embezzler.  And Jeff Clark?

15       A.   Was his director.

16       Q.   Was he replaced by Mr. Crieder?

17       A.   Yes.  So there were all these things happening.

18   Then, all of a sudden, getting this announcement that

19   Randy was let go.  It stirs up staff when they don't

20   know what's going on.  This was around the same time

21   that the interviews were going on we talked about.  Mike

22   had already been promoted.

23       Q.   He had just been promoted; is that correct?

**SUPA-0265**

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                    56

1      A.   Yes.  So there was a lot of confusion and

2  conspiracy theory floating around about that.  People

3  were just rattled and didn't know what was going on

4  because in previous years leadership was a lot more,

5  like I said, a lot more transparent and a lot more input

6  from other people on the team.

7      Q.   And who was Randy's supervisor?

8      A.   Tim Casey, who had retired -- no.  No.  Tim

9  retired before that.  So it must have been Mark Bauer.

10     Q.   What was Mark Bauer's position?

11     A.   The director of technical services.

12     Q.   Was he part of IT?

13     A.   Yes.

14     Q.   Who was pushing for Randy's dismissal?

15     A.   I couldn't really say that somebody was pushing

16  for it.  I think there was frustration that the job

17  wasn't well aligned with Randy's ability.

18     Q.   Nonetheless, you expressed some warm feelings

19  for Randy in this email; is that correct?

20     A.   Yes.  He had been at Skidmore a long time.

21     Q.   In your opinion, could another position have

22  been found for him?

23     A.   Possibly.

**SUPA-0266**

(David Mayo, CM 518-495-9312)

1      Q.   All right.  So at this point in time,

2   September 22, 2017, did you consider Mr. Marcotte your

3   supervisor at that time or was it Bill Duffy?

4      A.   Bill.

5      Q.   Did you consider Mr. Marcotte your superior at

6   that time or someone on an equal level to you?

7      A.   That's confusing because I considered him a

8   peer, on the same director level as me.  I'm not sure

9   the timing there when he actually was promoted to the

10   assistant CTO because that was never announced, that I'm

11   aware of.  It just kind of happened.  I still always

12   considered, and I think Bill did, as well, that he was

13   my supervisor.

14      Q.   Bill was?

15      A.   Yes.  And then Tom was supervising more of the

16   user services and the media services and that kind of

17   stuff.

18      Q.   Why would your position be different than the

19   other directors?

20      A.   I have a dotted line to the dean of faculty, as

21   well, to keep that connection with the academic side and

22   try and build a bridge between IT and academic affairs.

23   And so that's why I reported to Bill, so that he was

SUPA-0267

(David Mayo, CM 518-495-9312)

(Beth DuPont)                                                    58

1    involved in that piece, as well.  That was my

2    understanding.

3         Q.  You attended the directors' meetings; correct?

4         A.  Yes.

5         Q.  And you felt that you were an equal of

6    Mr. Marcotte at that time; is that correct?

7         A.  Yes.

8         Q.  In the last line of this you say that you don't

9    believe that he would reply to your email.  Is that

10   because he was having some personal issues that you

11   allude to at that time?  He was taking some sort of bad

12   trip or something.  Is that why you didn't think he

13   would respond to your email?

14        A.  I believe at this time he was out in Oregon

15   dealing with some family issues.

16        Q.  Did you ever have the meeting that you had

17   requested with him?

18        A.  He and I met regularly.

19        Q.  So you just met regularly?

20        A.  Yes.

21             MR. STECK:  (To Ms. Kinnin)  Do you have

22             any questions?

23             (Mr. Steck and Ms. Kinnin confer.)

SUPA-0268

(Beth DuPont)                                          59

BY MR. STECK:

    Q.  The Ben and Alex situation, was Mr. Marcotte involved in that at all?

    A.  No.  Bill was.  Bill helped me resolve that.

    Q.  How did you find out that Tom Marcotte had become assistant chief technology officer?  If it wasn't announced, how did you find out?

    A.  I don't know.  I think maybe in one of my conversations with Kathy.  She might have pointed out to me the name was changed outside the door.

    Q.  Did anyone ever explain to you what the specific duties of assistant chief technology officer were?

    A.  No.

    Q.  Did Mr. Duffy?

    A.  No.

    Q.  Did anyone tell you that Mr. Marcotte was specifically supervising anyone?

    A.  No.  Not with that much clarity, no.

    Q.  And did it appear to you that Mr. Marcotte was helping Mr. Duffy as needed in the IT department?

    A.  Yes.

        MR. STECK:  I don't have any other

SUPA-0269

(Beth DuPont)                                              60

1          questions.

2                    MR. BILLOK:  I have no questions.

3                    (The examination in the above-entitled

4          matter was concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1    STATE OF                 )

2    COUNTY OF                )  ss.:

3

4

5            I have (heard) read the foregoing record

6    of my testimony taken at the time and place noted in the

7    heading thereof and do hereby acknowledge it to be a

8    true and correct transcript of the same.

9

10           _____

11           BETH DuPONT

12

13

14

15   Sworn to before me this

16   ____ day of _____, 2020

17

18

19   _____

20   Notary Public

21

22

23
```

**SUPA-0271**

62

1

2

3

4                    C E R T I F I C A T E

5

6

7          I, David Mayo, a court reporter and notary

8    public, do hereby certify that the foregoing is a true

9    and accurate transcript of the proceedings reported

10   stenographically by me in the above matter.

11

12       Dated: ___8-3-20_____

13

14                    _____

15

16

17

18

19

20

21

22

23

**SUPA-0272**

(David Mayo, CM 518-495-9312)

63

1    I,_____, have read the transcript of

2    my testimony and would like the following changes:

3    PAGE   *   LINE   *   CHANGE FROM   *   CHANGE TO

4    _____*_____*_____*_____

5

6    _____*_____*_____*_____

7

8    _____*_____*_____*_____

9

10    _____*_____*_____*_____

11

12    _____*_____*_____*_____

13

14    _____*_____*_____*_____

15

16    _____*_____*_____*_____

17

18    _____*_____*_____*_____

19

20    Subscribed to and sworn to before me
       this ___ day of _____ 2020

21

22    _____               _____

23    Notary Public                   Signature

SUPA-0273